ACCEPTED
01-15-00937-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12/2/2015 6:38:02 PM
CHRISTOPHER PRINE
CLERK

# CASE NO. 01-15-00937-CV
## IN THE FIRST COURT OF APPEALS
### HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

12/2/2015 6:38:02 PM

CHRISTOPHER A. PRINE
Clerk

**LIANG "BENNY" ZHAO**,

*Defendant-Appellant,*

v.

**XO ENERGY, LLC,** and **XO ENERGY WORLDWIDE, LLLP**,

*Plaintiffs-Appellees.*

ON ACCELERATED INTERLOCUTORY APPEAL FROM
THE OCTOBER 29, 2015, PRELIMINARY INJUNCTION ISSUED BY
THE 240th JUDICIAL DISTRICT COURT OF FORT BEND COUNTY, TEXAS
CAUSE NO. 15-DCV-226436
THE HONORABLE CHAD BRIDGES, PRESIDING

## OPENING BRIEF OF DEFENDANT-APPELLANT LIANG "BENNY" ZHAO

STURM LAW, PLLC

Charles A. Sturm
Texas Bar # 24003020
csturm@sturmlegal.com
Shannon A. Lang
Texas Bar # 24070103
slang@sturmlegal.com
723 Main Street, Suite 330
Houston, Texas 77002
(713) 955-1800 tel.
(713) 955-1078 fax

*Attorneys for Defendant-Appellant*
*Liang "Benny" Zhao*

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.1(a), Defendant-Appellant identifies the following parties to the trial court order from which this appeal is taken and each party's trial and appellate counsel:

**Liang "Benny" Zhao**
*Defendant-Appellant*

Charles A. Sturm
Shannon A. Lang
STURM LAW, PLLC
723 Main Street, Suite 330
Houston, Texas 77002

*Trial and Appellate Counsel for Defendant-Appellant*
*Liang "Benny" Zhao*

**XO Energy LLC**
**XO Energy Worldwide, LLLP**
*Plaintiffs-Appellees*

Tom Van Arsdel*
Zachary B. Allie**
James Bernhardt***
WINSTEAD PC
1100 JPMorgan Chase Tower
600 Travis Street
Houston, Texas 77002

*Counsel for Plaintiffs-Appellees XO Energy LLC and*
*XO Energy Worldwide, LLLP*

\*      *Trial and appellate counsel*
\*\*     *Trial counsel only through November 18, 2015*
\*\*\*    *Trial counsel as of November 18, 2015*

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL.......................................................... i

TABLE OF CONTENTS ................................................................................. ii

INDEX OF AUTHORITIES............................................................................ iv

I.    STATEMENT OF THE CASE ...............................................................1

II.   STATEMENT REGARDING ORAL ARGUMENT ..............................2

III.  ISSUE PRESENTED .............................................................................3

IV.  STATEMENT OF FACTS ......................................................................4

      A.   The Wholesale Electricity Markets and the XO Entities.........................4
      B.   Dr. Zhao's Employment Agreement with Worldwide. ...........................5
      C.   Dr. Zhao's Employment with Worldwide. ...........................................8
      D.   FERC Commences an Investigation into XO's Trading Practices..........9
      E.   Dr. Zhao's Resignation from Worldwide. .............................................10
      F.   The Federal Lawsuit. .............................................................................14
      G.   The State Court Lawsuit. ........................................................................16
      H.   The Temporary Injunction Hearing. ......................................................16
      I.   The de novo Temporary Injunction Hearing. ........................................20

V.   SUMMARY OF THE ARGUMENT...................................................22

VI.  ARGUMENT...........................................................................................24

      A.   Standard of Law.....................................................................................24
          1.   *Temporary Injunction*.................................................................26
          2.   *Writ of Attachment.* ...................................................................30
          3.   *The Court's "Inherent Authority" to Attach Assets*......................33

      B.   Analysis..................................................................................................35
          1.   *The Trial Court Abused its Discretion in Issuing a Temporary Injunction over Dr. Zhao's Income.* ..........................37
              a.   XO did not establish a probable right to recovery. ................37
              b.   XO did not establish a "probable, imminent, and irreparable" injury. .................................................................41
          2.   *XO is Not Entitled to a Writ of Attachment.*..................................46

3. *The Trial Court Abused its Discretion in Exercising "Inherent  Discretion" to Order Dr. Zhao to Deposit his 2014 Bonus with the  Registry of the Court.* ...................................48

**VII.  PRAYER** ........................................................................49

**CERTIFICATE OF SERVICE** ...........................................................51

**CERTIFICATE OF COMPLIANCE** ............................................................52

# INDEX OF AUTHORITIES

**CASES**

*Alliance Royalties, LLC v. Booth*,
  313 S.W.3d 493 (Tex. App.—Dallas 2010, no pet.)................................ 33, 34, 48

*Baca v. Hoover, Bax & Shearer*,
  No. A14-88-00418-CV, 1989 Tex. App. LEXIS 456
  (Tex. App.—Houston [14th Dist.] March 9, 1989, no writ) ........................ 25, 27

*Baker v. Int'l Record Syndicate, Inc.*,
  812 S.W.2d 53 (Tex. App.—Dallas 1991, no writ) ..............................................31

*Ballenger v. Ballenger*,
  694 S.W.2d 72 (Tex. App.—Corpus Christi 1985, no writ) ......................... 28, 29

*Behringer Harvard Royal Island, LLC v. Skokos*,
  No. 05-09-00332-CV, 2009 Tex. App. LEXIS 9456
  (Tex. App.—Dallas Dec. 14, 2009, no pet. ............................................. 33, 34, 49

*Berry v. Chase Home Fin. LLC*,
  No. C-09-116, 2010 U.S. Dist. LEXIS 12531 (S.D. Tex. Feb. 12, 2010) ...........34

*BMG Direct Mktg. v. Peake*, 178 S.W.3d 763 (Tex. 2005)............................. 31, 46

*Butnaru v. Ford Motor Co.*, 84 S.W.3d 198 (Tex. 2002)........................................26

*Camp Mystic, Inc. v. Eastland*,
  399 S.W.3d 266 (Tex. App.—San Antonio 2012, no pet.) .......................... 28, 29

*Castilleja v. Camero*, 414 S.W.2d 424 (Tex. 1967) ..............................................34

*Castilleja v. Camero*, 414 S.W.2d 431 (Tex. 1967) ........................................ 25, 34

*Chin Tuo Chen v. Braxton*,
  No. 06-09-00088-CV, 2010 Tex. App. LEXIS 171
  (Tex. App.—Texarkana Jan. 13, 2010, pet. denied) ..........................................29

*De Beers Consol. Mines v. United States*, 325 U.S. 212 (1945) .............................29

*E.E. Maxwell Co. v. Arti Décor, Ltd.*,
  638 F. Supp. 749 (N.D. Tex. 1986) ........................................................ 30, 31, 46

*El Paso Nat'l Bank v. Fuchs*, 34 S.W. 206 (1896) ...................................................31

*Ex parte Preston*, 347 S.W.2d 938 (Tex. 1961) .......................................................33

*Forrest Prop. Mgmt. v. Forrest*,
  No. 10-09-00338-CV, 2010 Tex. App. LEXIS 5863
  (Tex. App.—Waco July 21, 2010, no pet.) .......................................................24

*Fox v. Tropical Warehouses, Inc.*,
  121 S.W.3d 853 (Tex. App.—Ft. Worth 2003, no pet.).............................. 25, 29

*Harmon v. Daggett*,
  No. B14-88-00103-CV, 1988 Tex. App. LEXIS 2006
  (Tex. App.—Houston [14th Dist.] Aug. 11, 1988, no pet.) ...............................34

*Harper v. Powell*,
  821 S.W.2d 456 (Tex. App.—Corpus Christi 1992, no pet.).............................27

*In re Argyll Equities, LLC*,
  227 S.W.3d 268 (Tex. App.—San Antonio 2007, no pet.) ............... 24, 30, 32, 46

*In re Bays*, 355 S.W.3d 715 (Tex. App.—Ft. Worth 2011, no pet.).......................33

*In re Deponte Invs., Inc.*,
  No. 05-04-01781-CV, 2005 Tex. App. LEXIS 898
  (Tex. App.—Dallas, Feb. 3, 2005, no pet.) ........................................... 25, 28, 29

*In re Reveille Res. (Texas), Inc.*,
  347 S.W.3d 301 (Tex. App.—San Antonio 2011, no pet.) .......................... 25, 32

*In re Tex. Natural Res. Conservation Comm'n*, 85 S.W.3d 201 (Tex. 2002) ........24

*In re Wakefield*,
  No. 14-10-01160-CV, 2010 Tex. App. LEXIS 9922
  (Tex. App.—Houston [14th Dist.] Dec. 15, 2010, no pet.)................................34

*Law v. William Marsh Rice Univ.*,
  123 S.W.3d 786 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ..............30

*Manheim v. Adam Dev. Props., L.P.*,
   No. 10-09-00259-CV, 2009 Tex. App. LEXIS 9824
   (Tex. App.—Waco Dec. 30, 2009, no pet.)................................ 27, 43, 44

*N. Cypress Med. Ctr. Operating Co. v. St. Laurent*,
   296 S.W.3d 171 (Tex. App.—Houston [14th Dist.] 2009, no pet.) .....................24

*Nowak v. Los Patios Investors*,
   898 S.W.2d 9 (Tex. App.—San Antonio 1995, no pet.) ................................ 28, 29

*Nueva Generacion Music Group, Inc. v. Espinoza*,
   __ S.W.3d __, 2015 Tex. App. LEXIS 7958
   (Tex. App.—Houston [1st Dist.], July 30, 2015, pet. filed).............. 26, 41, 42, 43

*Reyes v. Burrus*, 411 S.W.3d 921 (Tex. App.—El Paso 2013, pet. denied) ...........29

*Rogers v. Daniel Oil & Royalty Co.*, 130 Tex. 386 (1937) .....................................26

*Rushlake Hotels (USA) v. Hyatt Corp.*,
   No. 01-94-00827-CV, 1994 Tex. App. LEXIS 3140
   (Tex. App.—Houston [1st Dist.] Dec. 22, 1994, no pet.) .....................................30

*S.R.S. World Wheels v. Wnlow*,
   946 S.W.2d 574 (Tex. App.—Ft. Worth 1997, no pet.)................................ 30, 32

*Shor v. Pelican Oil & Gas Mgmt., LLC*,
   405 S.W.3d 737 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).................27

*State v. Sw. Bell. Tel. Co.*, 526 S.W.2d 526 (Tex. 1975)..........................................28

*Tel. Equip. Network v. Ta/Westchase Place*,
   80 S.W.3d 601 (Tex. App.—Houston [1st Dist.] 2002, no pet.).........................25

*Victory Drilling, LLC v. Kaler Energy Corp.*,
   No. 04-07-000094-CV, 2007 Tex. App. LEXIS 4966
   (Tex. App.—San Antonio June 27, 2007, no pet.)................................. 26, 28, 29

*Walling v. Metcalfe*, 863 S.W.2d 56 (Tex. 1993) ............................................. 26, 27

*Wash. DC Party Shuttle, LLC v. iGuide Tours, LLC*,
   406 S.W.3d 723 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ....... 25, 29

*World Football League v. Dallas Cowboys Football Club, Inc.*,
513 S.W.2d 102 (Tex. App.—Dallas 1974, writ ref'd n.r.e.)................................25

**STATUTES**

TEX. BUS. & COM. CODE § 2.718(a) ........................................................................31
TEX. CIV. PRAC. & REM. CODE § 61.001................................................................30
TEX. CIV. PRAC. & REM. CODE § 61.002................................................................32
TEX. CIV. PRAC. & REM. CODE § 61.005................................................................31

# I.    STATEMENT OF THE CASE

This case is, in relevant part, a suit for damages and injunctive relief concerning the alleged breach of confidentiality and non-compete provisions of an employment agreement.  1.CR.5–20.  This accelerated interlocutory appeal is from the issuance of a Temporary Injunction by the Honorable Chad Bridges of the 240th Judicial District Court of Fort Bend County, Texas, requiring that Defendant-Appellant deposit into the Registry of the Court, where it is to stay during the pendency of the case, the total sum of money damages sought by Plaintiffs-Appellees.  3.CR.620–23.

## II.    STATEMENT REGARDING ORAL ARGUMENT

Despite the weight of settled case law disallowing the issuance of prejudgment relief attaching Defendant-Appellant's income in advance of final judgment, the Trial Court issued a temporary injunction requiring that Defendant-Appellant deposit with the Registry of the Court, during the pendency of litigation, the sum of money damages sought by Plaintiffs-Appellees in their breach of contract and breach of fiduciary duty case.  The Trial Court's Order effects an unwarranted extension of long-standing Texas law.  Defendant-Appellant believes oral argument would be beneficial to enable the Court to fully explore the novel ruling of the Trial Court and its implications on Texas residents.

## III.   ISSUE PRESENTED

Whether the Trial Court erred in issuing a prejudgment, temporary injunction requiring that Defendant-Appellant deposit into the Registry of the Court, during the pendency of the lawsuit, the total sum of money sought by Plaintiffs-Appellees as money damages for their breach of contract and breach of fiduciary duty claims.

## IV.  STATEMENT OF FACTS

### A.    The Wholesale Electricity Markets and the XO Entities.

Electricity is a commodity traded on a variety of wholesale electricity markets that exist in the United States and elsewhere.  1.CR.216–217.  Various trading strategies and methodologies are employed by traders who buy and resell electricity among power generators, retailers, and financial intermediaries.  1.CR.217–218.  These markets are governed by federal regulations enacted by the Federal Energy Regulatory Commission ("FERC"), various state agencies, and market operators.  1.CR.218–219.  Because of the ways in which trades are effectuated, opportunities exist for an unscrupulous trader to manipulate the markets for her personal gain.  1.CR.218.  Thus, several markets utilize rules, such as the so-called "Settlement Rule," that require that traders disgorge profits under certain circumstances to discourage and penalize improper trading activities.  1.CR.218.

Beginning in or around 2011, Shawn Sheehan began establishing a series of entities to trade on wholesale electricity markets in the Unites States and/or to provide services to trading entities.  1.CR.219.  Among these are Plaintiffs-Appellees XO Energy LLC ("XOE") and XO Energy Worldwide, LLLP ("Worldwide") (collectively, "XO"), which provide various administrative and technical services to entities and individuals engaged in wholesale electricity

4

trading market. 1.CR.219. XOE, for a monthly fee, provides "technology and professional" services to Worldwide, including "executive management and administration, product marketing and sales, information support and technology services, centralized purchasing, engineering, procurement and logistics, cost financing, customer support, test engineering, and/or quality control and product warranty." 1.CR.219–220. Worldwide is a technology company "in the business of providing software services and support," to other Sheehan-related trading entities. 1.CR.219–220; 2.CR.299 & 301; 2.RR.26 & 60.

**B.     Dr. Zhao's Employment Agreement with Worldwide.**

In December 2012, Defendant-Appellant Dr. Liang "Benny" Zhao commenced employment as a Transmission/Congestion Analyst with Worldwide. 1.CR.7 & 220. Dr. Zhao was to be paid a "Base Salary" of $125,000 per year and participate in the company's "discretionary employee incentive program." 1.CR.7 & 23 & 220. As a condition of his employment, Dr. Zhao was required to spend half his working time in St. Thomas, U.S. Virgin Islands. 1.CR.11 & 23 & 220. He was otherwise permitted to work remotely from his home in Katy, Texas, and was provided hardware, software, and supplies from Worldwide to facilitate his work. 1.CR.220.

Dr. Zhao's employment with Worldwide was also contingent upon his execution of an "Employment Agreement" drafted by the company, the "main

5

intent" of which was to "protect the intellectual property" of the technology company. 1.CR.7 & 220. However, in addition to provisions directed to protection of Worldwide's software and other technology, the Agreement contained a variety of provisions setting forth the terms of Dr. Zhao's employment with the company. 1.CR.25–32; 2.CR.272–279.

For example, the Employment Agreement provides that Dr. Zhao would be employed by Worldwide and expected to "perform such duties as may be assigned from time to time" by Worldwide's managers. 1.CR.25; 2.CR.272. In addition to his Base Salary, the Agreement provides that Dr. Zhao "may be awarded certain incentive compensation (Profits Share)" at Worldwide's discretion and that Worldwide "shall evaluate" whether Dr. Zhao would be awarded such "share of profits" "[a]t the end of each calendar year." 1.CR.25; 2.CR.272.

The Employment Agreement includes a "Non-Competition" provision which, in relevant part, purports to prohibit Dr. Zhao, for two years following his separation from Worldwide, from "[being] engaged, directly or indirectly, . . . or attempting to become engaged in a business that competes with the business of [Worldwide] or any of its subsidiaries or affiliates as it relates to [Worldwide's] business . . . ." 1.CR.26; 2.CR.273.

The Employment Agreement includes a "Confidentiality" provision that

provides that Dr. Zhao "shall not, directly or indirectly, disclose to anyone, or use in competition with [Worldwide] or any of its subsidiaries or affiliates, any Confidential Information of or pertaining to [Worldwide]," with "Confidential Information" defined as "confidential or other proprietary information that is owned by [Worldwide] or any of its subsidiaries or affiliates . . . ." 1.CR.28; 2.CR.275.

In the event of a breach of the intellectual property or Non-Competition provisions of the Employment Agreement, Dr. Zhao's termination for "Cause," or his resignation without "Good Reason," the Employment Agreement provides that Dr. Zhao "shall automatically forfeit any and all rights to any deferred Bonuses or other deferred incentive compensation (including without limitation any options relating to equity in [Worldwide] or its affiliates), and any grant by [Worldwide] of such remuneration shall be automatically void." 1.CR.27; 2.CR.274.

"Cause" for termination under the Employment Agreement is strictly defined as "(i) [Dr. Zhao's] willful and continued failure to perform and to discharge his . . . duties and responsibilities under [the Employment] Agreement for any reason (other than [Dr. Zhao's] disability) after (x) [Worldwide] has provided [Dr. Zhao] with written notice of its intent to terminate his employment under this clause, and (y) [Dr. Zhao] has failed to resume the performance of such duties within fifteen (15) days following receipt of such notice; (ii) any other

7

willful misconduct by [Dr. Zhao] that is materially and demonstrably injurious economically to [Worldwide]; (iii) [Dr. Zhao's] final conviction of any felony or any misdemeanor involving moral turpitude; or (iv) [Dr. Zhao's] violation of any of the provisions of Section 5 of this Agreement [which includes the intellectual property and Non-Competition provisions, but not the Confidentiality provisions, of the Employment Agreement]." 1.CR.28; 2.CR.275.

### C. Dr. Zhao's Employment with Worldwide.

Upon commencement of employment with Worldwide, Dr. Zhao was tasked with trading electricity on the "CAISO" market, which covers California and parts of Nevada. 1.CR.223. Dr. Zhao had never before worked in energy trading. 1.CR.223. Accordingly, his trading activities were closely directed and supervised by Worldwide's other employee trading in the CAISO market, Neil Huber. 1.CR.223. Throughout his employment, Dr. Zhao traveled regularly to St. Thomas, where Worldwide is located, and Landenberg, Pennsylvania, where XOE operates, and was in constant contact with his co-workers, and in particular, Mr. Huber, when he was working from Texas. 1.CR.224.

Dr. Zhao was a valuable, productive, and very profitable employee. He earned a bonus in excess of $260,000 in his first year with Worldwide and in excess of $800,000 his second year with Worldwide. 1.CR.224.

8

**D. FERC Commences an Investigation into XO's Trading Practices.**

In late 2014, FERC and/or CAISO commenced an investigation into trading practices by Mr. Sheehan's companies. 1.CR.224. At issue was whether XO's corporate structure was designed to deliberately evade the Settlement Rule and whether XO was engaging in improper trading activities on the CAISO market. 1.CR.224. Despite that he was a witness and potential target of the investigation by virtue of his activities on the CAISO market, XO did not immediately inform Dr. Zhao of the investigation and, as Dr. Zhao later learned, submitted statements to FERC and/or CAISO purportedly concerning and/or on behalf of Dr. Zhao without Dr. Zhao's input or consent. 1.CR.224.

FERC subsequently requested an investigative interview with Dr. Zhao. 1.CR.224. Despite obvious conflicts of interest, Mr. Sheehan offered to provide Dr. Zhao with legal representation, on the condition that Dr. Zhao accept Mr. Sheehan's chosen attorneys from the law firm Norton Rose Fulbright ("Fulbright"), which would simultaneously represent XO, Dr. Zhao, and Mr. Huber. 1.CR.224. Dr. Zhao, not understanding the serious implications of the legal conflict, certain of his lack of involvement in any wrongdoing, and unable to spend tens of thousands of dollars on attorneys' fees for his employer's alleged wrongdoing, accepted Mr. Sheehan's offer. 1.CR.224.

In preparation for his FERC investigative interview, Dr. Zhao learned for the

first time that his trading activities were not being conducted on behalf of his employer, Worldwide, but in fact for other Sheehan entities with whom he had no employment relationship, XO Energy CAL, Inc., XO Energy CAL, LLC, XO Energy CAL2, Inc., and XO Energy CAL2, LLC.  1.CR.225; 2.RR.60.

In connection with the FERC investigation, Dr. Zhao was directed to retain, and not to destroy, any data or materials potentially relevant to the investigation. 1.CR.225.  Dr. Zhao took this mandate seriously.  1.CR.225.  He consulted with his employer's IT staff to ensure that his computer and data were secure. 1.CR.225.  Though he was informed that Worldwide remotely backed-up its employees' computers, Dr. Zhao was concerned about potential errors or backup failures (especially given that he was working thousands of miles away from Worldwide's St. Thomas office), and took special care to protect his work materials.  1.CR.225.

### E.    Dr. Zhao's Resignation from Worldwide.

In February 2015, during a trip to St. Thomas, Dr. Zhao was informed by Mr. Sheehan and Worldwide manager, Joel Bearden, that in order to continue working for Worldwide, Dr. Zhao would have to relocate permanently to St. Thomas or Landenberg.  1.CR.225.

During that meeting, Mr. Sheehan and Mr. Bearden also discussed the terms of Dr. Zhao's 2014 incentive compensation.  1.CR.9 & 225.  Based on his

performance for the company, Dr. Zhao was to be awarded $834,131.00, of which $50,000 constituted a "DB Plan Contribution," $17,000 constituted "2014 Profit Share," and $18,000 constituted his 401(k) employer match. 1.CR.225. However, Dr. Zhao was informed that the company was holding back approximately 10% of his bonus, which would only be paid if Dr. Zhao cooperated with the company in the FERC investigation such that the company was ultimately required to pay less than some internally-targeted amount in regulatory fines. 1.CR.225–226.

Mr. Sheehan and Mr. Bearden advised Dr. Zhao to take time to consider his options and asked Dr. Zhao to inform them of his decision to relocate after he received his bonus at end of the month. 1.CR.226.

During that same trip to St. Thomas, Dr. Zhao attended a company meeting during which Mr. Sheehan advised Dr. Zhao and his co-workers that Worldwide intended to revise the Non-Competition provision of Worldwide's employment agreements for any employee who chose to resign following distribution of 2014 bonuses. 1.CR.226. Under the new Non-Competition agreement, the non-compete period would extend only one year following an employee's separation from the company and the company would pay the employee his base salary for four months of that period. 1.CR.226. Despite that his Employment Agreement is with Worldwide, a technology company that provides "software services and support" to companies engaged in electricity trading, Mr. Sheehan indicated his belief that

11

the Non-Competition provisions of Dr. Zhao's Employment Agreement prevent Dr. Zhao from engaging in electricity trading in any capacity anywhere in the United States. 1.CR.226.

During the next couple weeks, Dr. Zhao asked the company follow-up questions about the ultimatum, discussed his options with his family, and began exploring other employment options. 1.CR.226; 2.RR.61. Concerned about the ongoing FERC investigation, and facing a shortage of space on his work computer hard drive, Dr. Zhao also took steps to ensure protection of company data and backed up work materials to external hard drives he purchased and intended to secure and provide to the company upon his resignation. 1.CR.9–10 & 226–227.

Unbeknownst to Dr. Zhao, in the days following delivery of the ultimatum, Mr. Sheehan directed members of his staff to remotely monitor Dr. Zhao's computer activities. 1.CR.9–10 & 227. Supposedly, Mr. Sheehan concluded from this monitoring that Dr. Zhao was planning to resign, despite Mr. Sheehan's attempts to entice him—with the promise of more than $84,000—to stay and assist with the FERC investigation. 1.CR.10 & 227. According to XO, it had evidence—an untranslated "to-do" list written in Chinese by Dr. Zhao—that Dr. Zhao was researching the process for becoming a CAISO trader, which XO determined was a violation of Dr. Zhao's non-compete obligations. 1.CR.10. At some point, XO decided that since one such step was to provide a $500,000

12

security deposit to CAISO, Dr. Zhao intended to fund his allegedly unlawful plan to compete with his 2014 bonus, thereby "removing" the funds from Texas and XO's reach.  1.CR.15; 2.RR.21.

Nevertheless, despite claiming to have learned this damning information on Wednesday, February 25, 2015, 2.RR.44–45, on Friday, February 27, 2015, Dr. Zhao received his 2014 bonus, totaling $532,547.59, via direct deposit to his bank (in California) and 401(k) account (also outside of Texas).  1.CR.10–12 & 68 & 227; 2.RR.17–18.  On Saturday, February 28, 2015, Dr. Zhao contacted Mr. Bearden by phone, informed Mr. Bearden that he could not relocate his family, and resigned his position with Worldwide.  1.CR.227; 2.RR.63–64.  Mr. Bearden did not state, or even suggest, that Dr. Zhao was suspected of misconduct or that Dr. Zhao may not be entitled to his 2014 bonus.  1.CR.227.  Dr. Zhao was not asked to return his 2014 bonus.  1.CR.227.

Shortly thereafter, a purported private investigator arrived at Dr. Zhao's home unannounced.  1.CR.227–228.  The investigator claimed he had been sent by XO to collect Worldwide's computer, peripheral devices, and other company-related material.  1.CR.227–228. Dr. Zhao readily assisted the investigator in collecting all of Worldwide's property, including the hard drives containing backups of Dr. Zhao's work materials.  1.CR.227–228; 2.RR.63–64.  Dr. Zhao later learned that the investigator was not sent by the company merely to collect

13

company property. 1.CR.228. Instead, Dr. Zhao's own attorneys at Fulbright, while still representing Dr. Zhao, hired the investigator in order to assist XO in developing claims against Dr. Zhao that the company intended to use to persuade FERC that any wrongdoing by the company was the fault of Dr. Zhao. 1.CR.228.

The following Monday, March 2, 2015, Dr. Zhao sent Mr. Sheehan and Mr. Bearden an email expressing his gratitude for the opportunity to work for Worldwide, confirming that the private investigator had retrieved Worldwide's property, inquiring about the cessation of health benefits, payment of his accrued vacation time, and the status of the $84,000 held back from his bonus; and asking about the revisions to the Non-Competition provision promised during the February company meeting. 1.CR.228–229; 2.CR.281–282. Neither Mr. Sheehan nor Mr. Bearden responded. 1.CR.229.

## F. The Federal Lawsuit.

To effectuate its plan to scapegoat Dr. Zhao, XO concocted bogus legal claims against him. 1.CR.229. Despite Dr. Zhao having resigned his position with Worldwide on February 28, 2015, on which date Worldwide collected all of its property from Dr. Zhao's home, on March 6, 2015, "XO Energy" proclaimed it was terminating him for "cause." 1.CR.11–12 & 70 & 229. "XO Energy" did not explain what the "cause" was for this supposed termination. 1.CR.70 & 229.

That same day, XOE and Worldwide filed a lawsuit against Dr. Zhao in the

14

United States District Court for the Southern District of Texas. *See XO Energy LLC v. Zhao*, No. 4:15-CV-00599 (S.D. Tex.). Broadly, XO alleged that in backing up company data to external hard drives, Dr. Zhao had impermissibly "copied" confidential company data in violation of his Employment Agreement. 1.CR.229. XO further alleged that Dr. Zhao intended to misappropriate this data in order to compete with XO in violation of the Non-Competition provision of his Employment Agreement. 1.CR.229. XO alleged that immediately upon learning of this alleged wrongdoing, it terminated Dr. Zhao for "Cause" and, as a result, was somehow entitled to recoup Dr. Zhao's 2014 bonus. 1.CR.229. XO brought claims for breach of contract, "misappropriation of confidential information," and "breach of the common law duties of loyalty and confidentiality." 1.CR.229. Dr. Zhao moved for dismissal on the ground that the federal court lacked jurisdiction over XO's claims. 1.CR.230.

While Dr. Zhao's motion was pending, the parties engaged in extensive discovery, including forensic analyses of Dr. Zhao's work computer, the external hard drives, other flash drives, his work phone, personal computer, and e-mail. 1.CR.230. As confirmed via the sworn testimony of XOE's Chief Financial Officer, John Charette, these analyses and other discovery exchanged during the federal case uncovered no evidence that Dr. Zhao had misappropriated, transferred to any third party, or retained any of XO's confidential company information.

2.RR.65–66.

## G. The State Court Lawsuit.

In September 2015, the federal court held that it lacked jurisdiction over XO's case and dismissed XO's suit. 1.CR.230. Despite having found no evidence that Dr. Zhao engaged in wrongdoing, and unable to explain how it could terminate an employee who no longer worked for it, XO refiled its case in this Court (asserting identical allegations as in the federal case, but dropping its disproven misappropriation claim) and sought an injunction, in relevant part, attaching Dr. Zhao's income and requiring him to deposit his 2014 bonus and 401(k) employer match with the Registry of the Court pending resolution of the case. 1.CR.5–20 & 230.

## H. The Temporary Injunction Hearing.

The underlying lawsuit was initially assigned to Fort Bend County Associate Judge Stuti Patel. On September 30, 2015, Judge Patel held a hearing on XO's application for a Temporary Injunction. 2.RR.1. The sole issue in dispute involved XO's request that Dr. Zhao deposit with the Court the money damages sought by XO. 2.RR.4–6. In a departure from its pleadings, XO abandoned its request for a statutory writ of attachment over Dr. Zhao's money, 1.CR.14–16, instead relying on the Court's "inherent authority" to issue an injunction requiring the deposit of "disputed funds" with the Court. 1.CR.74–91; 2.RR.13–15 & 16–17

& 19–21 & 73. In support of its request that the Court exercise this alleged authority, XO offered only the sworn testimony of XOE's CFO, John Charette. 2.RR.23.

In an effort to prove a likelihood of success on XO's breach of contract and breach of fiduciary duty claims, Mr. Charette testified that Worldwide's employees, such as Dr. Zhao, have access to the company's "confidential" information, which he described broadly as "proprietary software, all of our trading strategies, the . . . information that we as a company have provided to verify strategies[, and] confidential maps of the electricity grid." 2.RR.33. However, he admitted that the software over which XO was claiming a proprietary interest, and the bulk of the data it claims as its "confidential" information, is publicly available. 2.RR.68–69. Mr. Charette offered no further information about the nature of the so-called "confidential" information giving rise to XO's claims against Dr. Zhao.

Mr. Charette testified that after Dr. Zhao was presented with the ultimatum concerning his future with Worldwide, company management began monitoring Dr. Zhao's computer activities and witnessed him coping "an exorbitant amount of information" to external hard drives, including "maps" and unspecified "proprietary software information." 2.RR.46–47. Despite claiming on direct examination that Dr. Zhao was terminated as a result of this "copying," 2.RR.56, Mr. Charette admitted that Dr. Zhao had, in fact, resigned his position with

17

Worldwide on February 28, 2015, the day after receiving his 2014 bonus, and promptly and readily returned to XO all company devices and information, including the external hard drives containing "copies" of XO's allegedly "confidential" information. 2.RR.62–64 & 66. Indeed, having returned all such materials to the company, Mr. Charette conceded that it would have been impossible for Dr. Zhao to have continued working for Worldwide between the date of his resignation (February 28, 2015) and the date of his alleged termination for "Cause" (March 2, 2015). 2.RR.64.[1]

Mr. Charette admitted that, despite the benefits of discovery in the federal lawsuit, XO has no evidence that Dr. Zhao "took documents from the company and gave them to anybody." 2.RR.64–65. He admitted that XO has no evidence that Dr. Zhao "put [company] documents on his personal computer." 2.RR.66. And he admitted that Dr. Zhao was not prohibited, in any way, from backing up documents from his company computer to an external hard-drive, especially in connection with a criminal investigation such as the FERC investigation of XO in progress at the time of Dr. Zhao's resignation. 2.RR.67–68.

In support of its claim that XO would suffer a "probable, imminent, and irreparable injury" without injunctive relief, 1.CR.78, Mr. Charette offered

---

[1] The hearing transcript suffers from several transcription errors due to the reporter's difficulty interpreting the electronic recording of the proceedings. 2.RR.12. In relevant part, the transcript at page 64, lines 14–15 should read: "Can you explain how it is possible [for] a terminated employee [to continue to] work for [you]?" 2.RR.64.

testimony about trading on the CAISO market. He explained that new participants on the CAISO market are required to "deposit $500,000 in cash collateral or a line of credit, which is also equivalent of cash to be held by [CAISO] as financial security." 2.RR.32–33. He stressed that the money is merely a security deposit— "just to get into the market"—and is "not available to trade against." 2.RR.33. Mr. Charette explained that on top of the $500,000, individuals or entities wishing to actually trade on the market must post additional financial security, based on trading volume, that can easily exceed an additional $1,000,000. 2.RR.33.

Mr. Charette read into the record a few random English words in the Chinese language "to-do" list (which he admittedly could not read), and stated his concern that Mr. Zhao, having received his $500,000 (after-tax) bonus "now has sufficient funds, liquid funds to actually make a deposit with the California ISO to become a market member and compete with XO Energy." 2.RR.48–54 & 57–58. Mr. Charette offered no other testimony about Dr. Zhao's financial status or his ability to fund the additional millions necessary to actually operate as a CAISO trader, as Mr. Charette described.

Based on this thin record, the Associate Judge issued a Temporary Injunction. She explained that her interest was in "preserv[ing] the actual subject matter of this litigation, which is the funds," and that XO "has shown that there is a potential for injury to that property." 2.RR.82–83. She noted that XO, in fact, had

19

an "adequate remedy at law," but reasoned that some unstated "exceptions" justified attachment of Dr. Zhao's income. 2.RR.83. She ordered that Dr. Zhao promptly deposit his 2014 bonus and 401(k) employer match ($532,547.95) with the Registry of the Court "until further order of the Court" and set trial for December 1, 2015. 1.CR.197–200.

## I.     The de novo Temporary Injunction Hearing.

Pursuant to Section 54A.115(a) of the Texas Government Code, Dr. Zhao promptly requested a *de novo* temporary injunction hearing before District Judge Chad Bridges. 1.CR.201. In accordance with Texas law requiring leave of court to submit supplemental pleadings or additional evidence in connection with a *de novo* hearing, Dr. Zhao sought, and was granted, approval to file a responsive brief. 1.CR.201 & 213. Dr. Zhao's brief was filed in advance of the hearing. 2.CR.239–270.

XO did not seek leave of court to present additional evidence at the *de novo* hearing, but nevertheless issued a trial subpoena commanding Dr. Zhao's testimony. 3.CR.613–615. Dr. Zhao filed a Motion for Protective Order to quash the improperly-issued subpoena. 3.CR.608–609.

The morning of the October 22, 2015, hearing, XO apparently provided the Trial Court with a transcript of the initial TI hearing before the Associate Judge. 1.RR.3. Mr. Charette did not appear and the Trial Court was presented no other

evidence. The Trial Court entertained only a few minutes of argument from counsel before turning to the parties' submissions. 1.RR.3–9. After reviewing them, the Trial Court permitted only a few seconds of argument on Dr. Zhao's Motion for Protective Order before issuing his ruling. 1.RR.14–16.

The Trial Court held that it was "going to keep the temporary restraining order in place" and require the parties to return the following week for a "full-on injunction hearing," during which the Court could hear testimony from Dr. Zhao. 1.RR.16. When the parties could not identify a mutually available time for the hearing, the Trial Court changed course and held that it was simply "issuing the TI." 1.RR.17 & 20. However, the Trial Court indicated some confusion over the procedural posture of the case, subsequently stating that it was only issuing a TRO in advance of a December 15, 2015, trial on the merits. 1.RR.20–21. After the parties clarified that at issue was a TI, the Trial Court reiterated that it was "comfortable with [its] ruling" (which ruling remained unclear) while still noting its desire to hear testimony from Dr. Zhao. 1.RR.21–22. Counsel for Dr. Zhao argued that the Trial Court's desire for additional testimony suggested that XO has failed to meet its burden to justify injunctive relief and reminded the Trial Court of the evidentiary failings in XO's submission. 1.RR.22–23. The Court responded that "[w]e're going to get the December 15th trial date. You're going to do a docket control order and we'll be set for trial and your client [Dr. Zhao] will do

whatever he needs to do." 1.RR.23. The Court subsequently issued the TI and clarified that it intended to set trial not for December 15, 2015, but for December 1, 2015—leaving the parties only 40 days to prepare. 3.CR.620–623. Dr. Zhao subsequently deposited $532,547.59 with the Registry of the Court.

This appeal followed.[2]

## V.    SUMMARY OF THE ARGUMENT

At issue is an ordinary breach of contract case involving (disproven) allegations that Defendant-Appellant Dr. Zhao, a former employee of Plaintiff-Appellee Worldwide, copied XO's "Confidential" company information to two external hard drives in an attempt to start a competing business in violation of an Employment Agreement. Based on a patently unreasonably and unsupportable reading of the Employment Agreement, XO claims that this supposed breach entitles it to recover from Dr. Zhao his 2014 bonus and 401(k) employer match totaling $532,547.59. However, XO admits via sworn testimony that the mere copying of data to hard drives does not constitute a breach of the Employment Agreement and that no evidence exists that Dr. Zhao retained, used, or disclosed any company data. 2.RR.64–68. XO concedes that "an employee may lawfully

---

[2] Since the filing of this appeal, XO and Dr. Zhao agreed to a trial continuance to April 26, 2016. During a November 18, 2015, off-the-record hearing on the parties' Agreed Motion for Trial Continuance & Docket Control Order, the Trial Court instead set trial for March 22, 2015. The Trial Court stated that it saw little reason for delay since the attachments to XO's pleadings (allegedly reflecting the copying of data from Dr. Zhao's work computer to the external hard drives) "speak for themselves" and stated that a March trial date would "take care of" this appeal.

22

plan to compete with an employer and take active steps in furtherance of those plans" and offers no evidence of any actual competitive activity by Dr. Zhao. 1.CR.82. XO acknowledges that the breach alleged can be remedied via money damages—indeed, XO's claim for money damages is the crux of its case. 1.CR.12 (seeking $532,547.59 in damages for Dr. Zhao's alleged breach of contract); 1.CR.14 (seeking disgorgement or forfeiture of $532,547.95 [*sic*] for Dr. Zhao's alleged breach of fiduciary duty). Despite this, XO was granted a Temporary Injunction attaching Dr. Zhao's bonus and requiring him to place his earned income into the Registry of the Court pending the outcome of this litigation in order to secure XO's collection of damages in the event of a final judgment in its favor.

Texas law is clear and unequivocal that the facts presented here do not warrant or justify this manner of prejudgment relief. XO has failed to establish a "probable right to relief" on its claims as required for the issuance of a TI. Additionally, XO's alleged harms can be remedied via money damages, which unquestionably undermines its entitlement to injunctive relief. XO failed to establish any set of facts to overcome the presumption against injunctive relief to secure money damages—an omission the Trial Court acknowledged, yet unlawfully disregarded. Accordingly, as the Trial Court failed to abide by well-settled law, the Temporary Injunction Order should be reversed and Dr. Zhao's

money released from the Court Registry.

## VI. ARGUMENT

### A. Standard of Law

Pre-judgment remedies, such as temporary injunctive relief and pre-judgment writs of attachment are considered extraordinary remedies that should only be awarded in narrow circumstances. *See, e.g.*, *In re Tex. Natural Res. Conservation Comm'n*, 85 S.W.3d 201, 204 (Tex. 2002) ("An applicant for a temporary injunction seeks extraordinary equitable relief. He seeks to immobilize the defendant from a course of conduct which it may well be his legal right to pursue."); *In re Argyll Equities, LLC*, 227 S.W.3d 268, 271 (Tex. App.—San Antonio 2007, no pet.) ("Pre-judgment attachment is a particularly harsh, oppressive remedy. As a result, the statutes and rules governing this remedy must be strictly followed.").

The party seeking prejudgment injunctive relief bears the burden of proof and must present admissible evidence in support of its claims. *See, e.g.*, *Forrest Prop. Mgmt. v. Forrest*, No. 10-09-00338-CV, 2010 Tex. App. LEXIS 5863, at **9–10 (Tex. App.—Waco July 21, 2010, no pet.) (citing *N. Cypress Med. Ctr. Operating Co. v. St. Laurent*, 296 S.W.3d 171, 177 (Tex. App.—Houston [14th Dist.] 2009, no pet.)); *Baca v. Hoover, Bax & Shearer*, No. A14-88-00418-CV, 1989 Tex. App. LEXIS 456, at *12 (Tex. App.—Houston [14th Dist.] March 9,

24

1989, no writ.) (not designated for publication); *World Football League v. Dallas Cowboys Football Club, Inc.*, 513 S.W.2d 102, 105 (Tex. App.—Dallas 1974, writ ref'd n.r.e.).  Prejudgment relief "is not proper when the claimed injury is merely speculative; fear of injury is not sufficient to support a temporary injunction." *Wash. DC Party Shuttle, LLC v. iGuide Tours, LLC*, 406 S.W.3d 723, 742 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 861 (Tex. App.—Ft. Worth 2003, no pet.).

Even where a party demonstrates entitlement to a temporary injunction or writ of attachment preventing a transfer of assets, a defendant cannot be ordered to pay disputed funds into the court's registry unless the movant offers evidence that, despite the injunction or writ, the funds are nevertheless, "in danger of being 'lost or depleted.'"  *In re Reveille Res. (Texas), Inc.*, 347 S.W.3d 301, 304 (Tex. App.—San Antonio 2011, no pet.) (citing *Castilleja v. Camero*, 414 S.W.2d 431, 433 (Tex. 1967)); *In re Deponte Invs., Inc.*, No. 05-04-01781-CV, 2005 Tex. App. LEXIS 898, at *4 (Tex. App.—Dallas, Feb. 3, 2005, no pet.).

A trial court's issuance of a temporary injunction is reviewed for an abuse of discretion.  *Tel. Equip. Network v. Ta/Westchase Place*, 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, no pet.).  Reversal is warranted where the trial court's actions were "so arbitrary as to exceed the bounds of reasonable discretion" or where the trial court erroneously applied the law to undisputed facts. *Id.*

25

**1. Temporary Injunction.**

A temporary injunction "does not issue as a matter of right." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). To obtain one, an applicant "must plead and prove: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Id.* It is well-settled that "[a]n injury is irreparable if the injured party cannot be compensated in damages or if the damages cannot be measured by a certain pecuniary standard." *Id.* Thus, "generally, a court will not enforce contractual rights by injunction, because a party can rarely establish an irreparable injury and an inadequate legal remedy when damages for breach of contract are available." *Nueva Generacion Music Group, Inc. v. Espinoza*, __ S.W.3d __, 2015 Tex. App. LEXIS 7958, at *11 n.5 (Tex. App.—Houston [1st Dist.], July 30, 2015, pet. filed) (quoting *Butnaru*, 84 S.W.3d at 211); *see also Victory Drilling, LLC v. Kaler Energy Corp.*, No. 04-07-000094-CV, 2007 Tex. App. LEXIS 4966, at *8 (Tex. App.—San Antonio June 27, 2007, no pet.) ("[When] an adequate and complete remedy at law is provided, our courts, though clothed with equitable jurisdiction, will not grant equitable relief." (quoting *Rogers v. Daniel Oil & Royalty Co.*, 130 Tex. 386 (1937))). "Damages are usually an adequate remedy at law, and the requirement of demonstrating an interim injury is not to be taken lightly." *Id.* (quoting *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993)).

26

"Although it is unusual, circumstances can arise in which a temporary injunction is appropriate to preserve the *status quo* pending an award of damages at trial." *Walling*, 863 S.W.2d at 58. Typically, these circumstances involve the threatened transfer or destruction of real property or unique and irreplaceable personal property or situations where the defendant's conduct threatens to disrupt an ongoing business. *See, e.g.*, *Shor v. Pelican Oil & Gas Mgmt., LLC*, 405 S.W.3d 737, 750 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (collecting cases). Where a claim is for pure money damages, unconnected to any unique asset, courts have issued injunctions to freeze assets only where the defendant is insolvent or likely to be insolvent at the time a judgment is rendered. *See, e.g.*, *Manheim v. Adam Dev. Props., L.P.*, No. 10-09-00259-CV, 2009 Tex. App. LEXIS 9824, at **5–6 (Tex. App.—Waco Dec. 30, 2009, no pet.). However, strict proof of insolvency and a showing that, absent an injunction, the plaintiff will be left without any potential remedy whatsoever, is required. *Id.*, at **6–7.

Thus, a plaintiff cannot merely claim that a defendant <u>may</u> be judgment-proof by the time litigation concludes. *Id.* Nor can a plaintiff seek to attach or enjoin funds merely to ensure a defendant has assets to satisfy a judgment. *See, e.g.*, *Harper v. Powell*, 821 S.W.2d 456, 457 (Tex. App.—Corpus Christi 1992, no pet.). Such attempts "put[] the cart before the horse" and find no support in the law, which does not "authorize[] courts to issue writs of injunction against

27

defendants restraining them from disposing of their property upon which a plaintiff has no form of lien, pending litigation." *Id.* Similarly, it is not enough to suggest that a defendant may dissipate its assets during the course of litigation. *See, e.g.*, *Nowak v. Los Patios Investors*, 898 S.W.2d 9, 6–7 (Tex. App.—San Antonio 1995, no pet.). In such cases, the Texas Uniform Fraudulent Transfer Act has been held to offer a viable remedy for such actions. *See, e.g.*, *Victory Drilling, LLC*, 2007 Tex. App. LEXIS 4966, at *8; *see Camp Mystic, Inc. v. Eastland*, 399 S.W.3d 266, 274 (Tex. App.—San Antonio 2012, no pet.) ("Generally, a temporary injunction is not available to secure a potential money judgment when a party has other existing legal remedies." (collecting cases)); *see also Ballenger v. Ballenger*, 694 S.W.2d 72, 77 (Tex. App.—Corpus Christi 1985, no writ) (holding that an injury is not irreparable if it "can be cured by monetary damages, regardless of the passage of time between entry of a judgment and satisfaction thereof").

Lest the courts become tools of "injustice" utilized by plaintiffs to "immobilize" a defendant as the sole aim of the litigation, the conditions to issuance of a temporary injunction are strictly enforced. *See State v. Sw. Bell. Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975). As Texas courts are quick to point out:

> Every suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him . . . disabling him to use so much of his funds or property as the court deems necessary for security or compliance with its possible decree. And, if so, it is difficult to see why a plaintiff in

28

any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence.

*Victory Drilling, LLC*, 2007 Tex. App. LEXIS, at \*\*6–7 (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 222–23 (1945)); *Nowak*, 898 S.W.2d at 11 (same).

Thus, appellate courts do not hesitate to reverse trial court injunctions that are unsupported by adequate proof on each of the elements for temporary injunctive relief. *See, e.g.*, *Reyes v. Burrus*, 411 S.W.3d 921 (Tex. App.—El Paso 2013, pet. denied) (reversing order of and dissolving temporary injunction because the plaintiff "failed to establish that she ha[d] no adequate remedy at law to secure potential money damages"); *Camp Mystic, Inc.*, 399 S.W.3d at 273–77 (same); *Chin Tuo Chen v. Braxton*, No. 06-09-00088-CV, 2010 Tex. App. LEXIS 171, at \*\*9–10 (Tex. App.—Texarkana Jan. 13, 2010, pet. Denied) (same); *Victory Drilling, LLC*, 2007 Tex. App. LEXIS 4966, at \*\*6–8 (same); *Fox*, 121 S.W.3d at 861 (same); *Nowak*, 898 S.W.2d at 11 (same); *Ballenger*, 694 S.W.2d at 77 (same); *see also Wash. DC Party Shuttle, LLC*, 406 S.W.3d at 741–43 (affirming denial of a temporary injunction because the plaintiff failed to prove the money damage were incapable of calculation and would not adequately compensate its alleged injuries); *Law v. William Marsh Rice Univ.*, 123 S.W.3d 786, 794 (Tex. App.—

29

Houston [14th Dist.] 2003, pet. denied) (same); *Rushlake Hotels (USA) v. Hyatt Corp.*, No. 01-94-00827-CV, 1994 Tex. App. LEXIS 3140, at \*\*15–16 (Tex. App.—Houston [1st Dist.] Dec. 22, 1994, no pet.) (not designated for publication) (same).

### 2. Writ of Attachment.

A remaining option for a breach of contract plaintiff seeking prejudgment relief is to seek a statutory writ of attachment. "A writ of attachment is available to a plaintiff in a suit if it proves that: (1) the defendant is justly indebted to the plaintiff; (2) the attachment is not sought for the purpose of injuring or harassing the defendant; (3) the plaintiff will probably lose his debt unless the writ of attachment is issued; and (4) specific grounds for the writ exist under Section 61.002 [of the Texas Civil Practice & Remedies Code]." TEX. CIV. PRAC. & REM. CODE § 61.001.

A defendant is "justly indebted" to a plaintiff if, and only if, he is obligated to pay a "liquidated debt" under a contract. *See In re Argyll Equities*, 227 S.W.3d at 271. The "long-standing rule" in Texas "is that a writ of attachment will not issue in a suit for unliquidated damages." *E.E. Maxwell Co. v. Arti Décor, Ltd.*, 638 F. Supp. 749, 753 (N.D. Tex. 1986) (applying Texas law). The only exception is where personal service cannot be made on the defendant. *See id.*; *S.R.S. World Wheels v. Wnlow*, 946 S.W.2d 574, 575 (Tex. App.—Ft. Worth 1997, no pet.);

30

TEX. CIV. PRAC. & REM. CODE § 61.005.

"The term 'debt' has been defined as an obligation to pay a liquidated sum on an express or implied contract." *E.E. Maxwell Co.*, 638 F. Supp. at 753 (citing *El Paso Nat'l Bank v. Fuchs*, 34 S.W. 206, 207 (1896)). For the sum to be "liquidated," (1) the harm caused by the breach must be incapable of being estimated or is difficult to estimate at the time of the agreement, and (2) the sum charged must be a reasonable estimate of damages. *See BMG Direct Mktg. v. Peake*, 178 S.W.3d 763, 766 (Tex. 2005); *Baker v. Int'l Record Syndicate, Inc.*, 812 S.W.2d 53, 55 (Tex. App.—Dallas 1991, no writ). The fee must be agreed upon by the parties at the time of contract formation, though "a term fixing unreasonably large liquidated damages is void as a penalty." *BMG Direct Mktg.*, 178 S.W.3d at 767; *Baker*, 812 S.W.2d at 55 (quoting TEX. BUS. & COM. CODE § 2.718(a)).

Section 61.002 sets forth an exclusive list of circumstances that must also be present in order to justify issuance of the writ:

> (1) The defendant is not a resident of this state or is a foreign corporation or is acting as such;
>
> (2) The defendant is about to move from this state permanently and has refused to pay or secure the debt due the plaintiff;
>
> (3) The defendant is in hiding so that ordinary process of law cannot be served on him;

31

(4)     The defendant has hidden or is about to hide his property for the purpose of defrauding his creditors;

(5)     The defendant is about to remove his property from this state without leaving an amount sufficient to pay his debts;

(6)     The defendant is about to remove all or part of his property from the county in which the suit is brought with the intent to defraud his creditors;

(7)     The defendant has disposed of or is about to dispose of all or part of his property with the intent to defraud his creditors;

(8)     The defendant is about to convert all or part of his property into money for the purpose of placing it beyond the reach of his creditors; or

(9)     The defendant owes the plaintiff for property obtained by the defendant under false pretenses.

TEX. CIV. PRAC. & REM. CODE § 61.002.

In order to establish entitlement to a writ of attachment, a plaintiff must submit sworn testimony, based on personal knowledge, setting forth specific facts bearing on each element of the statute. *See S.R.S. World Wheels*, 946 S.W.2d at 575; TEX. CIV. PRAC. & REM. CODE § 61.022(a). This includes facts establishing that the plaintiff is unlikely to recoup a future judgment absent the writ. *In re Argyll Equities*, 227 S.W.3d at 272. Conclusory statements that the defendant is, or is likely to become, insolvent are insufficient. *Id.* Instead, a plaintiff must offer evidence of, for example, the defendant's cash on hand, source of revenue, and liabilities. *See In re Reveille Res. (Texas), Inc.*, 347 S.W.3d at 304–05.

32

## 3. The Court's "Inherent Authority" to Attach Assets.

Finally, Texas courts have an "inherent authority" to order that a "disputed fund," shown to be in danger of being "lost or depleted," be placed into the registry of the court during the pendency of litigation to determine the fund's owner. *See Behringer Harvard Royal Island, LLC v. Skokos*, No. 05-09-00332-CV, 2009 Tex. App. LEXIS 9456, at **9–10 (Tex. App.—Dallas Dec. 14, 2009, no pet.).

Importantly, however, this inherent authority does not supersede "the carefully constructed statutes concerning garnishment, attachment, receivership, etc." *Alliance Royalties, LLC v. Booth*, 313 S.W.3d 493, 497 (Tex. App.—Dallas 2010, no pet.). However, a trial court may be entitled to exercise broader authority in accordance with statutory protective regimes, such as with respect to a court-supervised guardianship proceeding. *See, e.g.*, *In re Bays*, 355 S.W.3d 715 (Tex. App.—Ft. Worth 2011, no pet.).

In all other cases, "disputed fund" has been narrowly construed to extend to money for which the only question before the court is its owner. This "inherent authority" has been utilized to protect, for example, (i) the proceeds from the sale of community property being held by the husband-constructive trustee, who threatened to dispose of the money rather than permit the court to distribute it in accordance with divorce proceedings, *Ex parte Preston*, 347 S.W.2d 938 (Tex. 1961); (ii) lottery winnings over which multiple parties claimed ownership,

33

*Castilleja v. Camero*, 414 S.W.2d 424 (Tex. 1967) & 414 S.W.2d 431 (Tex. 1967); and (iii) funds earmarked to pay receiver's fees, *Harmon v. Daggett*, No. B14-88-00103-CV, 1988 Tex. App. LEXIS 2006, at **6–7 (Tex. App.—Houston [14th Dist.] Aug. 11, 1988, no pet.).

Efforts by litigants to invoke the court's "inherent authority" to attach funds to satisfy a potential future judgment have been soundly and summarily rejected. *See Alliance Royalties, LLC*, 313 S.W.3d at 497; *In re Wakefield*, No. 14-10-01160-CV, 2010 Tex. App. LEXIS 9922, at **1–2 (Tex. App.—Houston [14th Dist.] Dec. 15, 2010, no pet.); *Behringer Harvard Royal Island, LLC*, 2009 Tex. App. LEXIS 9456, at **8–10 (collecting cases); *see also Berry v. Chase Home Fin. LLC*, No. C-09-116, 2010 U.S. Dist. LEXIS 12531, at **7–10 (S.D. Tex. Feb. 12, 2010) (applying Texas law).

Texas courts are clear: "[A] trial court does not have authority—beyond the purview of the attachment statutes—to order that funds be deposited in the court's registry to generally secure payment of a possible future judgment." *Behringer Harvard Royal Island, LLC*, 2009 Tex. App. LEXIS 9456, at *11. Thus, "[i]f a plaintiff wants to protect its right to collect a potential judgment, it must follow the specific statutes designed for that purpose." *Alliance Royalties, LLC*, 313 S.W.3d at 497.

**B.     Analysis**

The Trial Court abused its discretion in issuing a Temporary Injunction requiring Dr. Zhao to deposit his 2014 incentive compensation with the Registry of the Court in order to secure XO's ability to recover damages in the event of a judgment in its favor.    In issuing the TI, the Trial Court ignored glaring deficiencies in XO's evidentiary submission and disregarded settled law disallowing prejudgment injunctive relief over a litigant's assets in an ordinary case for money damages such as this.

Notably, XO did not come before the Trial Court with mere suspicions of wrongdoing.  For months, XO had the opportunity to pursue—and did pursue— discovery in support of its case.  It admits that it has found no evidence that Dr. Zhao misappropriated, transferred to any third party, or retained any of XO's confidential company information.  2.RR.65–66.  Instead, all that has been discovered is that he backed-up data to hard drives that were immediately turned over to XO upon his resignation from Worldwide and which remain in XO's possession. 2.RR.67–68.  XO concedes that nothing in Dr. Zhao's Employment Agreement, or any other company policy, prohibits this conduct.  2.RR.68.

Equally unavailing are XO's claims that Dr. Zhao was imminently planning to compete with Worldwide in violation of any non-compete obligations, which is supported entirely by XO's speculative interpretation of a "rough" translation of a

document written in Chinese supposedly directed to plans by Dr. Zhao to become a CAISO trader. 2.RR.48–54. Even if XO's interpretation of this document had evidentiary support, nothing in the so-called "to-do" list indicates any efforts by Dr. Zhao to compete with Worldwide in its business of providing software and support to trading entities. 1.CR.219–220; 2.CR.299 & 301; 2.RR.26 & 60. And even if Dr. Zhao's Employment Agreement could be judicially re-drafted to render the XO CAL entities parties to it, and energy trading a "competitive" activity, XO's evidence establishes—at best—merely a plan. XO has offered no evidence that Dr. Zhao has actually engaged in competing activities and concedes that "an employee may lawfully plan to compete with an employer and take active steps in furtherance of those plans." 1.CR.82. Its speculative assertions that Dr. Zhao intended to use his 2014 bonus to set up a competing business is devoid of fact, illogical, and starkly undermines any claim that Dr. Zhao could not satisfy a judgment in this action.

Indeed, despite ample opportunity to do so, XO has conspicuously avoided seeking any discovery into Dr. Zhao's ability to pay damages in this case. XO simply proclaims that he will be unable to satisfy a judgment, ignoring entirely that Dr. Zhao, a highly educated, high-performing professional, earned over $1,000,000 in his short time at XO alone, after working for decades in other employment, and with ample opportunities to secure well-paying employment in the future. Absent

36

a showing of insolvency, an injunction to secure money damages cannot be had.

In short, XO rests on nothing more than hyperbole and speculation, ignoring entirely the wealth of information that has been exchanged in discovery, none of which support its insistent, but baseless, proclamation that Dr. Zhao has breached contractual and fiduciary duties to Worldwide in a manner than cannot be remedied by recoverable money damages. The Trial Court's apparent conclusion that XO established a "probable right to recovery" and a "probable, imminent, and irreparable injury" is unsupported by fact or law. The Trial Court abused its discretion in issuing the Temporary Injunction and the TI Order should be reversed.

### 1. The Trial Court Abused its Discretion in Issuing a Temporary Injunction over Dr. Zhao's Income.

#### a. XO did not establish a probable right to recovery.

The Trial Court abused its discretion, and improperly applied fact to law, in evaluating XO's probable right to recovery—a key element that must be satisfied in order to justify prejudgment injunctive relief. In its pleadings and submissions in support of its request for a TI, XO engages in sleight of hand. It fails to connect Dr. Zhao's alleged misconduct to any language in the Employment Agreement prohibiting such conduct and misstates the business of XOE and Worldwide in an unsupportable attempt to broaden the scope of the Employment Agreement by fiat. These failings are readily apparent and should have been acknowledged by the

Trial Court.

*First*, XO's request for injunctive relief rests on its allegation that Dr. Zhao, in advance of his resignation, "engaged in the wholesale copying of [XO's] Confidential Information onto two (2) external hard drives." 1.CR.9–10. It speculates that Dr. Zhao engaged in this "theft" of data so that he could "carry" it away and use it "for his personal benefit or for the benefit of his competing business." 1.CR.10–12. However, mere allegations of wrongdoing are insufficient to establish a probable right to recovery; instead, as XO concedes, such allegations must be supported by admissible evidence. 1.CR.80. Here, XO offered no evidence in support of its claim of data theft. Instead, it admits that there is no evidence that any company information was misappropriated by Dr. Zhao. 1.RR.65–66. Additionally, as it must under the terms of Dr. Zhao's Employment Agreement, which does not prohibit him from backing up data to hard drives, but only from "disclos[ing] to anyone, or us[ing] in competition with [Worldwide] or any of its subsidiaries or affiliates, any Confidential Information of or pertaining to [Worldwide]," XO concedes that merely copying information to hard drives is not prohibited. 2.RR.67–68. In order to be legally viable, the TI Order issued by the Trial Court must rest on evidence of wrongdoing; as no such evidence was presented by XO, the TI Order must be reversed.

*Second*, notwithstanding the foregoing, while XO continues to insist that Dr.

Zhao was planning to compete with Worldwide in violation of his Employment Agreement, it concedes, as it must, that merely "planning" to compete is not unlawful. 1.CR.81. Yet, at best, XO only adduced evidence of a plan. XO does not allege, and has to evidence to show, that Dr. Zhao was actually engaged in competitive activities in breach of the Non-Compete provisions of his Employment Agreement. The Trial Court's apparent conclusion to the contrary is an abuse of discretion and requires reversal of the TI Order.

Nevertheless, even if XO had evidence that Dr. Zhao had taken actual steps toward establishing a company to trade on the CAISO market, such activity is not prohibited by the terms of his Employment Agreement. The Non-Compete provision of Dr. Zhao's Employment Agreement plainly states that he is prohibited only from "engag[ing] in a business that competes with the business of [Worldwide] or any of its subsidiaries or affiliates as it relates to [Worldwide's] business." 1.CR.26; 2.CR.273. XO admits that Worldwide is a technology company "in the business of providing software services and support," to trading entities. 2.CR.299; 2.RR.26 & 60. XO does not allege, and has no evidence to suggest, that Dr. Zhao was planning to engage in the software business. The Trial Court erred in finding a probable breach of the Non-Compete provisions of the Employment Agreement, further demonstrating the Trial Court's error in issuing a TI.

39

***Third***, even if XO could offer evidence that Dr. Zhao probably breached his Employment Agreement, it offers no evidence that such breach amounted to "Cause" for termination under the Agreement or that such "Cause" triggers an automatic forfeiture of earned income from past years. XO cannot explain how it could terminate an employee days after he resigned his employment, 2.RR.64, and it offers no evidence that the misconduct that Dr. Zhao allegedly engaged in constitutes "willful misconduct . . . that is materially and demonstrably injurious economically to [Worldwide]," or, as noted above, violated the Non-Compete provision of Dr. Zhao's Employment Agreement. Such misconduct is required (in relevant part) to terminate Dr. Zhao for "Cause." 1.CR.28; 2.CR.275. Absent a termination for "Cause," XO has no conceivable claim over Dr. Zhao's 2014 bonus. The Court's apparent conclusion to the contrary is unsupported by fact or law.

Moreover, XO's claim that it can recoup Dr. Zhao's bonus money relies on a nonsensical reading of the Employment Agreement that renders all "deferred incentive compensation" paid to any Worldwide employee at any time during the employee's tenure with the company subject to forfeiture. Such a position defies logic, a plain reading of the Employment Agreement, and is almost certainly unconscionable under Texas law. Instead, a fair reading of the Employment Agreement provides that an employee who "(a) breaches any of the covenants [of

40

the Non-Compete provisions of the Employment Agreement], (b) is terminated for Cause . . . , or (c) terminates his or her employment without Good Reason" forfeits any rights to deferred compensation for the year in which the employee separates from the company. 1.CR.27; 2.CR.274. XO's claim that it can recover moneys paid (and taxed) for past performance is dangerously farfetched. The Trial Court's failure to evaluate the legal and factual viability of such a reading constitutes an abuse of discretion demanding reversal of the TI Order.

### b. XO did not establish a "probable, imminent, and irreparable" injury.

The Trial Court further erred in concluding that XO established a "probable, imminent, and irreparable" injury, as required for issuance of a TI. XO's entire case is built around its efforts to secure—through a prejudgment remedy—money. Texas law is clear that money damages constitute an "adequate legal remedy" foreclosing injunctive relief and that an issuance of an injunction that effective attaches funds merely to ensure payment of a possible future judgment constitutes reversible error.

Two recent decisions of the Texas Court of Appeals are directly on point. In *Nueva Generacion Music Group, Inc. v. Espinoza*, __ S.W.3d __, 2015 Tex. App. LEXIS 7958 (Tex. App.—Houston [1st Dist.] July 30, 2015, pet. filed), the plaintiff appealed from a decision of the district court denying issuance of a temporary injunction. The plaintiff Nueva was an artist management company that

41

had previously represented the defendant musician pursuant to a Representation Agreement. *Id.*, at 2–3. The parties had a falling out that resulted in litigation that was ultimately settled pursuant to a "Final Settlement Agreement" ("FSA"). *Id.*, at 3. The FSA required, in relevant part, that the defendant continue to honor the Representation Agreement while he made three payments totaling $4,500,000 over the ensuing year. *Id.*, at 4. After the defendant allegedly breached the agreement by utilizing other artist managers and failing to pay the final $3,500,000 payment, Nueva brought a new suit and sought a temporary injunction. Nueva claimed that the defendant was booking performances through other artist managers, under-reporting earnings, and failing to pay required commissions. *Id.*, at 7. Nueva argued that this alleged misconduct threatened its ability to ultimately collect the $3,500,000 due under the FSA (which was complicated by the fact that the defendant lived, and the FSA was performable, in Mexico) and that an injunction was therefore required "to prohibit [the defendant] from engaging in other representations." *Id.*, at 5–8.

The district and appellate courts disagreed. The appellate court noted that all of Nueva's claims—including related tort claims for breach of fiduciary duty and fraud—"relate to its allegations that [the defendant] breached the Representation Agreement and FSA by withholding commissions or failing to perform career obligations obtained for him by Nueva in order to satisfy the terms of the FSA."

*Id.*, at 12. Although Nueva offered evidence that the defendant was using different booking agencies to book performances, thus frustrating Nueva's efforts to collect the $3,500,000 due under the FSA, none of the evidence "demonstrate[d] a harm that [could] not be adequately compensated in damages following a trial on the merits of Nueva's claim that [the defendant] breached the FSA." *Id.*, at 13. Absent a "probable, imminent, and irreparable injury," a temporary injunction could not be had. *Id.*, at 16.

In *Manheim v. Adam Development Properties, L.P.*, No. 10-09-00259-CV, 2009 Tex. App. LEXIS 9824 (Tex. App.—Waco Dec. 30, 2009, no pet.), plaintiff-appellee Adam Development Properties ("ADP") alleged that the defendant furniture manufacturer failed to fulfill contractual obligations to design, produce, and deliver custom furniture to ADP and received funds under the contract from ADP to which it was not entitled. *Id.*, at **1–2. The manufacturer admitted that it used funds from ADP to purchase inventory for other projects. *Id.*, at *2. ADP, seeking money damages, alleged that the manufacturer had insufficient assets to satisfy a potential future judgment. *Id.* It sought, and was granted by the trial court, an injunction placing ADP's inventory under court supervision to prevent it from being "destroy[ed], s[old], encumber[ed], secret[ed], or any way harm[ed]." *Id.*, at *3.

The appellate court reversed. The court noted that while the availability of

money damages typically forecloses the right to obtain temporary injunctive relief, an injunction may be appropriate if "the defendant is insolvent." *Id.*, at \*6. However, the party seeking injunctive relief must adduce evidence "under standard rules of evidence" establishing the defendant's insolvency. *Id.* ADP offered nothing more than a company representative's testimony that he suspected that the manufacturer was "hardly in strong financial shape." *Id.*, at \*\*7–8. But this was not enough, especially as the manufacturer had not "as of the time of the injunction, . . . admitted that [it] was insolvent or financially unable to satisfy a judgment obtained against him." *Id.*, at \*8. Thus, ADP failed to meet its burden to establish an "irreparable" injury and the injunction was dissolved.

The same result is compelled here. XO's claimed harm for breach of contract and breach of fiduciary duty, for which it seeks injunctive relief, can be remedied entirely by the money damages it seeks to encumber via a prejudgment remedy. This fact alone undermines its claim for injunctive relief. Moreover, XO admits that it is seeking an injunction merely to protect its future ability to recover a potential judgment. Texas law disallows this use of injunctive relief. The one exception, where a defendant is insolvent, requires an evidentiary showing that XO does not, and cannot make. Instead, all XO offered was its corporate representative's speculative opinion that Dr. Zhao might have been thinking about potentially utilizing his 2014 bonus money as a security deposit with CAISO. The

44

problems with this testimony are manifest.

Aside from being purely speculative and entirely disconnected from admissible factual evidence, XO's claims are illogical. XO admits that in order for Dr. Zhao to establish the CAISO trading entity it alleges, he would have to deposit, in addition to the $500,000 "just to get into the market," at least another $1,000,000 in order to actually trade on the market. 2.RR.32–33. Thus, if XO's suspicions could fairly be taken as fact, as the Trial Court's TI Order suggests they were, Dr. Zhao must have at his disposal millions of dollars, starkly undermining any claim by XO of Dr. Zhao's insolvency and instead establishing his ready ability to satisfy a judgment. Contrary to XO's claim that once these funds are provided to CAISO, they are lost forever, it admits that these funds are merely held as security and are not dissipated by trading activity. 2.RR.32–33. Thus, if Dr. Zhao has the means to engage in this allegedly "competing" enterprise, as XO insists he does, he has the means to pay damages in the (unlikely) event of a judgment against him in this suit, either through the millions in liquid assets he must have if XO's story is to be believed, or by recovering deposits made with CAISO.

Thus, the Trial Court abused its discretion in concluding that XO faced a "probable, imminent, and irreparable injury" absent prejudgment injunctive relief. The TI Order should be reversed.

## 2. XO is Not Entitled to a Writ of Attachment.

Although XO requested a writ of attachment in its Original Petition, it appeared to abandon that request at the TI hearings. Nevertheless, to the extent the Trial Court's Order could be interpreted as relying on the attachment statute, such reliance is wholly supported by fact or law and an abuse of discretion.

***First***, Dr. Zhao is not "justly indebted" to XO. At issue in this case is whether Dr. Zhao breached an Employment Agreement and, if so, the proper measure of damages for such breach. The Employment Agreement does not contain a liquidated damages provision and nothing in Texas law allows for a discretionary bonus to be construed as "liquidated" damages. Given that the amount of any such bonus could not be known by Dr. Zhao at the time the Employment Agreement was executed, he could not possibly have agreed that such sum would constitute a fair measure of damages for a breach of any of the myriad provisions of the Agreement. *See BMG Direct Mktg.*, 178 S.W.3d at 766. Nor can it be said that the amount sought by XO here—more than half a million dollars—is not an unlawful penalty under the contract, given the lack of any actual harm to XO from Dr. Zhao's backing-up company data to external hard drives. *Id.* Absent a liquidated debt under a contract, a writ of attachment cannot be had. *In re Argyll Equities*, 227 S.W.3d at 271; *see also E.E. Maxwell Co.*, 638 F. Supp. at 753.

***Second***, given the vast discovery that has been exchanged in this case, and

the litigation of a previous lawsuit by XO against Dr. Zhao on identical allegations as those presented here, it cannot be said that XO's request for a writ "is not sought for the purpose of injuring or harassing" Dr. Zhao. On the contrary, XO's aim is plainly apparent—to prevent Dr. Zhao from accessing his lawfully earned income (income on which he has paid income taxes) to meet his financial obligations following his resignation from employment and to mount a defense to XO's slanderous claims to FERC. XO's conduct should not be countenanced through the "extraordinary" award of a writ of attachment.

*__Third__*, XO can offer nothing more than pure speculation that it will "probably lose its debt" unless a writ is issued. Having failed to pursue discovery on this question, XO cannot simply rest on conclusory and xenophobic assertions that Dr. Zhao intends to start a competing business or move his money to China. 2.RR.21, 58.

*__Fourth__*, especially having deposited Dr. Zhao's 2014 bonus and 401(k) employer match outside the state of Texas, where it remains, XO cannot establish any of the Section 61.002 factors necessary to obtain a writ of attachment. There can be no intention to remove property from the jurisdiction of the Trial Court that was never within its jurisdiction in the first place.

Thus, absent a liquidated debt at risk of loss via the transfer of such funds out-of-state, XO cannot establish entitlement to a writ of attachment. To the extent

the Trial Court's TI Order could be interpreted as issuing a writ, such issuance constitutes an abuse of discretion and should be reversed.

**3. The Trial Court Abused its Discretion in Exercising "Inherent Discretion" to Order Dr. Zhao to Deposit his 2014 Bonus with the Registry of the Court.**

Finally, Texas law is clear: XO cannot attempt an end-run around the legal requirements for obtaining prejudgment relief via an injunction or writ of attachment by resort to the Court's "inherent authority" to issue injunctive relief. To the extent the Trial Court relied on such authority, doing so constitutes an abuse of discretion.

A Trial Court's "inherent authority" to award prejudgment relief is to be sparingly exercised in only the most limited of circumstances involving a "disputed fund" in a case that does not implicate "the carefully constructed statutes concerning garnishment, attachment, receivership, etc." *Alliance Royalties, LLC*, 313 S.W.3d at 497. At issue here is not a fund whose ownership is in doubt. Instead, XO presents an ordinary breach of contract action and request for damages that can only be awarded upon a finding that Dr. Zhao breached his Employment Agreement and caused XO recoverable damages.

Unlike marital assets, lottery winnings, or receivership fees, the parties to this case do not concede that the only issue to be decided is who "owns" Dr. Zhao's 2014 bonus. On the contrary, at issue is whether Dr. Zhao breached an

48

enforceable agreement and thereby proximately caused XO recoverable damages. While XO maintains that the proper measure of damages for Dr. Zhao's alleged breach is his 2014 bonus, its contractual theory does not convert Dr. Zhao's bonus into a "disputed fund."

Moreover, XO offered evidence that the fund is in "danger of being lost or depleted." Again, despite ample opportunity to do so, XO adduced no evidence of Dr. Zhao's financial status and ability to pay a judgment in this case. Especially after months of discovery, conclusory, speculative, and illogical claims are insufficient to justify the extraordinary remedy sought.

The basis of the Trial Court's TI Order is unclear, but to the extent it relied on some "inherent authority" to issue the Order, doing so is in patent contravention of well-settled and controlling Texas law holding that "[a] trial court does not have authority—beyond the purview of the attachment statutes—to order that funds be deposited in the court's registry to generally secure payment of a possible future judgment." *Behringer Harvard Royal Island, LLC*, 2009 Tex. App. LEXIS 9456, at *11. The Trial Court abused its discretion in issuing such extraordinary relief and the TI Order should be reversed.

## VII.  PRAYER

XO alleges an ordinary breach of contract and fiduciary duty case for which its seeks money damages. Nothing in XO's allegations, and certainly nothing in

49

the facts developed through discovery or offered during the Temporary Injunction hearings, justify prejudgment relief. The Trial Court abused its discretion in issuing the TI Order, which is unsupported by fact or law. Accordingly, Dr. Zhao respectfully requests that the Order be reversed, the Temporary Injunction dissolved, and his income promptly returned to him by the Registry of the Court. Dr. Zhao further requests an order awarding costs of suit and all other relief to which he may be justly entitled.

Respectfully submitted,

**STURM LAW, PLLC**

*/s/ Shannon A. Lang*
Charles A. Sturm
Texas Bar No. 24003020
csturm@sturmlegal.com
Shannon A. Lang
Texas Bar No. 24070101
slang@sturmlegal.com
723 Main Street, Suite 330
Houston, Texas 77002
(713) 955-1800 tel.
(713) 955-1078 fax

*Attorneys for Defendant-Appellant*
*Liang "Benny" Zhao*

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2015, pursuant to Texas Rule of Appellate Procedure 9.5(b)(1), a true and correct copy of the foregoing document was served on counsel of record for Plaintiffs-Appellees identified below via the electronic filing manager utilized to file this document with the Court.

Thomas C. Van Arsdel
tvanarsdel@winstead.com
WINSTEAD P.C.
1100 JPMorgan Chase Tower
600 Travis Street
Houston, Texas 77002
(713) 650-2728 tel.
(713) 650-2400 fax.

*Attorney for Plaintiffs-Appellees XO Energy LLC*
*and XO Energy Worldwide, LLLP*

/s/ Shannon A. Lang
Shannon A. Lang

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the Maximum Length requirement of Texas Rule of Appellate Procedure 9.4(i)(2)(B) because this brief contains 11,041 words, excluding the parts of the brief exempted by Texas Rule of Appellate Procedure 9.4(i)(1), as determined by the word count function of the word processing program used to generate this document.

Dated: December 2, 2015          */s/ Shannon A. Lang*
                                 Shannon A. Lang

                                 *Attorney for Defendant-Appellant*
                                 *Liang "Benny" Zhao*

# APPENDIX

**CASE NO. 01-15-00937-CV**
IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS

---

**LIANG "BENNY" ZHAO**,
*Defendant-Appellant,*

v.

**XO ENERGY, LLC,** and **XO ENERGY WORLDWIDE, LLLP**,
*Plaintiffs-Appellees.*

---

## INDEX TO APPENDIX

| Bookmark | Document |
|:---:|:---|
| (1) | **Amended Temporary Injunction Order** [3.CR.620–623] |
| (2) | **Employment Agreement** [1.CR.25–32] |
| (3) | **Transcript of Temporary Injunction Hearing** (September 30, 2015) [2.RR.1–86] |
| (4) | **Transcript of *de novo* Temporary Injunction Hearing** (October 22, 2015) [1.RR.1–24] |
| (5) | **Plaintiff's Answers to Second Interrogatories** [2.CR.297–300] |
| (6) | **Technology & Professional Services Agreement** [3.CR.301–308] |

Filed
10/22/2015 3:26:12 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Layla Helton

CAUSE NO. 15-DCV-226436

| | | |
|---|---|---|
| XO ENERGY LLC and | § | IN THE DISTRICT COURT OF |
| XO ENERGY WORLDWIDE, LLLP | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | FORT BEND COUNTY, TEXAS |
| | § | |
| LIANG "BENNY" ZHAO, | § | |
| Defendant. | § | 240TH JUDICIAL DISTRICT |

## AMENDED TEMPORARY INJUNCTION ORDER

On this day, the Court considered the Original Petition and Application for Prejudgment Writ of Attachment, and, in addition or in the alternative, Application for Temporary Injunction (collectively, the "Petition"), filed by Plaintiffs XO Energy LLC and XO Energy Worldwide, LLLP (collectively, "Plaintiffs") against Defendant Liang "Benny" Zhao ("Defendant"). The Court has considered the Petition, the evidence attached thereto, the presentations and representations of counsel, the record, and the evidence adduced at the Court's hearings on the Petition on September 30, 2015, and Defendant's Motion for a *De Novo* Hearing on October 22, 2015. Based on all of the foregoing, the Court makes the following findings:

The Court finds that it clearly appears from the facts set forth in Plaintiffs' Petition that unless Defendant is restrained, Plaintiffs will suffer irreparable injury if Defendant is allowed to use, disclose or otherwise retain or profit from any of Plaintiffs' confidential, proprietary or trade secrets information or use or remove from the State of Texas property, in the form of $532,547.59 in deferred compensation he obtained from Plaintiffs, inter alia, to fund and meet the capitalization and financial security requirements established for registering as a trading company or market participant with the California Independent System Operator ("CAISO") or similar market in the energy trading industry. The Court finds that it is reasonably probable from the specific facts contained in Plaintiffs' Petition that Plaintiffs will suffer immediate and

15-DCV-226436
ORDER
Order
3844550

AMENDED TEMPORARY INJUNCTION ORDER

PAGE 1

620

irreparable injury, loss or damage unless such actions are enjoined until a final hearing on the merits can occur. The nature of the injury includes (i) the destruction and devaluation of Plaintiffs' confidential, proprietary, and trade secret information; and (ii) the loss, depletion or other injury to property consisting of $532,547.59 in deferred compensation Plaintiffs' paid Defendant in the event that he uses or removes the funds from the State of Texas. Accordingly, the Court finds that it should maintain the status quo and protect Plaintiffs from irreparable injury by entering a temporary injunction against Defendant. Based on the foregoing findings, it is hereby:

ORDERED that Defendant and any and all of his agents, employees, representatives and those in direct participation with them, who receive actual notice of this Temporary Injunction Order, either directly or indirectly from:

a. contacting or soliciting any and all Plaintiffs' clients, customers, vendors or suppliers that Defendant came into contact with as an employee of Plaintiffs or for which he obtained confidential information about during his employment until final judgment, other order of the Court, or agreement of the parties;[*]

b. using, transferring, copying or disclosing any documents, information and/or electronic data that Defendant obtained access to as a part of his employment with Plaintiffs, including, but not limited to, the following:[*]

   i. documents, information and/or electronic data contained in or derived from Constraint Effects, the proprietary software developed and maintained by Plaintiffs;[*]

   ii. secured maps and other similar Critical Energy Infrastructure Information;[*]

   iii. documents, information and/or electronic data contained in or derived from PowerWorld Simulator and other third-party software licensed and used by Plaintiffs;[*]

   iv. documents, information and/or electronic data contained in or derived from Plaintiffs' email systems;[*]

---

[*] As stated on the record at the hearing on September 30, 2015, Defendant does not oppose entry of those restrictions identified herein by an "*".

v. production cost and optimization models or forecasts;[*]

vi. congestion models or forecasts; and[*]

vii. load flow analysis.[*]

c. altering, deleting, destroying, hiding, secreting, or otherwise removing from the jurisdiction of this Court any document, record, disc or other written or electronic data or media, including those contained on any personal or business computer, hard drive or other device, which contains or describes any of Plaintiffs' confidential, proprietary, or trade secret information.[*]

It is further ORDERED that Defendant, on or before October 23, 2015, shall deposit into the registry of the Court the sum of $532,547.59, which represents the sum of deferred compensation that was deposited into Defendant's personal bank and 401K accounts and which he received from Plaintiffs on or about February 27, 2015, where such sums shall remain until further order of the Court.

It is further ORDERED that this Order and the restrictions contained herein shall continue from the date of the entry of this Order until a final judgment is entered in this case, unless terminated earlier by this Court or agreement of the parties.

It is further ORDERED that the final trial on the merits of this case be heard in the 240th Judicial District Court of Fort Bend County, Richmond, Texas, on the 1st day of December, 2015, at 9:00 a.m.

It is further ORDERED that this Temporary Injunction Order will be immediately effective based upon Plaintiffs' October 13, 2015 deposit of a surety bond in the amount of $532,547.95.

IT IS SO ORDERED.

SIGNED at Richmond, Texas, on this 29th day of October, 2015 at 11:20 Am

_____
**PRESIDING JUDGE**

Approved and respectfully submitted by,

WINSTEAD PC

By: */s/ Tom Van Arsdel*

Tom Van Arsdel, Attorney-in-Charge
Texas Bar No. 24008196
Zachary B. Allie
Texas Bar. No. 24063997
1100 JPMorgan Chase Tower
600 Travis Street
Houston, Texas 77002
713.650.2728 Telephone
713.650.2400 Facsimile

**ATTORNEYS FOR PLAINTIFFS
XO ENERGY LLC and XO ENERGY
WORLDWIDE, LLLP**

## CERTIFICATE OF SERVICE

I certify that on the 22nd day of October, 2015, a true and correct copy of the foregoing document was served via electronic service on:

> Charles A. Strum (csturm@sturmlegal.com)
> Shannon A. Lang (slang@sturmlegal.com)
> Sturm Law, PLLC
> 723 Main Street, Suite 330
> Houston, Texas 77002

*/s/ Tom Van Arsdel*
Tom Van Arsdel

# EMPLOYMENT AGREEMENT
## WITH LIANG "BENNY" ZHAO

### DATE: November 27, 2012

The parties to this Employment Agreement (this "Agreement") are XO Energy, Worldwide, LLLP (the "Employer"), and Liang "Benny" Zhao (the "Employee"). The Employer desires to ensure itself of the services of the Employee as of XXX  TBD XXX and the Employee desires to accept such employment on the terms and conditions set forth in this Agreement.

Accordingly, the parties, intending to be legally bound, agree as follows:

1. **Employment and Term.** The Employer offers to employ the Employee as an [Analyst], and the Employee accepts that employment with the Employer. Employee's employment under this Agreement shall commence as of XXX  TBD XXX (the "Commencement Date") and shall continue on an "at will" basis until termination of Employee's employment as provided in Section 7 of this Agreement (the "Term"). Upon approval of the Employee's background check and due diligence package by the UVI Research and Technology Park (RTP), Employee will become a Class B Limited Partner.

2. **Duties.** The Employee shall report to and perform such duties as may be assigned from time to time by the Employer's Managing Members and/or such other senior executives of the Employer as the Managing Members may designate. The Employee shall devote his or her best efforts to promote the Employer's interests, and he or she shall perform his or her duties and responsibilities faithfully, diligently and to the best of his or her ability, consistent with sound business practices and at the location designated by the Employer. The Employee shall devote his or her full working time to the business and affairs of the Employer.

3. **Base Salary/Vacation.** Employer shall pay the Employee a base salary/minimum distribution (the "Base Salary") at an annual rate not less than $125,000. The Base Salary shall be payable in accordance with the Employer's regular payroll practices. Employee's Base Salary may be adjusted at the discretion of the Employer at the end of each fiscal year, and shall not be reduced during the course of any fiscal year. Upon becoming a Partner, Base Salary will then be converted to a Minimum Distribution and reported to employee at year end on a K1. Income and Self Employment taxes are the responsibilty of the Partner. Vacation days accrue during the Term. The initial level of vacation accural shall equal an annualized rate of 15.0 days (3 weeks). Vacation days shall be pre-approved by Employee's immediate supervisor.

4. **Incentive Compensation.** In addition to the Base Salary, Employee may be awarded certain incentive compensation (Profits Share) as determined in the sole discretion of the Employer. At the end of each calendar year, Employer shall evaluate whether Employee shall be awarded a share of Profits for the year then ending.

5. **Covenants of the Employee.** In order to induce the Employer to enter into this Agreement, the Employee hereby covenants and agrees as follows:

5611829.4
BOST_1912547.2

25

(a) Prior Restrictions. By accepting employment with Employer, the Employee agrees that he or she is not currently bound by any agreement that could prohibit or restrict him or her from being employed by Employer or from performing any duties under this Agreement.

(b) Assignment. The Employee irrevocably assigns to the Employer, or to any party designated by the Employer, his or her entire right, title and interest in all Developments that are made, conceived, or developed by the Employee, in whole or in part, alone or jointly with others, within the scope of his or her affiliation with the Employer. Such assignment shall include, without limitation, all Intellectual Property Rights in such Developments. "Developments" shall mean all discoveries, inventions, designs, improvements, enhancements, ideas, concepts, techniques, know-how, software, documentation or other works of authorship, whether or not copyrightable or patentable, in any form, related to any business or technology that has been developed or is under development by the Employer. "Intellectual Property Rights" shall mean all forms of intellectual property rights and protections that may be obtained for, or pertain to, the Confidential Information (as defined in Section 6) and Developments, or arise from work performed by Employee under this Agreement, and may include without limitation all right, title and interest in and to (i) all letters patent and all filed, pending or potential applications for letters patent, including any reissue, reexamination, division, continuation or continuation-in-part applications throughout the world now or hereafter filed; (ii) all trade secrets, and all trade secret rights and equivalent rights arising under the common law, state law, Federal law and laws of foreign countries; (iii) all mask works, copyrights other literary property or author's rights, whether or not protected by copyright or as a mask work, under common law, state law, Federal law and laws of foreign countries; and (iv) all proprietary indicia, trademarks, tradenames, symbols, logos and/or brand names under common law, state law, Federal law and laws of foreign countries.

(c) Records. All papers, books and records of every kind and description relating to the business and affairs of the Employer, or any of its affiliates, whether or not prepared by the Employee, other than personal notes prepared by or at the direction of the Employer, shall be the sole and exclusive property of the Employer, and the Employee shall surrender them to the Employer immediately upon expiration of the Term and at any time upon request by the Employer.

(d) Non-Competition. The Employee shall not, during the Term and for a period of two (2) years following the expiration of the Term for any reason (the "Restricted Period"), directly or indirectly:

(i) Be engaged, directly or indirectly, either as an agent, employee, consultant, partner, officer, director, stockholder, proprietor, owner, or otherwise of any person, firm, corporation or organization engaged or attempting to become engaged in a business that competes with the business of the Employer or any of its subsidiaries or affiliates as it relates to the Employer's business (hereinafter, "Competitive Business"), including without limitation all existing and potential competitors and vendors of Employer, except for services rendered to Employer or a successor of Employer; provided, however, that nothing contained in this Section 5(d)(i) shall restrict Employee from owning stock of a publicly held and traded utility company; or

2

(ii)    for Employee's own account, or for the account of any person, firm, corporation or organization engaged or attempting to become engaged in any aspect of a Competitive Business on a worldwide basis, sell to, solicit, contact or service to any person, firm, corporation or other organization that is or was a customer or prospective customer of Employer, with which Employee had contact during Employee's employment, regardless of the time when said customer or prospective customer became a customer or prospective customer of Employer.

During the Restricted Period, Employee shall inform every new employer, prior to accepting employment, of the existence of this Agreement and the provisions of this Section 5.

(e) Non-Solicitation. The Employee shall not, during the Restricted Period, directly or indirectly:

(i)    Solicit for employment or engagment on the Employee's own behalf, or on behalf of a Compteitive Business, any individual or entity who is or has been an employee, agent or independent contractor of the Employer during the Restricted Period; or

(ii)    Contact or attempt to persuade any agent, broker or employee of Employer or its affiliated companies to terminate his or her relationship with Employer or do any act that may result in the impairment of the relationship between Employer and such agent, broker or employee.

(f) Blue Pencil. The provisions contained in this Section 5 as to the time periods, geographic area and scope of activities restricted are severable, so that if any provision contained in this Section 5 is determined to be invalid or unenforceable, that provision shall be deemed modified so as to be valid and enforceable to the full extent lawfully permitted.

(g) Breach; Enforcement.

(i)    Nothwithstanding any other remedy at law or in equity to which Employer may be entitled or may pursue, in the event Employee (a) breaches any of the covenants contained in this Section 5, (b) is terminated for Cause (as defined below), or (c) terminates his or her Employment without Good Reason (as defined below), he or she shall automatically forfeit any and all rights to any deferred Bonuses or other deferred incentive compensation (including without limintation any options relating to equity in Employer or its affiliates), and any grant by Employer of such remuneration shall be automatically void.

(ii)    The Employee agrees and warrants that the covenants contained herein are reasonable, that valid consideration has been and will be received therefor and that the agreements set forth herein are the result of arms-length negotiations between the parties hereto. The Employee recognizes that the provisions of this Section 5 are vitally important to the continuing welfare of the Employer, and its affiliates, and that money damages constitute a totally inadequate remedy for any violation thereof. Accordingly, in the event of any such violation by the Employee, the Employer, and its affiliates, in addition to any other remedies they may have, shall have the right to institute and maintain a proceeding to compel specific performance thereof or to issue an injunction restraining any action by the Employee in violation of this Section 5.

3

5611829.4
BOST_1912547.2

6. **Confidentiality**. The Employee shall not, directly or indirectly, disclose to anyone, or use in competition with the Employer or any of its subsidiaries or affiliates, any Confidential Information of or pertaining to the Employer, including without limitation, any trade secrets, advertising arrangements, costs, financial data, employee information or information as to organization structure of the Employer or any of its subsidiaries or affiliates. "Confidential Information" shall mean confidential or other proprietary information that is owned by the Employer or any of its subsidiaries or affiliates, including without limitation, hardware and software designs, product specifications and documentation, business and product plans, customer lists, and other confidential business information. Confidential Information shall not include information which: (i) is or becomes public knowledge without any action by, or involvement of, the Employee in violation of this Agreement; (ii) is disclosed by the Employee with the prior written approval of the Employer; or (iii) is disclosed pursuant to any judicial or governmental order or in any dispute with the Employer, provided that the Employee gives the Employer sufficient prior notice to contest such order. The Employee shall not disclose to the Employer or any of its subsidiaries or affiliates, use in the Employer's or any of its subsidiaries' or affiliates' business, or cause the Employer or any of its subsidiaries or affiliates to use, any confidential or proprietary information or materials of any third party. Nothing in this Section 6 is designed to narrow the Employer's enforcement rights under any state of federal law.

7. **Termination of Employment.**

(a) **Death or Disability**. The Employee's employment under this Agreement shall terminate upon his or her death or Permanent Disability. For purposes of this Agreement "Permanent Disability" shall mean a physical or mental disability or infirmity that prevents the material performance by Employee of his or her duties hereunder (i) lasting for a continuous period of ninety (90) days or longer; or (ii) for ninety (90) days out of any one hundred twenty (120) day period.

(b) **Termination by the Employer**. The Employer may terminate the Employee's employment under this Agreement with or without Cause (as defined below) by giving written notice to the Employee of such termination. In the event of a termination without Cause, the Employer shall provide the Employee with at least 30 days' advance written notice of his termination. For purposes of this Agreement, the Employer shall have "Cause" to terminate the Employee's employment under this Agreement in the event of: (i) the Employee's willful and continued failure to perform and to discharge his or her duties and responsibilities under this Agreement for any reason (other than the Employee's disability) after (x) the Employer has provided the Employee with written notice of its intent to terminate his employment under this clause, and (y) the Employee has failed to resume the performance of such duties within fifteen (15) days following receipt of such notice; (ii) any other willful misconduct by the Employee that is materially and demonstrably injurious economically to the Employer; (iii) the Employee's final conviction of any felony or any misdemeanor involving moral turpitude; or (iv) the Employee's violation of any of the provisions of Section 5 of this Agreement.

(c) **Termination by the Employee**. The Employee may terminate his or her employment under this Agreement with or without Good Reason (as defined below) by giving prior written notice to the Employer. If the Employee terminates his or her employment without Good Reason, he or she shall provide the Employer with at least 30 days advance written notice

4

of his intent to terminate his or her employment. For purposes of this Agreement, the Employee shall have "Good Reason" to terminate his or her employment upon: (i) the Employer's breach of a material provision of this Agreement, (ii) written notice to the Employer describing the nature of the breach proving an intent to terminate the Agreement for Good Reason under this clause, and (iii) the Employer's failure to correct the breach within fifteen (15) days following the written notice required in Section 7(c)(ii).

### 8. Compensation Upon Termination.

(a) Compensation upon Termination for Any Reason. Subject to Section 5(g) of this Agreement, if the Employee's employment under this Agreement is terminated for any reason, then the Employee shall be entitled to receive the following benefits (collectively, the "Standard Termination Benefits"): (i) the amount of his or her Accrued Obligations (as defined below), to be paid in a single lump sum cash payment within thirty (30) days of the date of termination, and (ii) any payments which the Employee, his or her spouse, beneficiaries or estate may be entitled to receive pursuant to any employee benefits plan or program of the Employer. As used in this Agreement, "Accrued Obligations" means, as of the date of termination, (A) any accrued but unpaid Base Salary, (B) any accrued and unpaid reasonable expense reimbursements, and (C) any accrued, but unpaid vacation.

(b) Additional Termination Compensation. If the Employer terminates the Employee's employment without Cause, if the Employee terminates his or her employment for Good Reason, or if Employee's employment is terminated under Section 7(a) of this Agreement, the Employee (or in the case of his or her death, his or her estate or beneficiary, as the case may be) shall be entitled to receive, in addition to the Standard Termination Benefits set forth in Section 8(a) above, the following additional benefits (the "Additional Termination Benefits") within thirty (30) business days following his/her termination of employment:

(i)     a cash amount equal to two (2) months of the Employee's Base Salary as of the date of termination, payable in a lump-sum; and

(ii)     a pro-rata amount of his or her target bonus earned in the year of termination.

The benefits referred to in this Section 8(b) ("Severance Pay") shall be given in lieu of any other claims, termination benefits or payments held by or due to or the Employee. In addition, all payments given hereunder shall be given only in exchange for the execution and delivery of a general release, in a form and substance agreeable to the Company, which releases any claims the Employee might have against the Company related to Employee's employment. Employee will forfeit any and all amounts due as Severance Pay hereunder upon the breach of any covenants in Section 5.

### 9. Miscellaneous.

(a) Binding Effect. This Agreement shall be binding upon and inure to the benefit of the heirs and representatives of the Employee and the successors and assigns of the Employer.

5

(b) Notices. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered, return receipt requested mail, to the parties at the following addresses (or at such other address as a party may specify by notice to the others):

To the Employer:                                    To the Employee:

XO ENERGY WORLDWIDE, LLLP          Liang "Benny" Zhao
6501 Red Hook Plaza, Suite 201
St Thomas, VI 00802-1306
Attn: Shawn Sheehan/John Charette

Addresses may be changed by written notice sent to the other party at the last recorded address of that party.

(c) Jurisdiction and Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware. The parties hereto consent to the jurisdiction and venue of any state or federal court in the State of Delaware and agree that any permitted lawsuit may be brought to such courts or other court of competent jurisdiction upon the consent of both parties.

(d) Severability. If any provision of this Agreement, or the application of any provision to any person or circumstance, shall for any reason and to any extent be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected but shall be enforced to the full extent permitted by law.

(e) Prior Understandings. This Agreement embodies the entire understanding of the parties hereof, and supersedes all other oral or written agreements or understandings between them regarding the subject matter hereof. No change, alteration or modification hereof may be made except in a writing, signed by each of the parties hereto.

(f) Successors.

(i)    Employer's Successors. No rights or obligations of the Employer under this Agreement may be assigned or transferred except that the Employer may assign this Agreement to any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Employer if such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place. As used in this Agreement, "Employer" shall mean the Employer as herein before defined and any successor to its business and/or assets (by merger, purchase or otherwise) which executes and delivers the agreement provided for in this Section 9(f)(i) or which otherwise becomes bound by all the terms and provisions of this Agreement by operation of law.

(ii)   Employee's Successors. No rights or obligations of the Employee under this Agreement may be assigned or transferred by the Employee other than his rights to

6

5611829.4
BOST_1912547.2

30

payments or benefits hereunder, which may be transferred only by will or the laws of descent and distribution. Upon the Employee's death, this Agreement and all rights of the Employee hereunder shall inure to the benefit of and be enforceable by the Employee's beneficiary or beneficiaries, personal or legal representatives, or estate, to the extent any such person succeeds to the Employee's interests under this Agreement. The Employee shall be entitled to select and change a beneficiary or beneficiaries to receive any benefit or compensation payable hereunder following the Employee's death by giving the Employer written notice thereof. In the event of the Employee's death or a judicial determination of his incompetence, reference in this Agreement to the Employee shall be deemed, where appropriate, to refer to his beneficiary(ies), estate or other legal representative(s). If the Employee should die following his date of termination while any amounts would still be payable to him hereunder if he had continued to live, all such amounts unless otherwise provided herein shall be paid in accordance with the terms of this Agreement to such person or persons so appointed in writing by the Employee, or otherwise to his legal representatives or estate.

(g) <u>Non-Disclosure</u>. Unless otherwise required by applicable law or the rules of any stock exchange or quotation system on which the securities of the Employer are listed, or by legal process, each of the parties to this Agreement shall hold the terms of this Agreement in the strictest confidence and shall not disclose or otherwise make public any of the terms and conditions of this Agreement; provided, that, any disclosure made by Executive to his spouse, attorney(s) or financial adviser(s) shall not be deemed to be a breach of this Section 9(g).

(h) <u>No Waiver</u>. The failure of any party at any time or times to demand strict performance by any other party of the terms, covenants, or conditions set forth in this Agreement shall not be construed as a continuing waiver or relinquishment thereof, and any party may at any time demand strict and complete performance of such terms, covenants, and conditions.

(i) <u>Integration</u>. This Agreement constitutes the final, exclusive, and complete expression of the agreement of the parties hereto, and it embodies all of the terms and conditions of the Agreement between the parties with respect to the subject matter hereof. This Agreement is expressly intended to replace and supersede all prior and contemporaneous agreements, proposals, negotiations, representations, and warranties, if any, between the parties. There are no agreements, representations, or warranties that have not been included in this Agreement. It represents the result of arms length negotiation between the parties and shall be interpreted and construed without regard to any presumption or other rule requiring construction against the party who caused the Agreement to be drafted.

(j) <u>Execution in Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which together shall constitute but a single instrument.

[The remainder of this page is intentionally left blank.]


[Signature lines appear on the following page.]

7

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

EMPLOYER:

XO ENERGY WORLDWIDE, LLLP

By: _____

Name _____

Title:

EMPLOYEE: 

Liang Zhao _____ 12/3/2012

9

32

REPORTER'S RECORD

VOLUME 2 OF 3 VOLUME

TRIAL COURT CAUSE NO. 15-DCV-226436

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
11/12/2015 3:11:05 PM
CHRISTOPHER A. PRINE
Clerk

| | |
|---|---|
| XO ENERGY LLC and | ) IN THE DISTRICT COURT OF |
| XO ENERGY WORLDWIDE, LLLP | ) |
|     Plaintiffs, | ) |
| | ) |
| VS. | ) FORT BEND COUNTY, TEXAS |
| | ) |
| LIANG "BENNY" ZHAO, | ) |
|     Defendant. | ) 240TH JUDICIAL DISTRICT |

---

## **TEMPORARY INJUNCTION**

---

On the <u>30th</u> day of <u>September, 2015,</u> the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Stuti Patel, Associate Judge Presiding, **via digital recording** under Rule 199.1(c), held in Richmond, Fort Bend County, Texas, pursuant to the Texas Rules of Civil Procedure.

TRANSCRIPTION UNDER RULE 203.6(a) by a Certified Shorthand Reporter.

**APPEARANCES**

**MR. TOM VAN ARSDEL**
SBOT NO. 24008196
Attorney at Law
1100 JP Morgan Chase Tower
600 Travis Street
Houston, TX  77002
Telephone:  713-650-2728

AND

**MR. ZACHARY B. ALLIE**
SBOT NO. 24063997
Attorney at Law
1100 JP Morgan Chase Tower
600 Travis Street
Houston, TX  77002
Telephone:  713-650-2728


Attorneys for Plaintiff XO Energy LLC and
                         XO Energy Worldwide, LLLP.






**MS. SHANNON ASHLEY LANG**
SBOT NO. 24070103
723 Main Street, Suite 330
Houston, TX  77002
Telephone:  713-955-1800

Attorney for Defendant Liang "Benny" Zhao

**WITNESS INDEX**

John Charette                              Direct    Cross   V.Dire

   By Mr. Van Arsdel              24 v2

   By Ms. Lang                                      60 v2


Closing Statement by Mr. Van Arsdel ..............71    2

Closing Statement by Ms. Lang ...................74    2

The Court's Ruling by Judge Patel ...............82    2

Reporter's Certificate ..........................86    2

\* \* \* \* \* \* \*

**EXHIBIT INDEX**

EXHIBIT      DESCRIPTION              OFFERED      ADMITTED

# 2.   California Independent      28
       System Operator Corp.
       Electronic Tarniff

# 7.   Offer of Employment to      37           38
       Mr. Zhao

# 8.   Employment Agreement to     41           41
       Mr. Zhao

# 13.  Exhibit D to Petition       53
       Screen shots

# 14.  Paystub for Mr. Zhao        56           56

# 16.  Letter of Termination to    56           57
       Mr. Zhao

*(The following hearing is being transcribed from a **digital audio recording** provided by Stuti Patel, Associate Judge for the 240th District Court.)*

(PROCEEDINGS)

THE COURT: We are on the record for 15-DCV-226436. If the attorneys could state their names and who they represent for the record.

MR. VAN ARSDEL: Yes. Tom Van Arsdel for XO Energy, LLC, and XO Energy Worldwide LLLP, the Plaintiffs.

MR. ALLIE: Zachary Allie for the same parties.

MS. LANG: Shannon Lang on behalf of the Defendant, Liang Zhao.

THE COURT: Okay. Thank you, counsel. It is my understanding before we got on the record this morning that y'all had an opportunity to meet and have reached I guess a partial agreement or the Defendant is not opposed to entry of certain parts of the order; is that correct?

MR. VAN ARSDEL: That's right.

MS. LANG: That's correct.

THE COURT: Okay. Do one of y'all want to cite for the record just briefly -- and I'm referencing

to the proposed temporary injunction order that was filed on 9-29 of this year under this cause number. Do one of the attorneys want to go ahead and state for the record what part of that proposed order is not opposed or unopposed?

MR. VAN ARSDEL: Sure. This order asks for, starting on page 2, the middle of page 2, certain elements of relief A, B, and C. As to A, the parties -- the Defendant is not opposed to the relief requested in Section A of the order, so long as every part of the phrase after the word "judgment" is struck. So, the phrase would read, "Contacting or soliciting any and all Plaintiffs' clients, customers, vendors, or suppliers that the Defendant came into contact with as an employee of Plaintiffs, or for which he obtained confidential information about during his employment until final judgment."

And then as to the relief requested in Section B including all subparts and Section C, the Defendant is unopposed to an entry of order for that relief as well.

THE COURT: And is that correct, Ms. Lang?

MS. LANG: That is correct.

THE COURT: Okay. So, we have placed on the record the part of the proposed order that is not

opposed. It is my understanding that this afternoon when we reconvene after the Court's recess, we will hear arguments, law, evidence about the remaining issue, which is the Plaintiffs' request for the deposit in the Court registry. Is that the only issue remaining?

MR. VAN ARSDEL: That's right.

MS. LANG: Yes, and then perhaps some changes to the preparatory language.

THE COURT: Yes. That is correct. And it could affect the other language. So, with all that being stated on the record, we are going to go off the record at this time. The Court stands in recess in this cause number until -- we will start exactly at 1:30 p.m. Does that work for both parties?

MR. VAN ARSDEL: Okay. That would be fine.

THE COURT: Okay. Then we are going to go off the record at this time.

(Off the record.)

THE COURT: We are back on the record in Cause Number 15-DCV-226436. If I could have the attorneys state their name and who they represent for the record again since we restarted it.

**OPENING STATEMENT**

MR. VAN ARSDEL: Yes. Tom Van Arsdel for

XO Energy, LLC, and XO Energy Worldwide, LLLP, the Plaintiffs.

MR. ALLIE:  Zachary Allie for the same Plaintiffs.

MS. LANG:  Shannon Lang on behalf of the Defendant.

THE COURT:  Okay.  Thank you.  And, Mr. Van Arsdel, are you going to be the primary presenting for the Plaintiff?

MR. VAN ARSDEL:  I will be.

THE COURT:  And you are the movant today, so, I will let you go ahead and give the Court some opening remarks briefly about what you are asking for.

MR. VAN ARSDEL:  Thank you, Your Honor. XO Energy and XO Energy Worldwide are companies involved in the wholesale of electricity trading market.  They operate out of an office in Saint Thomas U.S. Virgin Islands.  They also have an office in Landenberg, Pennsylvania, outside of Philadelphia.

And to accomplish their business objectives they hire a number of traders and analysts to support their trading activity.  Mr. Zhao, the Defendant, was formally an analyst with XO Energy.  He was employed beginning in 2013, and his employment was terminated earlier this year in March of 2015.

As part of fulfilling his duties for XO Energy as an analyst, Mr. Zhao was given access to certain confidential information that was necessary for the work he needed to do to facilitate trades and make good decisions on what energy markets to trade in. So, to receive this information he signed a number of agreements that allowed him access to the information and also required him to take certain measures to protect it, and we will have evidence of that in the record.

In addition to that, he had to sign an employment agreement. The employment agreement said that he was to receive a salary. That salary was $125,000 annually. A number of benefits he was also eligible for. And he was also eligible for deferred compensation, essentially a year-end bonus based on performance and the performance of the companies that would be determined solely in the discretion of management.

There are some additional provisions in the agreement that impact whether or not he gets a bonus. One of those is if he has violated Section 5 of the agreement. The agreement says that, "All payments of compensation are automatically void." Section 5 of the agreement contained a non-compete clause for two

years that prevents him from doing anything to compete with XO Energy in this industry.  The reason that's in there, Your Honor, is because these analysts and traders receive very specialized training, they receive not only the confidential information, they receive some training on how to use it.  So, what they don't want is for employees to come on board, get all this information, learn the ropes, and then immediately set up shop next door to compete.  So, they have a two year non-compete in there.  And it says, again, that if that's violated then any grant by the employer of such remuneration shall be automatically void, and that includes deferred bonuses.

What we have here is we discovered -- XO Energy -- discovered in February of 2015 that Mr. Zhao had been downloading and copying confidential information that was contained in various parts of XO Energy's computer system.  He downloaded this on to an external drive from his home in Katy.  Incidentally, Mr. Zhao was the only employee or representative of XO that lived outside of either Landenberg, Pennsylvania or Saint Thomas Virgin Islands, he lived in Katy.

THE COURT:  His house is in Katy, Fort Bend County?

MR. VAN ARSDEL:  It is.  And there is a

computer software package that was activated on his computer to capture all the activity and screen shots on his computers during a period from roughly February 13th, to February 27th.  And what those screen shots capture is his personal copying of various pieces of confidential information contained in proprietary software, contained in licensed software, contained in emails, maps that had been obtained from the independent service organizations that run these utility markets that are provided in exchange for confidentiality agreements --

THE COURT:  Who put that software in his computer to capture the screen shots?

MR. VAN ARSDEL:  The company did.  It's on everyone's computer, but you have to manually turn it on, and they did turn on the screen shot capability on his computer in mid February of 2015.  And all of the information or a selection of the information that was captured during those screen shots is attached to the petition.

So, what we also saw, in addition to the copying, was he was developing a to do list and accessing the website for an organization called CAISO, C-A-I-S-O, it's a California electricity company.  And what he was doing is he was looking for what the

requirements are to set up to be a trader on that utility grid, and he was making a to do list of everything that he needed to do to set himself up to trade on that ISO.  So, we have evidence that he was making imminent plans to compete against XO Energy.  He was going to quit the company, set up himself to compete on the CAISO and violate his non-compete.

So, once that was discovered, unfortunately the payment of the bonus that he was supposed to get for his performance in 2014 was not discovered in time to hold back that payment.  Because the company would have invoked and, in fact, has invoked the breach and enforcement provision of the employment contract which says that that remuneration is automatically void.  It was evidenced before he was to be made the payment, it was just not discovered until that payment was already in process and deposited in his account.

So, what we are asking the Court to do is enforce this part of the agreement, to compel Mr. Zhao to pay that money into the registry of the Court pending the outcome of this case.  We are disputing the ownership of the funds, and we believe that the agreements in place and under Texas law, we are entitled to this relief.

THE COURT:  So, you are asking that he be ordered to pay that amount -- I think it was around 500 something thousand dollars -- I have it in your pleadings, the exact amount.  You are asking that he be court ordered to pay that into the registry until this case is either resolved by settlement or resolved by trial?

MR. VAN ARSDEL:  That's right, Your Honor.

THE COURT:  Okay.  Ms. Lang, do you want to make some opening remarks about this hearing today?

**OPENING STATEMENT**

MS. LANG:  Well, first, we take issue with some of the stunning omissions from the callous representations of the facts here.

THE COURT:  I'm sorry, Ms. Lang, I just really want to make sure  we are all being recorded.  I don't mean to interrupt here, I apologize, but if you will just talk a little bit louder.  I just get concerned because you both know you are entitled to a transcript of today's proceedings and it has to be recorded properly before that can even be made.

(REPORTER'S NOTE:  AT THIS TIME THE JUDGE TURNED UP THE MICROPHONES FOR A BETTER RECORDING, BUT ACTUALLY NOW THERE IS A LOUD NOISE, A KIND OF SQUELCH NOISE.)

MS. LANG: Well, as I was saying, there are stunning omissions in the representation of the facts here. But I will start with the primary question before the Court, which is what is the extent of the Court's authority to order a writ of attachment on this money, and how has XO demonstrated they are entitled to it, and endorsed by the company of XO? Their position that this is a simple question as far as the money to be placed into the registry of the Court ignores that there is only one legal method to do that in Texas, and that's through a writ of attachment, which has been described as an ineffectually harsh remedy that should only be issued in the most narrow circumstances when various statutory requirements have been met. None of those have been met. In fact, none of them were mentioned. And those include whether the Defendant (unintelligible) indebted to the Plaintiff, and indebted for purposes of a writ of attachment meaning there is liquidated damages clause in the contract that can be enforced.

Two, the attachment is not sought for the purpose of injuring or harassing the Defendant. I would submit that this is very much about injuring and harassing the Defendant, because -- well, I'll finish with my recitation.

We have been engaged in litigation since

March, have conducted full discovery and the discovery has not brought out any facts to support their claim, which they are full aware of.

Three, the Plaintiffs will probably lose his debt once the writ of attachment is issued. And to that end, Texas courts have held that there needs to be an actual showing that, in fact, the party against whom a writ is sought doesn't have the financial wherewithal or ability to pay a judgment if one did, enforced against him, again, has fairly stated that under a contract. We have been in discovery for six months, so, there has been ample opportunity to make discovery on this issue.

And, four, the specific grounds for the writ to exist, another statute, Section 61.002 of the Texas Civil Practices and Remedies Code, and there is a list there we can go through, but none of those factors have been met either. So, the only issue for the Court is whether as a matter of law they have presented you a contract with a liquidated damages provision that constitutes theft justly owed to the Plaintiff, that they are not seeking to injure, harass or harass the Defendant, and that they meet the proper showing that there will be (unintelligible) in the event a judgment is issued. If they can't meet their showing, the writ

of attachment can't issue.  That's really the entire inquiry for this Court.

THE COURT:  The thing that you mentioned that the discovery has been completed between both parties already on this case through the federal court?

MS. LANG:  It was substantially completed. They filed suit in federal court back in March.  We filed a motion to dismiss on the basis of jurisdiction, but while that motion was being decided Dr. Zhao permitted discovery to proceed.  So, to that end, the parties exchanged computers and related devices, and then produced to the party's perspective experts, in fact, one was here earlier.  The devices have been investigated and analyzed.  We have exchanged documents in discovery.  Dr. Zhao has outstanding discovery that wasn't due yet when the case was dismissed.  But they have propounded discovery only one set (unintelligible).

THE COURT:  So, is there any discovery that your client, Mr. Zhao, is still seeking?

MS. LANG:  There are some things that Dr. Zhao is seeking.  In particular -- well, there are several things.  But in particular, going back to my first point, which there are some incredible omissions from the factual implications here.  First of all, Dr. Zhao was told in February, 2015, that he needed to

make a choice.  He needed to either relocate in Saint Thomas, or Landenberg, Pennsylvania, or resign his position.  He was given time to consider that and, in fact, was told that he should not reach his decision until he had an opportunity to receive his 2014 bonus, and that was only because they thought this attractive bonus would encourage him to stay with the company.  The high performing employee earned a $700,000 bonus last year.  Dr. Zhao asked a question in an email about the terms of the ultimatum, and in the meantime attended a company-wide meeting where the company expressed it's intent to offer Plaintiffs an amendment to their non-compete obligations that would lesson the time of two years to one, and include a severance provision.  We have not gotten those documents despite having asked for those documents of the non-compete.  And so, we are seeking those, and some various other things that --

THE COURT:  The various outstanding discovery that you say your client is going to want at some point?

MS. LANG:  Yes.  But not much.

THE COURT:  Okay.

MS. LANG:  But in the meantime, I think the important point is that we have conducted all of this discovery on the devices.  Dr. Zhao's computer has

been produced, various other devices have been produced. And there have been no additional facts pled in this complaint than there was in the original complaint.  And in looking through the binder of exhibits, there are no new exhibits offered here that were exchanged in (unintelligible) that would shed additional light on their case.  In fact, they have dropped the claims that they are brought in the federal case, and that was a claim for appropriation of trade secrets, which if you look at the contract under which they are proceeding, absent of the appropriation of trade secrets, there really isn't any contract violation.  And that brings us back to the point of whether they are entitled to a writ of attachment, because they can't show entitlement of the contract and they haven't met the other legal requirements for getting a writ.  There is no means or legal authority to order this money be placed into the registry of the Court.  I should also point out that obviously the Court's (unintelligible).

THE COURT:  Where was the money deposited?

MS. LANG:  It was deposited into a savings account in California.  Under the 401(k) money of -- well, I don't know if the (unintelligible).

THE COURT:  Mr. Van Arsdel, this money that we are talking about, which is the sole issue

today, I guess, remaining on the injunction --

MR. VAN ARSDEL:  Yes.

THE COURT:  -- that money is not in Texas?

MR. VAN ARSDEL:  It's in the Bank of America.

THE COURT:  Okay.

MR. VAN ARSDEL:  It's not as if it's stuffed under a mattress in California.  It's in the Bank of America, which obviously the Court can take judicial notice that the Bank of America has branches in Texas.  So, Mr. Zhao would have access to have those funds in Texas.

More on the point, we have identified a case, the Supreme Court of Texas, where the Supreme Court affirms the trial court's order of $17,000 that was held in a Mexican bank be paid into the registry of the court.

THE COURT:  Do you have a copy of that case?

MR. VAN ARSDEL:  I do.

THE COURT:  Have you given one to --

MR. VAN ARSDEL:  May I approach, Your Honor?

THE COURT:  Yes.  Thank you, sir.

MR. VAN ARSDEL:  Now, I'm sure opposing

counsel would be quick to note there are some procedural differences here.  This is a post-judgment order and not a pre-judgment order.  But the greater point is that this court said it was okay to compel money that is held in another jurisdiction to be paid into the registry of the court.

MS. LANG:  Well, if I could respond briefly.  The fact that this is post-judgment makes it entirely irrelevant.  But moreover, this case is from 1967, and I believe the writ of attachment statute comes after that.  And the Texas courts have held that that's the only thing under which unattached property where a judgment can be met.

MR. VAN ARSDEL:  And as to that point, Your Honor, I would be happy to respond as I have a string of cases on that.

THE COURT:  Okay.  This is 1967, and the writ of attachment statute I guess is after that.  What were you saying you had a response to?

MR. VAN ARSDEL:  Yes, Your Honor.  And we have another case that Mr. Allie will provide a copy of.  It's from 2009 which is after the writ of attachment statute was enacted.  It is from the Dallas Court of Appeals.  In this case there is a holding that the parties --

THE COURT: Counsel, just for the record, if you will read into the record all the cases you have handed to the Court, and the cites so we have them on the record.

MR. VAN ARSDEL: Certainly. This is Behringer, B-E-H-R-I-N-G-E-R, Harvard Royal Island, LLC versus Skokos, S-K-O-K-O-S. The cite is 2009 TEX@9Lexus 9456 in 2009 WL4756579. It's a December 14th, 2009 opinion from the Court of Appeals in Texas, 5th District in Dallas.

This case did hold that the applicant in this particular matter should have followed the writ of attachment statute. On page 10 of the opinion, this Court does say that the trial court has some inherent authority without implicating the attachment statutes to order independently to deposit funds into the court's registry. This authority arises when there is a dispute as to a particular fund. Specifically if the Plaintiff can show a dispute about a fund and show that the fund is in danger of being depleted, the trial court can order the funds to be deposited in the Court's registry. And, again, this is without regard to the requirements of the writ of attachment statute.

So, what we intend to show is that there is a dispute about this fund. He is saying that it is

now his property, and we are saying that under his employment agreement that payment was void and needs to be returned to the employer.  So, there is a dispute.

We also intend to show that as long as these funds are unprotected and are in Mr. Zhao's hands -- Dr. Zhao's hands -- they are at risk of being depleted.  Number 1, he was researching the requirements under the CAISO for becoming a trader on that exchange, and we intend to show that one of those requirements is the payment of a $500,000 deposit.  That is very similar to the amount that he just received from XO.

Number 2, we intend to show that he is a Chinese citizen, has access to Chinese financial assistance in the banks there, and that I think it is well accepted that once money is overseas in China, it becomes almost impossible to get it out of the Chinese bank.  Certainly they do not honor American court orders to have those funds returned to the United States.

So, we do believe we can make the requirements that were shown in 2009 in this Court of appeals case, and incidentally, I will mention that this is the same record that we brought to Judge Ellison in the federal court and he granted the relief we asked for.  It was a slightly different variation, he did not require a payment into the registry, but he did place a

freeze on the funds.  Under the same record without regard to the writ of attachment requirements.

THE COURT:  Is it 593 the statute number?  Do y'all know offhand?

MR. VAN ARSDEL:  For the writ of attachment?

THE COURT:  Yes.

MS. LANG:  It's Texas Civil Practices and Remedies Code 61.001.  Your Honor, I would be happy to respond to his last argument.

THE COURT:  Yes, if you want to respond, you may go ahead and do so.  I'm just checking something out, but please go ahead.

**OPENING STATEMENT**

MS. LANG:  Sure.  The point isn't clear, but the point here is, the holding, is that they should have filed a writ of attachment and failed to do so and calling it an injunction is not lawful.  This said as it is cited here it's not controlling.  It is disputed by a rash of (unintelligible). (Unintelligible) in the face of a statute that is very clearly (unintelligible).

Moreover, the Plaintiffs have not described any problem that any plaintiff would have in filing a suit.  The fact that my client has ties to China cannot be used against him.  He has got

(unintelligible) big part of the country.  And like any other litigant in a court in Texas, it's under very narrow circumstances to have a writ.  You get your judgment first and you try to correct it later.  Putting all of that aside, and I should also point out that Dr. Zhao (unintelligible).  But on a legal question, there is no question on a writ of attachment.  They are (unintelligible).

THE COURT:  You said you wanted to put on a witness for your factual basis to support -- that you have met the requisite?

MR. VAN ARSDEL:  Yes.

THE COURT:  If you want to go ahead and do that at this time, I will allow that.

MR. VAN ARSDEL:  Okay.  Yes, the Plaintiffs would call John Charette.

THE COURT:  Before we proceed, can you go ahead and spell your name for the record.

THE WITNESS:  John Charette, C-H-A-R-E-T-T-E.

THE COURT:  And I will ask you to speak up and speak into the microphone.  Go ahead, counsel.

MR. VAN ARSDEL:  Thank you, Your Honor.

**JOHN CHARETTE,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

Q.   (BY MR. VAN ARSDEL) Good afternoon, Mr. Charette.  Could you please introduce yourself to the Court?

A.   Yes.  My name is John Charette.  I'm the CFO, Chief Financial Officer for XO Energy.

Q.   And how long have you been the Chief Financial Officer for XO Energy?

A.   Since the company was founded in 2011 -- April, 2011.

Q.   And what was your job before you became CFO?

A.   I was also a CFO of an energy trading company, which was 50 percent owned by Shawn Sheehan, the owner of XO Energy.

Q.   And so, when you dissolved that company and went with this company, he brought you along as the CFO?

A.   Yes, that's correct.

Q.   Okay.  Can you talk a little bit about the duties that you have and that position that you have as CFO?

A.   Well, we are relatively a small firm.  We have traders, IT, and then myself.  So, as CFO, I do all the financial statements.  I handle all the banking, bank

reconciliations.  I also handle some of the human resource duties, some compliance duties, building managements, procurement of supplies with computers and whatnot.  Pretty much anything that needs to get done.

Q.   And what are some of the compliance issues that you encounter, and before you answer that question, are you basically the chief officer in charge of compliance?

A.   I am the compliance officer, yes.

Q.   Okay.  And what sort of compliance issues are you responsible for?

A.   Well, we just have to do some annual disbursements and announce to our employees the risk management policies and various compliance policies. It's a small company, there is not a lot involved with handling that.

Q.   Okay.  Can you tell us just briefly what XO Energy and XO Energy Worldwide do?  What is their business?

A.   Yes.  We trade electricity on the wholesale financial markets throughout the United States.  There are five different markets we trade in.  We basically buy and sell electricity primarily on the (unintelligible) markets, which is a one-day product. We also trade in products that are traded on a monthly basis.

Q.   And what's the goal and division of duties between XO Energy and XO Energy Worldwide?

A.   XO Energy Worldwide is our entity that owns our proprietary software that we developed and we use to analyze and predict what is going to happen in the market as well as with the trade of the various markets. XO Energy, LLC is a management company that handles personnel issues, legal matters, various housekeeping stuff that is unique to our company.

Q.   Where is XO Energy, LLC based?

A.   We are in Landenberg, Pennsylvania.

Q.   And that has been the case since 2011?

A.   Yes.

Q.   And where is XO Energy Worldwide based?

A.   We are mainly based in Saint Thomas U.S. Virgin Islands.

Q.   About how many employees does XO Energy, LLC have?

A.   We have five in the main office.

Q.   And how about XO Energy Worldwide?

A.   XO Energy Worldwide has 18.

Q.   Some of those are partners, right?

A.   Yes.

Q.   And to accomplish this business objective of trading energy, how is that physically accomplished?

A.   Of course you have to become a member of the various ISO's, which are the markets set up around the country.

Q.   So, what does ISO stand for?

A.   Independent System Operator.

Q.   Okay.

A.   They are attached with balancing the grid, and basically keeping our clocks running at the same speed all the time.  So, they run these markets where they try and predict, or everybody tries to predict the supply and demand for the next day.  And the companies will put in their offers and buy or sell what they have and what they need for the next day.  We participate in those markets.  We are what is known as financial traders.  So we don't actually use or generate the power we are buying and selling, but we act as competition for the market.

Q.   So, in your role with the company, are you familiar with the requirements that these various ISO's have for operating in that market?

A.   Yes.

Q.   And are you familiar specifically with the California Independent System Operators Corporation and what is required to operate in that market?

A.   Yes, I am.

Q.    All right.  I'm going to direct you to Exhibit No. 2. to the book in front of you.  Do you recognize that document?

A.    Yes, I do.

Q.    And can you tell us what it is?

A.    This would be the California Independent System Operator's tarniff, which is a document they need to file with FERC to run their market.

Q.    And just so the record is clear, can you tell us what FERC is?

A.    FERC is the Federal Energy Regulatory Commission.

Q.    And FERC not only regulates entities like California Independent System Operator Corporation, they regulate XO as well?

A.    Yes, they regulate the entire market.

Q.    So, this Exhibit 2 contains some of the requirements that all market participants or traders, such as XO, have to meet to be eligible for trade on that market?

A.    Yes.

Q.    Okay.

        MR. VAN ARSDEL:  Your Honor, I would like to offer Exhibit No. 2 into evidence.

        THE COURT:  Have you given that to

counsel, a copy?

MR. VAN ARSDEL:  Yes, she has a copy.

THE COURT:  Okay.

MS. LANG:  I would object the predicate has not been met.  And I don't know what the relevance of it is.

THE COURT:  I haven't seen it.  So, I don't know --

MR. VAN ARSDEL:  I'm sorry.  Let me hand this to you.

THE COURT:  Which exhibit number, 2, you said?

MR. VAN ARSDEL:  Exhibit 2.

THE COURT:  And what is this?  You said this was the California tarniff?

MR. VAN ARSDEL:  That's right.  So, this is one of the ISO's that XO and it's competitors trade on.  It's one of their markets that they do trades on. And in order to be eligible to do trade on these markets, you have to meet certain requirements that these ISO's publish.  And Mr. Charette just testified that these are the set of requirements that are imposed on traders like XO, and I want them to be in the record because we are about to talk about what not only XO has to do, but others who are trying to get in the market

have to do to participate.

MS. LANG:  And, again, I would object.  I don't see how any of his testimony is at all relevant.

THE COURT:  What is the relevance?  You are saying you have to pay money to be a part of this?

MR. VAN ARSDEL:  That's right.  Our contention is that Mr. Zhao -- Dr. Zhao -- was preparing to start his own operation as a trader on the CAISO market.  And as such, he was going to be required to put down a deposit of $500,000 for his initial eligibility as a new trader on that market.

THE COURT:  Where does it say that within Plaintiff's Exhibit No. 2?

MR. VAN ARSDEL:  Certainly, Your Honor.  I can point you right there.  It's not organized in the most user friendly way, but it is 4.10.1.5 and then there is a subsection for that.

MS. LANG:  Again, if I could restate my objection, and I'm not sure what he is offering, there is no cover.  (Unintelligible).  And he is not able to confirm this is an official document.

THE COURT:  You said 4.1 something?

MR. VAN ARSDEL:  4.10.1.5.

THE COURT:  The document that I have says that 4.1 is not used?

MR. VAN ARSDEL: 4.10.

THE COURT: Oh, okay. 4.10. what?

MR. VAN ARSDEL: .1.5 -- actually I can put this up on the screen. So, here is, "A candidate CRR holder is an applicant who is seeking to be a trader on this exchange." And one of the requirements is financial security information as set forth in Section 12. A little bit of a connect-the-dots scheme here, but we do have to go to Section 12 to see where the requirement is for the $500,000.

MS. LANG: I'm sorry is counsel testifying? I'm not following him.

MR. VAN ARSDEL: I'm reading the document.

THE COURT: I guess I'm still not finding what you are referring to, counsel.

MR. VAN ARSDEL: Unfortunately it is not user friendly in that way on the application numbers. But we did pull up on the screen here the cited language. This is the one we are citing that requires the financial security information as set forth in Section 12.

THE COURT: Is this a contract or agreement between the Defendant and this corporation?

MR. VAN ARSDEL: It's a set of standards published by the California ISO, which allows

participants to trade kilowatt packages and other products on their exchange. And in order to do that, they have certain requirements they have to meet. And so, this is a set of published criteria for participation in that market.

THE COURT: I'm not going to admit this document because I'm not even sure -- I mean, it is not signed by anybody. I don't know if it was in place at the time. It says October 1st, 2014. I just don't know if that was -- I mean, if he has personal knowledge about what he wants to testify about this corporation, I guess. I guess I will allow him to testify to that, but I don't understand at this point if I can verify this document for what the purpose of today is. But go ahead and proceed.

Q. (BY MR. VAN ARSDEL) Mr. Charette, are you familiar with what is required for new participants on the CAISO market?

A. Yes, I am.

Q. And if you are a new, or seeking to become a new participant in that market, what are some of the financial requirements that are made by a new person?

A. You immediately have to deposit $500,000 in cash collateral or a line of credit, which is also equivalent of cash to be held by the California ISO as

financial security.  This money is also not available to trade against, so, this is just to get into the market.

Q.   Okay.  So, as you mentioned, there is also security once you start making trades?

A.   Yes.

Q.   And what is the level of security that is required, based on the average trading volume?

A.   That would depend on your volume.  The amount of megawatts that you want to trade.  We have in one of our California entities a million and a half dollars posted, and in another entity we have $2.1 million in it.

Q.   When you have traders and analysts to do their job, do they have access to confidential information?

A.   Yes, they do.

Q.   Okay.  What sort of confidential information do they have access to?

A.   They have access to all of our proprietary software, all of our trading strategies, the (unintelligible) information that we as a company have provided to verify strategies.  They also have access to confidential maps of the electricity grid.

Q.   How are those obtained?

A.   These are obtained from our FERC, Federal Energy Regulatory Committee, but we have to get critical

energy infrastructure clearance, also known as CEII, which we have to renew every year.  That involves applying to FERC with nondisclosure agreements as well as having every one of our employees that have access to that sign an agreement.

Q.   And did Benny Zhao execute the necessary nondisclosure agreements and other protections to gain access to this information?

A.   Yes, he did.

Q.   What sort of information is contained on these secured maps?

A.   That is basically every nut and bolt that puts together our electricity grid throughout the country.

Q.   And so, there is a big interest on the part of the owner of these grids to keep that information secure?

A.   Absolutely.  Not only the owners of the grid, but the country itself, because it's --

Q.   Because of national security?

A.   National security, yes.

Q.   And so, but the clearance has to come through FERC, is that right?

A.   Yes.

Q.   Now, if you would, take a look at Exhibit 4 if you don't mind.  Can you tell me what Exhibit 4 is?

A.    This is an email between Neil Huber who is one of our traders and the contact at FERC requesting the CEII clearance.

MS. LANG:  I would object to this, Your Honor.  This is an email between two other people and it is hearsay.

THE COURT:  Is he a part of this email?

MR. VAN ARSDEL:  He is not copied on this email, Your Honor, but this is an email sent from a company employee to a representative of FERC.  I'm happy to prove it up as a business record if that's really necessary.  This is really just to show the steps that an individual must take to gain access to this information.  This is an email that Mr. Huber sent, his contact at FERC, to renew his access to the CEII information that he needs to execute his job responsibilities.

THE COURT:  Who is Mr. Huber?

MR. VAN ARSDEL:  He is the -- Mr. Charette can answer that.

THE WITNESS:  He is one of the traders for our company.  This is just one of the duties that he does on an annual basis on behalf of XO.  He handles the gatherings of all the clearances from everybody and getting the (unintelligible) confirmed.  And then

receiving the maps on our behalf.

THE COURT: Counsel, I'm going to ask you to move along a little bit, because we are really limited today for the injunction on that amount, the distribution that the Defendant received.

MR. VAN ARSDEL: I understand.

THE COURT: I don't think there is any dispute -- y'all correct me if I'm wrong -- that he received that amount; is that correct?

MS. LANG: That's correct.

MR. VAN ARSDEL: That's right.

THE COURT: Okay. I'm just going to ask you to move along a little bit on that point.

MR. VAN ARSDEL: Certainly.

Q. (BY MR. VAN ARSDEL) All right. Let's talk about Mr. Zhao's employment. Were you involved after the decision was made to hire Mr. Zhao and ending up as an employee of the company?

A. Yes.

Q. And what role did you have in that?

A. I handled getting all of his paperwork filed, his various employment paperwork, I-9, setting up his direct deposit, getting him set up on the company benefit programs, enrolled in the 401(k) plan. Ordering the computer and equipment for his (unintelligible).

Q.   Okay.  Also, take a look at Exhibit 7, if you wouldn't mind, and if you could tell us what that is?

A.   This is the initial offer letter to Mr. Zhao, offering him a position at the company.

Q.   And it explains his salary; is that right?

A.   Yes.

Q.   And as well as some benefits that he would be eligible for?

A.   Yes.

Q.   And at the end of the first paragraph it also says that he gets to participate in an Employee Incentive Program, which will be defined by the management members; is that right?

A.   Yes.

Q.   And it also says in the following paragraph that it is contingent upon his execution of an employment agreement and information policies; is that right?

A.   Yes, that's correct.

Q.   And did Mr. Zhao, in fact, sign an employment agreement and information policies?

A.   Yes, he did.

MR. VAN ARSDEL:  Your Honor, before I move on, I would like to admit Plaintiff's Exhibit No. 7 into evidence.

THE COURT:  Is there any objection, to this letter?

MS. LANG:  No objection.

THE COURT:  Okay.  That will be admitted.

(EXHIBIT ADMITTED)

Q.  (BY MR. VAN ARSDEL) Mr. Charette, if you could turn to Exhibit 8.  Could you tell us what Exhibit 8 is?

A.  This is the executed employment agreement between Mr. Zhao and XO Energy.

Q.  And could you look on page 9 and see that it has been executed?

A.  Yes.

Q.  And who has executed it?

A.  Shawn Sheehan and Liang Zhao -- Benny.

Q.  Okay.  And this agreement contains all the terms and conditions of his employment; is that right?

A.  That's correct.

Q.  Does the agreement contain a non-competition clause?

A.  Yes, it does.

Q.  And that's in Paragraph 5?

A.  Yes, it is.

Q.  And this is for two years?

A.  Yes.

Q.  And what is the reason that XO Energy requires

its analysts to sign agreements that contain non-competition clauses?

    A.    This is a very specialized market.  Our company spends a great deal of time, money and effort, training employees on our methods for trading in these markets.

            MS. LANG:  Your Honor, I object to the testimony.  Again, I think we are straying awfully far away at this point.

            THE COURT:  If you will just re-focus, counsel, on the issue of the amount here, and why you are seeking injunctive relief for that, specifically to have those proceeds deposited here.

            MR. VAN ARSDEL:  I understand, Your Honor.  I believe I have to lay a little bit of a foundation, because this provision ties into why we believe he violated --

            THE COURT:  And I don't want to cut you off from presenting your case.  I want to give you full opportunity to do that.  Okay?  But we just need to focus on why we are here today.  We are not here on the final trial on the merits or anything like that, as you know.

            MR. VAN ARSDEL:  I understand.

            THE COURT:  So, I'm just asking you to -- I want to give you the full opportunity, I do, but we

need to keep it focused on what the only issue is
remaining, because y'all have already reached an
agreement on part of it, on the other non-compete and
all of that stuff, right?

MR. VAN ARSDEL:  Yes.

THE COURT:  So, it's just the amount that
is the only issue.

MR. VAN ARSDEL:  We have, Your Honor, and
I'm doing my best to try not to waste your time.

THE COURT:  But go ahead.

MR. VAN ARSDEL:  I think you will see that
this does relate to our claim for why he needs to give
the money back, and that's my focus.  I hear the Court's
admonition.

Q.   (BY MR. VAN ARSDEL) Mr. Charette, if you could
turn to the next page on page 3, on Paragraph 5(g).  And
this paragraph deals with remedies that the company has
if the employer -- I'm sorry, if the employee is
terminated for cause, do you see that?

A.   Yes, I do.

Q.   If they terminate their own employment without
good reason.  Do you see that?

A.   Yes.

THE COURT:  Sir, what page are you on, or
what number?

MR. VAN ARSDEL:  This is on page 3 of Exhibit 8, Your Honor.

THE COURT:  Okay.  Go ahead.

Q.  (BY MR. VAN ARSDEL) And the final part of it deals with the employee's rights to any deferred bonuses or other deferred incentive compensation.  Do you see that?

A.  Yes.

Q.  And it says here that, "The employee shall automatically forfeit any and all rights to any deferred bonus or other deferred incentive compensation, including without limitation any options relating to equity in employer or its affiliates, and any grant by employer of such remuneration shall be automatically void."  Correct?

A.  Yes.

MS. LANG:  Your Honor, we have no objection to the admission of the document.  I don't think it needs to be read into the record.

THE COURT:  Do you want to offer that exhibit, then?

MR. VAN ARSDEL:  I do.  I want to offer Exhibit No. 8 into evidence.

THE COURT:  Okay.  Admitted.

(EXHIBIT ADMITTED)

Q.    (BY MR. VAN ARSDEL) And we see that this clause is invoked if the employee breaches any of the covenants contained in Section 5?

A.    Yes.

Q.    Okay?  And Section 5 is the non-compete?

A.    Yes.

MS. LANG:  Your Honor, I would object. This witness is not here to make a legal determination with regards to the contract.  That's a legal question or a fact question.

THE COURT:  If you could tie in to what you are basing your injunctive relief that you have requested.  I understand what you are saying about the breach and the contract, but it has already been admitted.  It is admitted in evidence.

MR. VAN ARSDEL:  Okay.  I will move on.

Q.    (BY MR. VAN ARSDEL) Mr. Charette, did you come to learn that Mr. Zhao was violating Section 5 of this agreement related to the non-competition?

A.    Yes, I did.

Q.    And how was it that you came to learn of his violation of that clause?

A.    We had a meeting with Mr. Zhao, telling him that he needed to decide with between going to Virgin Islands or the Pennsylvania office.  He was given time

to mull over that decision.  The day after that meeting, Shawn Sheehan turned on the Work Examiner software, which is the software that records his screen shots.

Q.   Okay.  And tell us who Shawn Sheehan is?

A.   Shawn Sheehan is the owner of XO Energy.

Q.   Is he also the Chief Executive Officer?

A.   Yes, he is.

Q.   And at the meeting you attended with Mr. Sheehan and Mr. Zhao, was he told what his bonus would be?

A.   Yes, he was.

Q.   And was he told when it was going to be paid?

A.   Yes.

Q.   And as you said, he was given two options for remaining with the company?

A.   Yes.

Q.   Both of which involved moving from his home in Katy to some other location?

A.   That is correct, yes.

Q.   Because Mr. Zhao was the only employee that did not live in either one of those locations?

A.   Yes.

Q.   Okay.  So, as a result of that meeting, Mr. Sheehan determined that it would be appropriate to turn on the monitoring software?

A.    Yes.

Q.    Could you explain very briefly what the software does?

A.    The software basically does various intervals, regular intervals, takes screen shots of computer monitors that are on the computer.

Q.    And on what date, if you know, was the Work Examiner product enabled on Mr. Zhao's computer?

A.    It would have been the day after that meeting, which I believe was February 12th.

Q.    So, that was the date that you started getting screen captures?

A.    On or about that date, yes.

Q.    And when was the first date that the company reviewed the captures of those screen shots that were started on February 13th?

A.    I believe he started reviewing those around February 25th.

Q.    Okay. And when was the bonus payments -- do you remember the amount of the bonus payments?

A.    The gross amount was $700 something thousand dollars. Net amount was just over $500,000.

Q.    Okay. Do you remember when that payment was scheduled to be direct deposited?

A.    Yes. It would have been deposited to all the

employees that received bonuses on Friday, February 27th, which was called in on Wednesday, February 25th to the payroll company.

Q.   Okay.  On the same day that a representative from XO began to look at the screen shots that were captured by Work Examiner?

A.   Yes.

Q.   Okay.  What did the screen shots captured by Work Examiner show?

A.   The screen shots showed --

MS. LANG:  Your Honor, I believe a predicate should be laid.  Did Mr. Charette actually witness any of this, or is this just (unintelligible)?

THE COURT:  You are saying who was actually conducting the surveillance of the screen shots?

MS. LANG:  Yes.  Does he have personal knowledge of it?

THE COURT:  That's a fair request.  If you will verify that for counsel and for the Court.

MR. VAN ARSDEL:  Okay.

Q.   (BY MR. VAN ARSDEL) Mr. Charette, are you familiar with how Work Examiner functions?

A.   Yes, I am.

Q.   And again, it is a software package that takes

screen shots of various screens that your employees are working on at various times?

A.   Yes.

Q.   And you control the integrals of those screen shots?

A.   Yes.

Q.   And then they are saved in a central area that can be reviewed by anyone with access to that software?

A.   Yes.

Q.   And you have access to that software?

A.   I do.

Q.   And you personally looked at the screen shots of what was captured with Mr. Zhao's computer?

A.   I saw the printouts of the screen shots.  I did not actually access the software, but I did --

Q.   After someone accessed them and printed them out and gave them to you?

A.   Yes.

Q.   Okay.  What did you see in those printouts?

A.   I saw -- if you look at a computer, you can see various disk drives that are on a computer.  I saw external disk drives named "my passports," which I know, because I personally have one at my house.  It is an external drive that you can buy on Amazon for like 80 bucks or something like that.  We do not have any

company owned "my passports."  It was determined they were personal drives owned by Mr. Zhao.  You could also see thousands of files being copied from our network on to these external hard drives.  Including maps, including proprietary software information, including emails from our email system.  And you can see the screen shots showing -- copying 3,000 some-odd files and so many gigs.  So, an exorbitant amount of information was being taken from our company network and stored on to these external hard drives.

Q.    Okay.  Before we look at these individual screen shots, is this an activity that anyone from XO Energy, to your knowledge, had authorized Mr. Zhao to do?

A.    No.

Q.    Is there any legitimate reason that you can think of, as an officer of XO Energy why anyone would copy any amount of files, much less the amount of files that Mr. Zhao had?

A.    There is no reason for that.

Q.    Had Mr. Zhao had any authority at all to make these copies?

A.    No, he did not.

Q.    And do you consider it a violation of his employment agreement that he made any copies?

A.   Yes.

MS. LANG:  I object, Your Honor.  This witness is not here to make a factual determination of whether this contract is breached.

THE COURT:  I will strike that last answer.  Just go ahead and proceed.  And again, focus to the deposit that you are requesting at hand as part of the injunctive relief.

MR. VAN ARSDEL:  Okay, Your Honor.

Q.   (BY MR. VAN ARSDEL) Did you also see in the screen shots anything related to CAISO and their requirements for setting up a new entity on CAISO?

A.   Yes, I did.

Q.   And what did you see on those screen shots?

A.   I saw screen shots of the list of requirements to set up to become a member of California ISO to start trading on that entity.

Q.   Did you also see screen shots from another screen where Mr. Zhao was creating a to do list?

A.   Yes, I did.

Q.   And did you see references to CAISO in that to do list?

A.   Yes, I did.

MS. LANG:  Your Honor, I'm going to object to this as well.  What he is referring to is a document

in Chinese.  I would like for him to explain how he is able to read that.

THE COURT:  Which document is in Chinese?

MS. LANG:  What he is referring to, the to do list.  The document that was written in Chinese.  They have offered no translation of it.  So, I want to know how Mr. Charette would be aware of such.

Q.  (BY MR. VAN ARSDEL) Let's look at Exhibit 13 and see.

THE COURT:  Is that the to do list you are referencing?

THE WITNESS:  Yes, it is.

Q.  (BY MR. VAN ARSDEL) Okay.  So, Mr. Charette, I show you here Exhibit 13, the first page of this Exhibit D.  The next page is the two screens; is that right?

A.  Yes, it is.

Q.  And the bottom screen looks like a list of some sort?

A.  Yes.  There is a number list.

Q.  It is written in Chinese; is that right?

A.  I assume that is Chinese, yes.

Q.  But there are some -- I don't know what you call it -- non-Chinese, the letters and numbers contained within it; is that right?

A.    Yes.

Q.    Okay.  Let's continue to look through the next page.  The next page the list appears to be growing.  He hasn't written anything next to the 4 yet, but there is a 4 that was not on the previous list?

MS. LANG:  Your Honor, I object to his leading.

THE COURT:  Go ahead and ask your next question, counsel.

Q.    (BY MR. VAN ARSDEL) What do you see on the right hand screen of this next page?

A.    That would be a screen shot from the California ISO website showing some of the requirements to become a member.

Q.    And you are familiar with this based on your familiarity of those requirements?

A.    Yes, I am.

Q.    And you visited that website before?

A.    Several times, yes.

Q.    Okay.  Let's continue to look through the next page.  It's the same website on the right-hand side, the CAISO requirements?

A.    Yes, it is.

Q.    And then we have the next page after that.  What do you note about the left-hand side?

A.   The list is much larger than it was.  If you look through number 4 there is some English in there and it's California ISO and it says "deposit" next to it in English.

Q.   And then on number 6 what do you see?

A.   Number 6, it also says "California ISO and the first reliability coordinator," which is the name -- which you are called as a member of ISO.

MS. LANG:  Your Honor, I would object to this.  This could be no conclusion about this.  It's in Chinese, and he still has not answered the question of whether he can read it.

THE COURT:  Well, I'm assuming, you can't -- am I wrong -- I'm assuming you cannot read Chinese?

THE WITNESS:  No, I can't.

THE COURT:  But you are just reading the English, I guess, parts of the screen shots?

THE WITNESS:  Just the English parts, yes.

Q.   (BY MR. VAN ARSDEL) The list on the left-hand side contains some words in English; is that right?

A.   Yes.

Q.   And that's what I have been asking you about?

A.   Yes.

Q.   And one of those phrases is "reliability

coordinator;" is that right?

A.   Yes.

Q.   Do you have an understanding based on your experience dealing with CAISO what a "reliability coordinator" is?

A.   A "reliability coordinator" is one of the definitions the market gives to it's members.

Q.   In reference to number 4 on the list, CAISO deposit.  Now, based on your experience dealing with CAISO, what do you understand a CAISO deposit to be?

A.   That would be cash collateral posted with California ISO.

Q.   Okay.  And then a little bit on 8 there are some English words written in that entry as well.  Do you see that?

A.   Yes.

Q.   And we have, what, the words "computer science?"

A.   Yes.

Q.   And below that two lines is "oracle and access."

A.   "Oracle and access," yes.

Q.   Do you have an understanding based on your knowledge in the industry of what "oracle and access" mean?

A.   Yes, these are some programming language that would be used for software development.

Q.   And, in fact, are those some of the software languages used by XO to develop their proprietary software?

A.   I believe, yes.

MS. LANG:  Your Honor, I would renew my objection to this argument.  Again, he is fully speculating on what it means.  They have had a month to bring in a certified translation of the document (unintelligible).

THE COURT:  I agree.  We are not going to admit it at this time because there are portions that are clearly in Chinese, and I don't think any of us here know what those portions state, especially in an admissible form before this Court.  So, I will ask you to go ahead and move along, counsel.

MR. VAN ARSDEL:  So, Your Honor, my offer of Exhibit 13 into evidence for the limited purpose of showing what is in English in this exhibit, that's overruled?

THE COURT:  I think he has testified to what is in English.  So, I have admitted his testimony about that.

MR. VAN ARSDEL:  Okay.

THE COURT: But the actual document is not admitted.

MR. VAN ARSDEL: Okay.

Q. (BY MR. VAN ARSDEL) Mr. Charette, who was the first person at XO to review these screen shots?

A. Shawn Sheehan.

Q. And did you receive a call from Mr. Sheehan on February 25th, after he reviewed these screen shots?

A. Yes, I did.

Q. What time of day did you receive that phone call?

A. It was in the evening. Probably around 6:30 or 7:00 o'clock at night.

Q. And what had you done with respect to the employee bonus payments that day?

A. I had called them into payroll.

Q. Including Mr. Zhao's?

A. Yes.

Q. And so, those payments were already in process?

A. Yes.

Q. And at what stage and process were they -- how quickly does it take for those payments to be processed once you call them in?

A. Once the call is processed the money is usually deposited within two days into the employees' accounts.

Or the day it is processed, the payroll company would process the file and then create each file.

Q. So, Mr. Sheehan, what did he share with you about what he discovered --

MS. LANG: Your Honor, I object, hearsay.

MR. VAN ARSDEL: I'm not offering this for the truth of the matter, Your Honor. Only to say what stage or what the steps were at the time they learned of these screen shots.

THE COURT: I'm not going to allow him to testify to anything that anybody else said. He could testify to what he said or what actions he took, as he would have personal knowledge of those.

Q. (BY MR. VAN ARSDEL) Based on what Mr. Sheehan told you, what steps did you take in response to Mr. Zhao's payment that had been processed earlier in the day?

A. I immediately even though it was after hours, I called my payroll company and tried to reach them on their cell phones, left a message. I did receive a phone call back. I asked them to stop the processing of that file if it was possible. She told me she would work on it as soon as she got in in the morning, about 8:00 o'clock in the morning. Within an hour of the next day starting work she told me that she could not stop

the file.  ACH rules prevented, and ACH file over I believe $100,000 was the threshold of it being reversed. So at that time there was no way to stop the payment.

Q.  Okay.  And based on what you and Mr. Sheehan learned of these screen shots, did you take any actions with respect to Mr. Zhao's employment?

A.  Yes.

Q.  What action was that?

A.  We terminated him for cause.

Q.  Okay.

MR. VAN ARSDEL:  I have a few things I would like to offer in evidence, Your Honor.  One is Exhibit 14.  And this is just proof of the ACH deposit.

MS. LANG:  I have no objection.

THE COURT:  That will be admitted.

(EXHIBIT ADMITTED)

Q.  (BY MR. VAN ARSDEL) And Mr. Charette, you had mentioned that Mr. Zhao's employment was terminated. Can you turn to Exhibit No. 16, please?  Is this the notice of employment termination that you signed and delivered to Mr. Zhao?

A.  Yes, it is.

MR. VAN ARSDEL:  Your Honor, I would ask that Exhibit No. 16 be admitted.

MS. LANG:  No objection.

THE COURT:  That's admitted.

(EXHIBIT ADMITTED)

Q.   (BY MR. VAN ARSDEL) Okay.  Mr. Charette, based on your knowledge of what CAISO requires it's new traders to deposit, do you have any concerns about what Mr. Zhao might do with this bonus money he just received?

MS. LANG:  Your Honor, I would object. It's purely speculative, and irrelevant.

MR. VAN ARSDEL:  I'm not speculating.  I'm saying what his concerns are.  It's part of the proof that we have to make.

THE COURT:  If he has concerns about anything that is related to the subject matter of why we are here today, which is the funds, I will allow him to testify about his concerns, not based on any hearsay information from what Zhao told him.  But again, limited to the subject matter of the injunctive relief you are seeking.

MR. VAN ARSDEL:  Yes, ma'am.

THE COURT:  Go ahead and re-ask the question, if you would.

MR. VAN ARSDEL:  Okay.

Q.   (BY MR. VAN ARSDEL) Mr. Charette, based on your knowledge of what CAISO requires of new participants in

the CAISO market to deposit, do you have any concerns about what Mr. Zhao may do with the money he received in February, 2015 from XO?

A.   Yes.  My concerns would be that he now has sufficient funds, liquid funds to actually make a deposit with the California ISO to become a market member and directly compete with XO Energy.

Q.   And did you see in those screen shots the information from the CAISO website that explains what those requirements were?

A.   Yes, I did.

Q.   So, we know from those screen shots that Mr. Zhao was looking at those requirements?

A.   Yes.

Q.   Okay.  Do you know where Mr. Zhao is a citizen, what country?

A.   Yes, he is a citizen of china.

MS. LANG:  Your Honor, I would object to relevance.

THE COURT:  That's going to be granted. We will move along on that point.

MR. VAN ARSDEL:  Okay.

Q.   (BY MR. VAN ARSDEL) Mr. Charette, finally, why do you believe that Mr. Zhao should be compelled to return this money to a mutual site so we can have our

litigation?

MS. LANG: Objection. That's a legal question. It doesn't have the (unintelligible)--

THE COURT: I think you -- your objection is granted. If you will reword that. If he is your client and he is speaking certainly for this Court, he is obviously entitled to tell the Court what he is seeking. But it needs to be rephrased.

MR. VAN ARSDEL: Thank you, Your Honor.

Q. (BY MR. VAN ARSDEL) Mr. Charette, you are an officer of XO Energy?

A. Yes, I am.

Q. Is a return of the money that was paid to Mr. Zhao a part of the relief that you are asking for in this lawsuit?

A. Yes, it is.

Q. Why is that?

A. We believe the payment was sent inadvertently. He was not entitled to that payment given the breach of his employment contract.

MR. VAN ARSDEL: Thank you, Your Honor. I pass the witness.

THE COURT: Go ahead, counsel, if you have any cross-examination of this witness.

MS. LANG: I have a few questions.

THE COURT: Yes, you may proceed.

**CROSS-EXAMINATION**

Q. (BY MS. LANG) Mr. Charette, you mentioned that XO Energy, LLLP is the trading entity; is that correct?

A. No. I mentioned that was the software entity.

Q. LLC is the trading entity?

A. LLC is the management company.

Q. LLLP is the trading company?

A. No, LLLP actually owns the software that we use to trade.

Q. Okay. So, who engages in trading?

A. The members of the market are all subsidiaries -- they are affiliates of XO Energy, LLC and XO Energy Worldwide.

Q. So, who did Mr. Zhao -- Dr. Zhao -- work for?

A. He worked for XO Energy, LLC.

Q. Utilizing software for LLLP?

A. Yes.

Q. Trading for other entities?

A. Trading for XO Energy Cal LP and XO Energy Cal LLP. It's strictly a corporate structure.

Q. Right. In fact, XO Energy or some of its affiliates are under investigation by the Federal Energy Regulatory Commission because of this corporate structure; is that correct?

MR. VAN ARSDEL: Objection, relevancy.

MS. LANG: Your Honor, it goes to the question of termination.

THE COURT: The termination is not the subject matter of this case at this point. So, I will ask you to focus again on the subject matter of the amount that is in question.

Q. (BY MS. LANG) You mentioned that you had a conversation -- were you involved in a conversation with Mr. Zhao about him having to move to Landenberg or to Saint Thomas in order to keep his job?

A. Yes.

Q. And that was on the 12th of...?

A. February.

Q. And did Dr. Zhao follow up with any additional questions about that conversation?

A. To me or --

Q. Are you aware whether he followed up with anybody and engaged in any further discussions about that?

A. I believe he asked some more questions.

Q. You testified that you told him that his bonus was going to be paid on the 27th; is that correct?

A. In that meeting we told -- we met with every employee that day to tell them what their bonus was and

when they would be paid out, yes.

Q.   And, in fact, Mr. Zhao resigned his position the day after receiving his bonus?

A.   I'm not aware of his resigning at all.

MS. LANG:  May I approach?

THE COURT:  Yes, you may.

Q.   (BY MS. LANG) You are aware there was a federal court case related to this case, correct?

A.   Yes.

Q.   Did you have any involvement in producing documents in connection with that case?

A.   I provided documents, yes.

Q.   I will show you a document that is marked XOE 00782, and 783.  Do you recognize this as (unintelligible) by your company on documents -- (unintelligible)?

A.   Yes.

THE COURT:  For the record, counsel, could you state what you and the witness are referring to?

MS. LANG:  Oh, sure.

THE COURT:  We don't have a live court reporter, so, we need to put everything, the documents on the record.  Go ahead.

Q.   (BY MS. LANG) Do you recognize this is an email from Liang Zhao dated March 2nd, 2015, to Shawn Sheehan

and J. Geardon (ph) at XOEnergy.com?

A.    Yes.

Q.    And J. Geardon is (unintelligible), correct?

A.    Yes, he is.

Q.    He is another employee of one of the XO Energy entities?

A.    Yes.

Q.    And have you seen this email before?

A.    Yes, I have.

Q.    Okay.  And the first line says, "My family just cannot work it out, and I will quit the job."  Did I read that correctly?

A.    Yes, you did.

Q.    March 2nd, correct?

A.    Yes.

Q.    And if you drop down to number 1, it says, "I talked with Joe on Saturday morning."  Are you aware of the conversation he had with Joe Geardon on Saturday morning about resigning his position?

A.    I'm aware he had a conversation with Joe Geardon.

Q.    And, in fact, it states in here that "somebody from the account security system came to my house and collected the devices.  Computer, screen, keyboard modem, cell phone, et. cetra;" is that correct?

A.    That's correct.

Q.    And, in fact, did the company have somebody from the account security solutions go to Dr. Zhao's house and collect equipment?

A.    Yes, we did.

Q.    Would it have been possible for Dr. Zhao to continue to work without a computer and without access to the actual system?

A.    Not from his house, no.

Q.    So, he, in fact, had resigned (unintelligible), or actually on that Saturday when he talked to Joe Geardon, correct?

A.    It would appear so from this.

Q.    Can you explain how it is possible that a terminated employee can no longer work for him?

A.    No, I can't.

Q.    Have you any involvement in the review of documents or computer equipment since this law suit was commenced in March in federal court?

A.    Have I personally handled any of the documents, no.

Q.    Have you been in communications with anybody regarding what has been found?

A.    Yes.

Q.    And have you had any role in putting together

the complaints that have been submitted to the Court?

A.    No.   That would be our attorney's role.

Q.    Did you look at the complaints that have been submitted?

A.    Yes.

Q.    Did you approve it?

A.    Yes.

Q.    Are you aware of any distinctions between the complaint that was filed in the federal court case and the complaint that was filed in the state court case here?

A.    I'm not an attorney.   So, no.

Q.    Well, just the matter of the allegations that were raised.   Did you add any new facts, have you discovered in the federal court case that bear on --

A.    I'm not aware of the jurisdiction issue.

Q.    So, there is no new claims or no new facts that you have added to the complaint here that you are aware of?

A.    Not that I'm aware of.

Q.    Do you have any reason to believe that Dr. Zhao took documents from the company and gave them to anybody?   Do you have any evidence of that?

A.    Did he give them to anybody?   No.

Q.    Do you have any evidence that he downloaded

them to his personal computer?

A.    Yes.

Q.    What are those?

A.    We have screen shots showing that they were downloaded to his personal-owned drives.

Q.    Are you aware of what devices were retrieved from his home on February 28th?

A.    Yes.

Q.    And that included those two hard drives, did they not?

A.    Yes.

Q.    In fact, he readily gave them to your investigators, is that correct?

A.    Yes.

Q.    Again, so, you have those from within hours of him quitting his job (unintelligible)?

A.    I believe so, yes.

Q.    So, do you have any evidence that he put documents on his personal computer and not the devices that he gave back to you?

A.    No, I don't.

Q.    And are you aware that he was informed in connection with the FERC investigation that he was not to delete, and in fact, should take care to backup all the data on his computer in connection with the federal

investigation?

A.   On his personal computer?  I'm not sure if he was --

Q.   On his work computer.

A.   He wouldn't have to back anything up.  We backup everything on our network.

Q.   And are you aware that his C drive was getting too full?

A.   I'm not aware of that.  I'm not an IT person.

Q.   Did you have any communications with the IT person about what instructions were given to Dr. Zhao about ensuring that all the data was backed up?

A.   I know one of our IT staff members remotely dialed into his computer and made sure it was backed up.

Q.   Okay.  But are you aware of the conversations they had regarding instructions given to Dr. Zhao to backup everything on the computer?

A.   No.

Q.   And would it be consistent with the idea of backing things up to see a mass movement of data from a computer to a hard drive that has been backed up?  Would that be consistent with wanting to make sure that everything in your computers are backed up in connection with the criminal investigation?

A.   If it hadn't been done to our company on hard

drives, it would --

Q. (Unintelligible). Dr. Zhao could walk into your office and pick up a hard drive, right? Is that correct?

A. That's correct.

Q. So, if he were to purchase a hard drive to make sure that things were backed up, there is nothing in his employment that would prohibit him from that, right?

A. No.

Q. And, again, you had that in your possession since within hours of him quitting his job, correct?

A. Yes.

Q. And despite your concerns or the stated concerns of the company that the conversation about him having to move would necessitate monitoring his computer, and knowing that you were going to pay this bonus on the 27th, are you aware of what reason you waited 12 days to look at these screen shots?

A. No, I'm not.

Q. One final question. You mentioned that a lot of this is confidential information. I think one of the things referenced in the complaint is something called "constraint effects?"

A. Yes.

Q. What does the data come from that is placed in

the constraint effects.

A.    The data is downloaded from the ISOs.

Q.    Are they publicly available?

A.    Some of the data is publicly available, yes.

Q.    And the data that is put into the third-party software -- not the power tool -- y'all don't write that software, you just buy it and sell it on the market?

A.    Yes, we license that software, yes.

Q.    And the data is available?

A.    The data that is entered into that, not all of the data is available.  Some of it is available, yes.

Q.    What about the data that is available.  Where does that come from?

A.    It comes from our own internally produced data. Various analysis that the traders and market may (unintelligible).

Q.    But, is it data that is manipulated by the software or the data that you control?

A.    No, there is manipulation done by the analysts. They analyze various grids.

MS. LANG:  I think that's all I have.

THE COURT:  Thank you, counsel.  Do you have any redirect at this time?

MR. VAN ARSDEL:  I don't, Your Honor.

THE COURT:  Do you have any more witnesses

at this time?

MR. VAN ARSDEL:  We do not.

THE COURT:  Ms. Lang, do you have any witnesses?

MS. LANG:  No, Your Honor.

THE COURT:  Okay.  So, are we done in terms of live witnesses for both sides?

MR. VAN ARSDEL:  We are.

THE COURT:  Thank you.  At this time would y'all like to have a few minutes each to briefly sum up your position on your relief requested?

MR. VAN ARSDEL:  Certainly.

THE COURT:  Okay.  I will let the movant go first.  How much time do you need, sir?

MR. VAN ARSDEL:  I don't suspect it would take more than five minutes.

THE COURT:  Okay.  Is five minutes each appropriate?

MS. LANG:  I believe it would be longer.

THE COURT:  How much time are you asking for, counsel?

MS. LANG:  20 minutes, 15?

THE COURT:  Why don't we limit it 15 minutes per side at a maximum.

MR. VAN ARSDEL:  Your Honor, if we could

take a couple minutes recess to get a drink of water?

THE COURT: Sure. Of course. No problem. Why don't we take a brief recess. We will go off the record at this time to allow that recess, and then we will continue when you are ready.

(Off the record.)

THE COURT: We are back on the record in cause number 15-DCV-226436. Counsel, if you could identify yourself for the record and go ahead and proceed with your closing remarks.

**CLOSING STATEMENT**

MR. VAN ARSDEL: Thank you, Your Honor. Tom Van Arsdel for the Plaintiffs. As the Court knows what is remaining in our request is a request that the Defendant be compelled to repay the moneys that he was paid after the discovery of his activities that were captured in the screen shots that we believe we have shown that was in violation of his employment agreement. We compel him to pay us those moneys into the registry of the Court as a temporary matter pending the outcome of this trial.

We believe we have shown not only through the facts, but through the law. Very simply, Your Honor, a payment of that bonus was subject to the terms of the employment agreement that was entered into

evidence in Exhibit 8, which contains the non-compete agreement. The non-compete agreement prohibits him from not only being engaged in competition, but from attempting to become engaged in a business that competes with the business of his employer. Again, this is from what is already in evidence.

It also says that if he violated any part of Section 5, the employee shall automatically forfeit any and all rights to any deferred bonuses or other deferred incentive compensation and any grant by the employer of such remuneration is automatically void.

I don't think we have any dispute that what he was doing was attempting to compete. I think there is ample evidence that he was looking on the sites for CAISO for what it takes to compete in that market, what it takes to be an independent player in that market, and he was creating a list with enough English terms to understand what his intent was. We also consider that at the very same time he was doing this, he was downloading to his personal hard drive a massive amount of confidential information including all the models for trade that other traders and analysts had developed over the years that he had access to in his role as an analyst, that he was downloading that for his personal use.

So, I think we have shown a likelihood as you could see on the merits as to his attempting to become engaged in the business that competes with XO. That violates Section 5 of his agreement. That means that he forfeited any rights to his bonus.

Unfortunately the full extent of his activities were not discovered until it was too late. But that does not mean that Section 5 (g)(i) does not have any effect. It says those payments are void and he automatically forfeits them. We are seeking a court order that compels him to forfeit them. So, I think as a matter of what the facts of the record shows, we have demonstrated our entitlement.

In terms of the legal authority, we are asking this Court to do nothing different than the federal court did. The federal court did not insist on writ of attachment formalities to be met. That court has and this Court has an inherent power to compel, to take that money pending the final outcome when there is a dispute about a particular fund, and I think anyone's characterization of this dispute is that there is a dispute about those funds, and they are in danger of being depleted. Virtually the same amount that he has been paid is the amount that is required for him to set up on the California ISO. We know he had an interest in

doing that.  We know that he was taking active steps to accomplish that.

We believe there is a danger that if he is not compelled to protect that money somehow, either paying it into the deposit of the Court, or having to be subjected to a frozen account like the federal judge did in this case, that money could be imminently transferred to an organization like CAISO that requires a deposit to operate.

So, for these reasons, Your Honor, we believe we have shown our entitlement to relief.  The Court has the authority to enter such orders just as the federal court which follows Texas procedural law on these type of claims.  And so, we believe we are entitled to the relief we are asking for, and ask the Court to enter an order compelling Mr. Zhao to pay the amounts he received on February 27th, 2015, into the registry of the Court pending final order of this Court.

THE COURT:  Thank you, counsel.  You may proceed, counsel.

**CLOSING STATEMENT**

MS. LANG:  (unintelligible) the federal court I'm confident that the Court's decision would have been reversed on appeal, which is in line and in control with Texas law.  But be that as it may, what the federal

court isn't at issue here.  What is at issue here is what this Court can do.  And notably absent from counsel's argument was any reference to the actual law that applies here.  Their reliance on Ditka (ph) from one outline case that states that -- that relies entirely on this 1967 case, and holds that there is some inherent authority here, is not controlling in this instance.  Here they are asking for a writ of attachment.  This is the only means by which Texas can achieve a pre-judgment attachment on somebody's property.  It goes without saying it is an extraordinary remedy.  You are not allowed to simply say we are going to win, so, we get all of your stuff now.  It's just like any other litigant.  You have to go into court, you have to prove your case, you have to deal with the likelihood or unlikelihood of judgment collection later.  That's simply a fact of our judicial system.

They are convinced that there was wrongdoing afoot, but there are obvious holes in their theory, not the least of which that you can't terminate an employee that doesn't work for you anymore.  They have admitted that he, in fact, no longer worked for them anymore, and was terminated.

There is no evidence that he actually breached his employment agreement.  There is no evidence

that this data that was put on a hard drive, that was given to the company, was ever put elsewhere. There is no evidence that it was downloaded to his personal computer. There is no evidence that it was sent to his email. There is no evidence that anything happened to it, and if there was, we would expect to see it in this complaint because we have already had an opportunity to conduct discovery. So, the (unintelligible) that have impacted here is exceptionally low. But even if you put all of that aside, you only need to read -- I'm sorry, one other thing, focus on the attempt to compete. It is simply unenforceable in Texas. They admit in the brief they submitted to this Court yesterday that it is absolutely lawful to plan to compete. You are permitted in certain circumstances to act in competing. We are confident that once you get to summary judgment, there will be no question that the limitation on somebody planning to do something in the future is an unenforceable restraint of trade.

So, you can look in the employee agreement and see that their reading is unsupported by the language and by logic. They have concocted a view of this agreement that basically renders any employee's bonus subject (unintelligible). You can work for the company for years and then you have breached the

requirements to give proper notice.  For that clause they can come after you for every bonus you got every year you overworked for the company.  It's plainly (unintelligible) outcome, and yet it is the theory they are proposing.  In reading of the contract it is clear that if you leave the company mid year, or if you have given up, it is your right to a bonus for that year.  Your prospective deferred bonus.  And there is no reading here that would make sense that would allow an employer to basically treat your bonus as something that is held in escrow until the day you quit, and it's unconfirmed that you never breached any provision of your contract.  But I think the focus here needs to be on the statute governing the writ of attachment, and that is just at the outset.  A writ of attachment requires and the courts have held that the litigants must strictly comply with the requirements set forth in the statute.  First, that the Defendant is justly indebted to the Plaintiff.  And here, they can't show that, because indebted has been defined to be formally and fully a liquidated debt under a contract.  And in order to constitute damages that are liquidated in a debt provision in a contract in Texas, you must strictly comply with the two rules -- or with the two factors.  One, the harm caused by the breach that is capable of

being estimated for a specific estimate at the time of the agreement, and two, the amount of liquidated damages within a reasonable forecast of just compensation. Here, neither of those are even close to being met.

There is nothing to suggest there was a meeting of the minds about whether damages under this contract would be reasonably -- that harm would be estimated at the outset. This contract covers far more than a non-compete and it involves intellectual property rights and giving notice to quit, and your options in a pro-benefit program. But moreover, they not only liquidated damages, it's not reasonable for a pass of just compensation. There was no opportunity for Dr. Zhao to sit down and have a reason, an analysis of whether he would be required to pay any certain amount if he chose to breach the contract. And that's what a liquidated damages provision does is it lets people know if you decide to breach, this is going to cost you. But here -- and they have made clear -- the money we are talking about was entirely discretionary at the sole and complete option of XO to pay or not pay, and in any amount. This is not a liquidated debt. There is nothing even about this that would suggest that it could be construed as a liquidated debt, and as a liquidated debt you cannot get a writ of attachment. You are in

the same boat as every other litigant that comes before the Court.  But even if we thought it was liquidated, the second the attachment is not sought for the purposes of injuring or harassing the Defendant.  And I submit that after six months of discovery they have identified no factors demonstrating wrongdoing by Dr. Zhao, and a continued insistence on tying up the money he relied on when he decided to quit his job.  He was not even able feed his family during the period of unemployment should somehow be outside of his reach.  That is obviously injurious, it is obviously harassing.

There is nothing in his employment agreement that prevents him from copying data to a hard drive, and that's all he has been accused of doing.  The Plaintiff will probably lose his debt once the writ of attachment is issued.  That showing has not been made either.  In as much as they want to focus on the $500,000, that may or may not be required to be a trader on some market, that the Chinese to do list may or may not suggest what he was doing.  They also pointed out that in order to actually trade on that market, you also have to put up maybe a million or 2 million more.  So, Dr. Zhao either has millions of dollars at his disposal, which renders this entire thing (unintelligible) because then he has every ability to pay a judgment, or he has

never had any intention of doing it because he would need $2 million more to make this happen. It's completely illogical, and that's why courts require more of a showing than simply saying here is something in Chinese that nobody can read, or trust that this is what you would think he was going to do.

And for the specific grounds for the writ under 61.002, there is evidence of them. I won't belabor the Court by going through all of them -- I think the first three factors are clear. There is no basis here for the writ of attachment. There is no liquidated debt. There is no evidence of that.

So, I would ask that this Court deny their request and have the case proceed just like any other breach of contract case would proceed. And we ask for judgment.

THE COURT: Thank you, counsel. Anything further from either side?

MR. VAN ARSDEL: Just very briefly, Your Honor. In the case that we cited from the Dallas Court of Appeals, in addition to it's reliance on the 1967 Texas Supreme Court case, it also relied on a case from the Houston Court of Appeals in 2009. It's in the block that we submitted earlier. The case of (unintelligible) Cypress Medical Center versus Saint Malone.

The writ of attachment doesn't cover every scenario, and that's why these courts, Dallas, Houston, Texas Supreme Court, have said that there is an inherent power in situations such as this where there is a dispute over the funds, and we can show it's in danger of being depleted. There is evidence of both of those factors, and we believe this Court, like the federal court before, has the authority to secure these funds for a limited and temporary time so we can resolve this dispute.

THE COURT: Okay. Anything further?

MS. LANG: Your Honor, I would be happy to cite you both cases that directly discuss the court that has already entered the writ of attachment statute and I can read them into the record, but again, if you read this decision you will see them. First of all the Court held --

THE COURT: What decision are you referring to?

MS. LANG: This is their Skokos case.

THE COURT: Oh, yes, I did review that one. It was Behringer.

MS. LANG: I'm not sure how that -- I'm perplexed of how that helps them given that the appellate court said that their relief sought was not

appropriate for that circumstance and it's surely not appropriate for this circumstance (unintelligible).

In any event, there is no shortage of case law in Texas that deals with this question, and I am happy to cite it.

Moreover, I will also remind the Court that the funds aren't under the jurisdiction of the court. So, even if the writ were to issue, I'm not sure what would actually happen.

THE COURT: Anything further?

MR. VAN ARSDEL: Nothing further, Your Honor.

MS. LANG: Nothing, Your Honor.

**(THE COURT'S RULING)**

THE COURT: Okay. At this time the Court is going to grant the temporary injunction order. And I will go ahead and cite into the record the basis for that granting. But first and foremost, the Court would like to preserve the actual subject matter of this litigation, which is the funds. The Plaintiffs are alleging that those funds were taken by a breach of contract. We are not here to decide that issue today. But we do want to preserve, I guess, the status quo of what the subject matter is, which is those funds.

The Plaintiff has shown that there is a

potential for injury to that property that is threatened by the Defendant.  The Plaintiff has shown that the Respondent's actions may have attempted or intended to harm the Applicant or those funds in question.

Furthermore, for a temporary injunction order to issue as both counsel knows, normally you have to prove an adequate remedy at law, which would be as defense has argued to simply collect on the judgment, if it is even obtained later on down the road.  However, there are some exceptions to that in order to prevent an alleged irreparable injury to property.  And for those reasons I am granting the temporary injunction order.

Moving along from after that order has been addressed, which I have just addressed, have either party considered going to any kind of mediation on this case?

MR. VAN ARSDEL:  We have not discussed in any detail.  Certainly we are open to any settlement process including mediation.

THE COURT:  Okay.  I would like to see y'all finish your discovery.  I would like to see y'all attempt mediation.  If mediation doesn't resolve it, obviously you will have your full opportunity to have a trial on the merits of this case.  And we will have to get you a date for that.  I will get you that today.  I

just don't have it with me at this point.  And there will need to be a bond posted as well.

It is my understanding that y'all will probably need to reword part of this order; is that correct?

MR. VAN ARSDEL:  I think so.

MS. LANG:  Yes, Your Honor.

MR. VAN ARSDEL:  Well, some of the things may need to be with tweaked a little bit based on their lack of opposition to some of the relief requested.

THE COURT:  Okay.  So, do you want to just submit that to me?

MR. VAN ARSDEL:  We can do that, yes.

THE COURT:  After you show it to counsel, of course.

MR. VAN ARSDEL:  We can do that, yes.

THE COURT:  Okay.  And let me work on getting a trial date for y'all as well, because that will need to be included.  So, if there is nothing further, we will go off the record on this case at this time.

MR. VAN ARSDEL:  Just a second.  Has the Court given us a ruling on the amount of the bond that will be required?

THE COURT:  Yes.  It's the amount

regarding the subject matter in question, which is the $532,547.95.

MR. VAN ARSDEL:  Okay.

THE COURT:  Anything further before we go off the record at this time?

MS. LANG:  No, Your Honor.

MR. VAN ARSDEL:  No, ma'am.

(Off the record.)

* * * * * *

REPORTER'S RECORD

VOLUME 1 OF 1 VOLUME

TRIAL COURT CAUSE NO. 15-DCV-226436

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
11/12/2015 3:08:22 PM
CHRISTOPHER A. PRINE
Clerk

XO ENERGY LLC & XO ENERGY ) IN THE DISTRICT COURT OF
WORLDWIDE, LLLP            )
                           )
VS.                        ) FORT BEND COUNTY,  TEXAS
                           )
                           )
LIANG "BENNY" ZHAO         ) 240TH  JUDICIAL DISTRICT

---

**DE NOVO HEARING**

---

On the 22nd day of October, 2015, the following proceedings came on to be heard in the above-titled and numbered cause before the Honorable CHAD BRIDGES, Presiding Judge, held in Richmond, Fort Bend County, Texas.

Proceedings reported by computerized stenotype machine.

**APPEARANCES**

TOM VANARSDEL
SBOT NO. 24008196
WINSTEAD PC HOUSTON OFFICE
600 TRAVIS ST, STE 100
HOUSTON, TEXAS  77002
TELEPHONE:  713-650-2728
ATTORNEY FOR XO ENERGY LLC

SHANNON LANG
SBOT NO. 24070103
STURM LAW, PLLC
723 MAIN STREET, STE 330
HOUSTON, TEXAS 77002
TELEPHONE:  713-995-1800
ATTORNEY FOR LIANG "BENNY' ZHAO

THE COURT:  Thank you have a seat please.

XO Energy LLC and Worldwide, LLLP v. Liang "Benny" Zhao.

Can I have everyone identify themselves for the record, please.

MR. VANARSDEL:  Tom Vanarsdel here for the plaintiffs.  Also with me is Zach Alley.

MS. LANG:  Shannon Lang on behalf of the defendant.

THE COURT:  This was on my desk when I got here about ten minutes ago from Zachary.

MR. ALLEY:  Yes, Your Honor.

THE COURT:  And this is from you?

MS. LANG:  Yes.  We tried to serve this yesterday but apparently your courtroom was locked.  We tried to deliver it.

THE COURT:  I haven't read a single bit of this yet and I can't digest this in ten minutes. Believe me, even though I'm relatively new to the civil side of this, I do read everything.  So this is what we are going to do right now.  We are going to let you two talk for a very short period of time about what you're about to give me some context as I start reading through this to go with what's in the file.  And then I'm going to start reading and y'all are going to start talking

with each other.  So having said that, who wants to go first?  This is your request?

MR. VANARSDEL:  This is our application.

THE COURT:  Then why don't you go first. Give me some background.  Give me some synopsis.

MR. VANARSDEL:  Okay, Your Honor.

My clients are in the wholesale energy trading business.  This is a dispute between them and one of their former employees who they caught downloading confidential information and preparing to open up his own business to compete with them, notwithstanding contracts in place that prevent him from doing that and also competing.  So that's the framework of the dispute.

So in February of this year, we began to suspect that he may be leaving the company and turned on some monitoring software to monitor his activities on the screen shots on his -- these are traders.  They work with four or five different screens at the time.  So they're screen shooting these at different intervals.

And what they discovered, was he was downloading confidential information, maps that are essential to the work that they do.  The proprietary software that enables this company to do its trading and the history of all their trading models, very sensitive

confidential proprietary information that they share with no one.

We did not discover the downloading until after they had already authorized the payment of a bonus from the previous year. His contract, his employment contract, says that if he breaches one of several conditions one of which is the non-compete, another one --

*THE COURT:* Let me rephrase and maybe refocus you a little bit as to what I want to hear. What I want to hear is a little bit more about the legal part of it. I get the facts. Do you happen to have -- the translation in the file, you describe it as rough. It's a little bit rougher than rough. Is there somebody here who has a better transcription of whatever this is in Mandrin --

*MR. VANARSDEL:* We now have a certified copy.

*MS. LANG:* Unfortunately, it's inadmissible under Texas Rules of Evidence.

*THE COURT:* You'll get a chance to talk.

Tell me what it is, tell me the legal part of what you need to do today. Okay. I understand injunctions but I want to hear it from you, from your version of it, because this part is still relatively new

to me.

MR. VANARSDEL: We have the transcript from the previous hearing with Judge Patel. We also subpoenaed the defendant. The defendant has objected to that subpoena and is indicating that the defendant will not appear today.

So what you have before you in our notebook is the transcript and the exhibits that were entered into evidence. Based on that evidence, we believe that it has given entitlement to an injunction that requires the defendant to pay the bonus that was not supposed to be paid. The contract says that if he does any number of things under his employment contract his entitlement to those are void.

And we want to say the dispute's over that particular fund, we want him to pay into the registry of the Court pending the outcome of this case.

THE COURT: Your turn, ma'am.

MS. LANG: We set out what we believe are the actual facts, which I believe are in our briefing, and if you want me to, I can discuss them. But the key issue here is that they haven't demonstrated legal entitlement to an injunction, much less an order attaching these funds or requiring them to be placed into the registry of the Court.

Texas law is clear and there is case after case after case that absolutely say you don't get an injunction under these circumstances. They haven't shown -- because entitlement -- because they haven't shown a probable right to relief. There is nothing in Dr. Zhao's employment contract that prohibits him from downloading documents to a hard drive, which he did, to backup materials in advance of resigning his job because he was under -- well, the company is under -- and he was a witness to a criminal investigation.

They took possession of those within an hour of him resigning his job and they've had them ever since. And we've had discovery in this case since March and they have not identified any facts that show that this information was ever disclosed, used, that he still has it, that he put it on his computer, that it went through his email, that he has done anything with it. It's in their possession.

And since he is not prohibited from backing up his computer under the terms of his employment agreement, they can't show a probable right to leave for breach of contract on those grounds.

With respect to whether he was or wasn't going to compete, we think that there are many problems with their argument, not the least of which is that he's

got a contract with one entity but they are trying to prevent him from competing with parties that aren't parties to that non-compete. Moreover, all they can show at best is that he was planning or thinking about starting a company while he was at the same time trying to see what the enforceability was with this non-compete.

He's not taken any actual steps to do anything. He's been governed by an injunction that he agreed to since March not to engage in any wrongdoing. But beyond that, the bigger problem is that their remedies are all monetary and they have an adequate remedy of law as a result.

The only way around that is to show that Dr. Zhao is insolvent and they've made no showing. They've had, again, since March to take any discovery on this case, to depose my client, to do anything to show that he couldn't satisfy judgment.

*THE COURT:* Is your client -- he indicates your client is not going to talk to us today about what he was doing or the contents of --

*MS. LANG:* Not today because under the law there is no basis to bring in new evidence during this de novo hearing unless they ask for leave of court. We ask for leave of court to submit our pleading and we

just expect them to do the same. He has been available for depositions since March. He has been available for discovery on his financial ability to pay a judgment since March. And since they haven't made that showing -- they didn't make that showing for the Associate Judge -- they can't make it now. They are not entitled to injunctive relief.

THE COURT: Okay. That's been very helpful for both of you. So for right now, I'm going to start reading all of this stuff. We have a couple of rooms over there, y'all go talk if there is anything to talk about. Please, go try regardless.

(Brief Recess)

THE COURT: All right. Come on up. I'm still reading your -- and I'm about to start on Volume II. A couple things: One, it's going to take me a while because I'm literally going to read every single page of this, some of it I might read twice. And as long as you're willing to hang out, that's fine by me.

The other side of this is before I forgot about it, is you both talked -- I think you mentioned that you both wanted to supplement; is that accurate?

MR. VANARSDEL: I think what you're reading is her supplement.

THE COURT: No, not supplement, but you

wanted to expand on the record that I have to read on this hearing de novo.

MS. LANG: We're content with what was submitted before.

MR. VANARSDEL: Your Honor, we had subpoenaed a witness who they've filed a motion to quash the subpoena and that was what we wanted to present in addition to a briefing, the briefing that you read.

THE COURT: Okay. All right. Then have y'all come -- and originally from what I'm reading, y'all had come to an agreement over a few things and I assume y'all are still agreed about those things?

MS. LANG: Yes. My client doesn't have anything, so he's not going to waste the Court's time fighting about an injunction.

THE COURT: What this comes down to is the half million dollars. I just wanted to make sure -- and it sounds like -- have y'all come to any kind of resolution on this one way or the other?

MR. VANARSDEL: No.

THE COURT: All right. Then I'm going to continue reading and we can go on from there. I just wanted to check with you -- it's going to take me a while longer. If y'all want to go get a cup of coffee, do whatever you need to do, it's going to take me at

least another 30 to 45 minutes to keep reading through all of this stuff. So do what you need to do.

(Brief Recess)

THE COURT: Y'all come on up, please. As a threshold matter, you are requesting that Dr. Zhao testify today, correct?

MR. VANARSDEL: I am, yes.

THE COURT: And your contention is that he should not testify and that you filed a motion to quash in that regard?

MS. LANG: Correct.

THE COURT: Unfortunately, there is a proposed order to quash his subpoena but there is no motion.

MS. LANG: There is -- we filed it this morning.

THE COURT: There is not one -- I've asked them to check through e-file. I've asked them to check through Odyssey and it is not appearing.

Now, I understand e-file can be a difficult thing. I've had my struggles with it myself. However, at this point there is no motion on file to quash.

MS. LANG: If I can respond, we did file it. I can find out from my assistant what happened.

But even under the rules, a person subject to subpoena to testify at a hearing can have the objection raised at the hearing.  So --

THE COURT:  I understand.  The other side of that is you can raise the objection and I get that; however, I would like to hear both sides' version of why I can't, without the motion I at least don't get your side and I don't think there has been any response filed.

Also, is Dr. Zhao actually, physically here?

MS. LANG:  No, he's not.

THE COURT:  Now, understanding that, I'm going to give you the opportunity to address that, if you would like, to either do it by filing your motion to quash or refiling.  Whatever, these daily electronics may be but I'm here to give you the chance to work on curing that.

MS. LANG:  Okay.

THE COURT:  And depending on how that goes is a threshold thing, we will get to the rest of it.  So if you've got a courtesy copy that I can take a look at, that would be great.  I assume you already have a copy of it?

MS. LANG:  We delivered a copy by courier.

THE COURT: I have -- I have not detected it.

MS. LANG: I can contact my assistant and find out the status, but I was in contact with her all morning.

THE COURT: I have not detected it in either volume.

MS. LANG: No, because that was from yesterday and we hadn't filed it yet but I'm told that it was sent with a courier at 8:30 this morning. It should have been here within 30 minutes.

THE COURT: Okay. That I don't have at this point. I can go back and check with the coordinator, but we will be glad to take a look at it and give you a chance to either lodge your objections or hear your motion. So that's what we are going to do.

You are going to give me about ten minutes to step down for a second and see if it's back there and read it or in that ten minutes you can get me a courtesy copy, whatever you need to do.

(Recess)

THE COURT: We are back on the record. This is Chad Bridges and I'm here with the attorneys for the parties. And, first of all, Mrs. Lang, on behalf of the State of Texas and as much as it applies to the

e-file thing, it owes you and I an apology because it was hung up in the system.

MS. LANG: Thank you.

THE COURT: And I have read it. I appreciate the courtesy copy that came to me and this is where I'm at right now. I have read what you have to say and I've read what you have to say. There was an electronically filed response to your motion for protective order. Did you get a chance to read that?

MS. LANG: Yes, and I'm prepared to provide a little argument in response.

THE COURT: I think that I'm about ready to rule right now on both matters. However, I will give y'all an opportunity to have a few moments to give me your side on both issues. Okay?

MR. VANARSDEL: Both issues meaning the motion for protective order and the motion for temporary injunction?

THE COURT: Yes. So your appeal, correct?

MS. LANG: I'm happy to start.

THE COURT: We let him go first last time. We'll give you the chance to go first this time.

MS. LANG: Sure. I can start briefly with our motion for protective order. Our purpose in filing that was to be consistent with the intentions of the

Legislature, which is while, Your Honor, has de novo review over it, this proceeding -- this isn't a do over. And the purpose of the Associate Judge is, is to take loads off of the District Court. And that purpose of the Legislature thwarted when any evidentiary hearing in front of an Associate Judge can be treated as a practice round. XO has had not just the two weeks between filing and the TI hearing, but seven-and-a-half months to develop evidence in support of its TI to seek to depose Mr. Zhao and to seek evidence. And they put together their best effort at the hearing and we think that that effort was willfully insufficient under well-settled and controlling law in Texas.

*THE COURT:* Yes, sir.

*MR. VANARSIDE:* As to the motion for protective order, as we stated in our response, we do believe that a motion for leave is necessary because what the language of the law says the Court shall -- the matter shall be tried de novo and is limited only to those matters specified in the appeal. In defendant's request for de novo hearing, the matter specified is the portion of the temporary injunction related to the payment of the money into the registry of the Court.

Mr. Zhao's testimony was to be limited to testimony in evidence regarding that matter. We believe

that the extra part of this language relates to extraneous issues that were not tried before the case. It's true he did not appear in that proceeding, but his testimony does relate to the matter specified in the appeal and out of an abundance of caution we included a motion for leave in our response.

THE COURT: This is where I'm at right now. I think for right now everybody is going to win a little bit and everybody is going to lose a little bit. I am not going to require Dr. Zhao to testify today. However, I am going to keep the temporary restraining order in place. We are going to give you a quick hearing date for a final entry of that when you can have time to bring in Dr. Zhao and we will hear what he has to say. I can give you a date as soon as a week from today, if that is quick enough for y'all?

MS. LANG: So to clarify, this would be basically another TI hearing.

THE COURT: Well -- no, I was ready to have a full-on injunction hearing.

MS. LANG: So we would likely, then, in that case, subpoena witnesses as well?

THE COURT: Exactly. And the question is -- because I'm ruling against you, I'm trying to do this quickly. And I would be glad to do that on the

29th or I could do that on the 28th as well, but that's even less notice.  After that it's not until -- as a practical matter -- probably going to be December and I would rather get to this sooner rather than later.

MR. VANARSIDE:  I'm available on the 29th.

MS. LANG:  I'm not.

THE COURT:  In reality I do have another civil nonjury date, but it is the day before Thanksgiving.

MR. VANARSIDE:  I have plane tickets out of town.

THE COURT:  I understand.  It's not my first option either, I'm bringing it up just to be fair to everybody.

MR. VANARSIDE:  Let me just interject. One issue is that I hear Ms. Lang say that she may subpoena witnesses as well.  If she's subpoenaing any witnesses that are under my parties' control they live in Philadelphia and St. Thomas, US Virgin Islands.  To arrange travel from St. Thomas is not the easiest.  It's very expensive if you do it last minute.  So the more notice we have, the better off we are going to be.

I understand she likely does not want the TI in place for any longer than it needs to be.

THE COURT:  Here is the calendar that they

gave me. Y'all take a look real quick and see what you can do.

MS. LANG: So we're looking at the places where there's a hole?

THE COURT: No, we're looking at the places where it says: Civil N/J. Well, December 15th will be a little late.

MR. VANARSIDE: That was on my agenda, things to discuss with the Court. That is clearly not a realistic date.

THE COURT: If there is a date that we can all agree to to where we could hold the status quo until we can either have trial quickly or a fuller hearing with live testimony, then I'm more than willing to be flexible with you guys.

MR. VANARSIDE: As far as the temporary injunction hearing, December 15th is open for us. We're going to have witnesses come from St. Thomas. I think it makes sense to give them as much notice as possible. In terms of trial date, I think we would have to look into next year.

THE COURT: What's your opinion, ma'am? What works for you?

MS. LANG: My opinion is that given how much discovery has already happened in this case, I

think we should just be set for trial. And in the meantime, I can tell you that my understanding is all this money is in past investments that he can't access without early withdrawal penalties. So it's not like anything is really going to happen anyway, and I would just a soon go to trial.

MR. VANARSIDE: She has made a jury demand. We would have to work on some deadlines with respect to expert witness deadlines. There has been no DCO in place since we got that trial. We've been working towards the assumption that December 1 was the date but understanding that she objected to the Associate Judge. We understood that to be the Associate Judge's date. It may or may not be but a quick trial date is okay with us, as long as the provisions of the order are in place, understanding the current order requires affirmative payment into the registry of the Court, which we understand is notwithstanding the fact that that order is effective.

MS. LANG: He can't even get most of the money is the problem. Like I said, it's tied up in investments. Some of it's in a 401K. And there is no legal basis for him to take the money out.

THE COURT: Well, I understand what you're saying. So what I'm telling you is that I made my

order.  It needs to be followed.  I'm going to give you a quick trial date.  Hopefully this will be resolved and I will take up that issue again as we get closer to what we need to do or as it is brought to my attention in a written motion or we will have a hearing about it.

For right now, December 15th is the date on the table for the trial.  I will let y'all come up with your own agreed discovery deadlines, if you can, and I try not to get in the middle of that.  If not, we will intervene and do what we need to do.

But I prefer -- you know your case better than me and what's capable and what's not capable.  So Sheila, December 15th, work out an agreed docket control order and I'll sign it.

MS. LANG:  Okay.  So then we'll just have trial December 15th?

THE COURT:  I think that's the date you just picked, isn't it?

MS. LANG:  So are you just issuing the TI then?

THE COURT:  Yup.

MS. LANG:  Okay.  My client is going to probably file an appeal.  I don't know if that's going to change anything.

THE COURT:  Actually, no.  Let's think

about this because you have to understand. Sixty days doing the civil part, y'all are using -- is just like me describing some of the lingo from being a criminal practitioner. So what you're saying is: I am granting the temporary restraining order for right now. What I understood --

MS. LANG: Injunction.

THE COURT: Well, I thought y'all had a TRO.

MR. VANARSIDE: We did hear the TRO. The Associate Judge heard evidence and granted a temporary injunction which carries us through trial. She filed a de novo appeal.

THE COURT: So what I'm saying is, then, I guess if that's the case, we have two options then. I will be fine -- I'm very comfortable with my ruling. If you want to appeal you certainly can. But where we are right now is I'm trying to get you to a quick trial date and you're saying that you want to do it December 15th. If you want that -- let me think for just a second.

If you're saying you feel that strongly about it, and certainly because he has not followed the Court's -- Judge Patel's directive on this -- and you feel that strongly about it, I guess I will give you a quick trial date but I also have a full hearing. We

will wait some time. We will have Dr. Zhao come in and do that. I can grant leave at this point with your request -- and we haven't started an evidentiary part of this -- and come back next week and have a full-on hearing with Dr. Zhao.

MR. VANARSIDE: Well, counsel indicated that she is out of town.

MS. LANG: I"m in New York for another matter this week. Um --

MR. VANARSIDE: It seems to me, Judge, you've made the ruling as to extending the temporary injunction through that trial date. He can exercise whatever rights he wants to in the interim and try to get some quick relief from the Court of Appeals and that will shake out however it shakes out.

To effectuate the ruling, though, I think we do need a revised order with the new trial date and extending those terms through that date.

THE COURT: All right. You sure you don't want a chance to talk to Dr. Zhao before we get there, ma'am?

MR. VANARSIDE: We might notice his deposition, Your Honor.

THE COURT: Ma'am?

MS. LANG: My concern is that you seem to

want Dr. Zhao's testimony in order to justify the TI and I suggest that they have not presented enough evidence. And, again, I think the evidence is lacking in tremendous ways under controlling law as to their entitlement to a TI.

At that point we have no choice but to seek relief from the appellate court. We are certainly happy to go forward on the current trial date, but my client is not going to not appeal this decision.

*THE COURT:* All right then. Well, this is where we're at. We're going to get the December 15th trial date. You're going to do a docket control order and we'll be set for trial and your client will do whatever he needs to do.

*MS. LANG:* Okay.

*MR. VANARSIDE:* We'll submit to you a temporary injunction order that captures all of that including the trial date to you this afternoon.

*THE COURT:* Sounds good. Anything else?

*MR. VANARSIDE:* No, sir.

*MS. LANG:* No. Thank you, Your Honor.

*THE COURT:* We're off the record.

(End of Proceedings)

STATE OF TEXAS

COUNTY OF FORT BEND

I, Liz Wittu, Official Court Reporter in and for the 240TH District Court of Fort Bend, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid/will be paid by _____.

                          /S/ Liz Wittu_____

                          Liz Wittu, CSR
                          Texas CSR 7928
                          Official Court Reporter
                          240TH District Court
                          Fort Bend County, Texas
                          301 Jackson
                          Fort Bend, Texas 77469
                          Telephone: 281-341-8601
                          Expiration: 12/31/2015

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

XO ENERGY LLC and
XO ENERGY WORLDWIDE, LLLP
    *Plaintiffs,*

v.

LIANG "BENNY" ZHAO,
    *Defendant.*

§
§
§
§
§
§
§
§
§

CIVIL ACTION NO. 4:15-CV-00599

## PLAINTIFF XO ENERGY LLC'S ANSWERS TO
## DEFENDANT'S SECOND INTERROGATORIES

TO:    Defendant Liang "Benny" Zhao, by and through his attorneys of record, Charles A. Sturm and Shannon A. Lang, Sturm Law, PLLC, 723 Main Street, Suite 330, Houston, Texas 77002

COMES NOW, Plaintiff XO Energy LLC ("Plaintiff" or "XOE") in the above-entitled and numbered cause, by and through its undersigned attorney, and pursuant to Rule 33 of the Federal Rules of Civil Procedure, makes the following answers to the Second Interrogatories served by Defendant Liang "Benny" Zhao ("Defendant").

297

Respectfully submitted,

WINSTEAD PC

By: /s/ Tom Van Arsdel
    Tom Van Arsdel, Attorney-in-Charge
    Texas Bar No. 24008196
    SDTX No. 23492
    Zachary B. Allie
    Texas Bar. No. 24063997
    SDTX No. 1075735
    1100 JPMorgan Chase Tower
    600 Travis Street
    Houston, Texas 77002
    713.650.2728 Telephone
    713.650.2400 Facsimile

**ATTORNEYS FOR PLAINTIFFS**
**XO ENERGY LLC and XO ENERGY**
**WORLDWIDE, LLLP**

OF COUNSEL:

Winstead PC
1100 JPMorgan Chase Tower
600 Travis Street
Houston, Texas 77002
713.650.2771 Telephone
713.650.2400 Facsimile

## CERTIFICATE OF SERVICE

I certify that on the 19th day of June, 2015, a true and correct copy of the foregoing document was served via electronic mail on the following in accordance with the Federal Rules of Civil Procedure and the parties' consent to service by electronic mail:

Charles A. Strum (csturm@sturmlegal.com)
Shannon A. Lang (slang@sturmlegal.com)
Sturm Law, PLLC
723 Main Street, Suite 330
Houston, Texas 77002

/s/ Tom Van Arsdel
Tom Van Arsdel

2

298

**XO ENERGY LLC'S ANSWERS TO**
**DEFENDANT'S SECOND INTERROGATORIES**

**INTERROGATORY NO. 2:**

State and describe in detail the corporate relationship, if any, between XO Energy LLC and XO Energy Worldwide, LLLP, including but not limited to any ownership interests held by XO Energy LLC in XO Energy Worldwide, LLLP, and/or vice versa, and any authority XO Energy LLC has over the operations of XO Energy Worldwide, LLLP, and/or vice versa.

**ANSWER:**

Since January 1, 2012, XOE has provided technology and professional services to XO Energy Worldwide, LLLP ("Worldwide"). Those services include, but are not limited to, executive management and administration, product marketing and sales, information support and technology services, centralized purchasing, engineering, procurement and logistics, cost financing, customer support, test engineering, and/or quality control and product warranty. In return for XOE's services, Worldwide pays a monthly fee.

XOE has no ownership interests in Worldwide and/or vice versa. *See XOE's Answer to Defendant's Interrogatory No. 1*; *Worldwide's Answer to Defendant's Interrogatory No. 1*; *Limited Liability Company Agreement of XOE* (XOE 00331 – XOE 00341); *Second Amended and Restated Agreement of Limited Liability Limited Partnership of Worldwide* (XOE 00442 - XOE 00464).

XOE's authority over the operations of Worldwide and/or vice versa is limited to the rendering and/or receiving of the technology and professional services described above.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| XO ENERGY LLC and<br>XO ENERGY WORLDWIDE, LLLP<br>　　　Plaintiffs,<br><br>v.<br><br>LIANG "BENNY" ZHAO,<br>　　　Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 4:15-CV-00599 |

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Shawn Sheehan, declare and state as follows:

My name is Shawn Sheehan. I have read the factual allegations of Plaintiffs XO Energy LLC and XO Energy Worldwide, LLLP's Answers to Defendant Liang "Benny" Zhao's Second Interrogatories, and verify that the factual allegations contained therein are, within my personal knowledge, true and correct, except for allegations that are specifically made on information and belief.

I declare and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct within my personal knowledge.

Executed in St. Thomas, U.S. Virgin Islands on this 19th day of June, 2015.

_____
Shawn Sheehan

4829-5241-9109v.2 57970-1

300

# TECHNOLOGY & PROFESSIONAL SERVICES AGREEMENT

This Technology and Professional Services Agreement (the "Services Agreement") is made and entered into effective as of January 1, 2012-- by and between XO Energy, LLC a Delaware limited liability corporation (the "Provider"), and XO Energy Worldwide, LLLP, a US Virgin Islands Limited Liability Limited Partnership (the "Recipient").

## RECITALS

WHEREAS, Recipient is in the business of providing software services and support with it's internally developed proprietary software.

WHEREAS, Provider has the knowledge, expertise, resources, and ability to provide certain services (the "Services," as defined more fully herein) in connection with and in support of the business of Recipient;

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, the parties agree as follows:

## AGREEMENT

1.    **Provision of Services.**  The Services that are the subject of this Services Agreement are the services identified in Exhibit A hereto. Provider will provide the Services to Recipient on the terms and conditions set forth in this Services Agreement and in Exhibit A hereto. In the event of conflict between the terms and conditions set forth in this Services Agreement and those set forth in Exhibit A hereto, the latter shall govern.

2.    **Compensation and Payment.** In consideration for the Services, Recipient will pay Provider a monthly fee equal to Provider's estimated total services costs and related expenses for providing the Services hereunder during that month plus a percentage (%) of those total costs as set forth in Exhibit B hereto to be periodically updated. This fee is in accordance with the cost allocations and comparable markup analysis as maintained in the Provider's Transfer Pricing compliance documentation which is periodically revised to ensure that the markup is consistent with arm's length service providers. Provider will invoice Recipient monthly for all Services provided in the preceding month.  Payment terms shall be net 60 days of invoice.  All payments shall be made to Provider at the address listed below or such other place as Provider may designate.  All financial obligations originating from the terms and conditions of this Agreement shall be denominated in U.S. Dollars.

3.    **Intellectual Property Rights.**  As between the parties, each shall retain all rights to and interest in any and all trademarks, tradenames, patents and other proprietary or Confidential Information (as defined herein) or knowhow associated with its own products and their design, manufacture, sale and distribution (collectively, the "Intellectual Property") which it may have or acquire under license or otherwise, and each party shall have the right to use the same only in the conduct of its activities in connection with which Services are provided pursuant to this Services

Agreement. No other right or license to any Intellectual Property is granted by either party to the other by this Services Agreement, and neither party shall have the right, except as may be granted by the other party from time to time in writing, to register or attempt to register, or to assert any legal entitlement to or ownership of any of the Intellectual Property of the other.

4. **Confidential Information.** Notwithstanding any other provision of this Services Agreement, the parties agree to maintain in confidence, and not to disclose to any third party, during the term of this Services Agreement any and all Confidential Information furnished by one party to the other. "Confidential Information" of a party (the "Disclosing Party") shall mean and include the Intellectual Property and any information of any nature except for information (i) which at the time of disclosure is, or subsequently becomes, part of the public domain through no fault of the other party (the "Receiving Party"); (ii) which at the time of disclosure, is already known to the Receiving Party and that party can prove such prior knowledge, or (iii) which is subsequently disclosed on a non-confidential basis to the Receiving Party by a third party whose receipt and disclosure does not constitute a violation of any confidentiality obligation to such party. Confidential Information may include, but shall not be limited to, processes, compilations of information, records, specifications, cost and pricing information, customer lists, catalogs, booklets, technical advertising and selling data, samples, and the fact of the Disclosing Party's intent to manufacture or market any new product, and except for information which is public or general industry knowledge, all information furnished by the Disclosing Party to the Receiving Party shall be considered to be Confidential Information, whether or not specifically so designated. Recipient shall take all reasonable steps to protect the Confidential Information from unauthorized disclosure. The Receiving Party further agrees not to use any Confidential Information in any way, directly or indirectly, except as required in the course of the performance of the terms of this Services Agreement and approved by the Disclosing Party.

5. **Compliance with Laws.** Each party shall at all times and at its own expense (i) strictly comply with all applicable laws, rules, regulations and governmental orders, now or hereafter in effect, relating to its performance of this Services Agreement, (ii) pay all fees and other charges required by such laws, rules, regulations and orders and (iii) maintain in full force and effect all licenses, permits, authorizations, registrations and qualifications from all applicable governmental departments and agencies to the extent necessary to perform its obligations hereunder. Without limiting the generality of the foregoing, the parties specifically acknowledge that certain of the Intellectual Property may be subject to United States export controls, pursuant to the Export Administration Regulations, 15 C.F.R. Parts 768-799, and agree to comply strictly with all requirements of those Regulations.

6. **Term and Termination.**

6.1 **Term.** This Services Agreement shall be effective as of the day and year first set forth above and shall continue in effect until terminated by either party as provided herein.

6.2 **Termination.** This Services Agreement may be terminated at any time by the mutual consent of the parties evidenced by an Agreement in writing signed by all parties, and either party may terminate this Services Agreement on 30 days written notice to the other party. Either party may terminate this Services Agreement immediately (i) in the event a material breach of any term of this Services Agreement by the other party shall continue uncured for a period of 30 days after notice thereof is given in writing by the non-breaching party to the breaching party; (ii) upon a

302
XOE 00538

breach by the other of the provisions of Sections 4 or 5 hereof; (iii) upon the other's insolvency; or (iv) upon the other's filing of a voluntary or involuntary petition in bankruptcy, assignment for the benefit of creditors, or any comparable event or proceeding under the laws of the jurisdiction in which the other is located.

6.3 **Consequences of Termination.** Upon termination of this Services Agreement, each party shall immediately cease using all Intellectual Property of the other, cease all activities pursuant to this Services Agreement, and at the option of the other party, return or destroy all Intellectual Property in its possession, custody, or control which belongs to or which was received from the other party.

6.4 **Remedies Cumulative.** The remedies of the parties under this Agreement shall be valid or binding on the parties unless such change or modification shall be in writing signed by the party or parties against whom the same is sought to be enforced.

7. **Indemnity.** Each party agrees to indemnify, defend, and hold harmless the other and the other's shareholders, directors, officers, and affiliates from and against any and all liability, loss, damage, costs and expenses, including all attorneys' fees and costs, arising from the other's negligence or willful misconduct, breach of any provision of this Services Agreement, or infringement of any third party's proprietary rights or intellectual property by or on behalf of any person or entity, in connection with the design, manufacture, or use of the Products. Provider shall at all time carry and maintain a policy or policies of insurance of a type and in amounts reasonably necessary to protect it from third party claims and, to the extent necessary to satisfy its indemnification obligations to Recipient hereunder, assigns its rights under such policies of insurance to Recipient.

8. **Miscellaneous Provisions.**

8.1 **Relationship of the Parties.** This Services Agreement shall in no way constitute the parties hereto partners or joint venturers, and is being entered into solely for the administrative convenience of both parties. This Services Agreement is not for the benefit of any third party.

8.2 **Severability.** If any provision of this Services Agreement shall be held unenforceable, either by operation of law or otherwise, the remainder of the Services Agreement shall nevertheless remain in full force and effect, it being the intent of the parties that this Services Agreement will be deemed to have been amended by modifying such provision to the extent necessary to render it valid, legal and enforceable while preserving its intent or, if such modification is not possible, by substituting therefore another provision that is legal and enforceable and that achieves the same objective.

8.3 **No Waiver.** No express or implied waiver by any party of any provision of this Services Agreement or of any breach or default of the other party shall constitute a continuing waiver, and no waiver by any party shall prevent such party from enforcing any and all other provisions of this Services Agreement or from acting upon such other provisions or upon any other or subsequent breach or default by the other party.

303
XOE 00539

8.4     **Force Majeure.**  If the performance of any part of this Services Agreement by either party, or of any obligation under this Services Agreement, is prevented, restricted, interfered with, or delayed by reason of any cause beyond the reasonable control of the party liable to perform, unless conclusive evidence to the contrary is provided, the party so affected shall, on giving written notice to the other party, be excused from such performance to the extent of such prevention, restriction, interference or delay, provided that the affected party shall use its reasonable best efforts to avoid or remove such causes of nonperformance and shall continue performance with the utmost dispatch whenever such causes are removed.  When such circumstances arise, the parties shall discuss what, if any, modification of the terms of this Services Agreement may be required in order to arrive at an equitable solution.

8.5     **Successors and Assigns.**  This Services Agreement shall be binding on and shall inure to the benefit of the parties, Affiliates, their respective successors, successors in title, and assigns, and each party agrees, on behalf of it, its Affiliates, successors, successors in title, and assigns, to execute any instruments that may be necessary or appropriate to carry out and execute the purpose and intentions of this Services Agreement and hereby authorizes and directs its Affiliates, successors, successors in title, and assigns to execute any and all such instruments.  Each and every successor in interest to any party or Affiliate, whether such successor acquires such interest by way of gift, devise, assignment, purchase, conveyance, pledge, hypothecation, foreclosure, or by any other method, shall hold such interest subject to all of the terms and provisions of this Services Agreement.  The rights of the parties, Affiliates, and their successors in interest, as among themselves, shall be governed by the terms of this Services Agreement, and the right of any party, Affiliate or successor in interest to assign, sell, or otherwise transfer or deal with its interests under this Services Agreement shall be subject to the limitations and restrictions of this Services Agreement.

"Affiliate" or "Affiliates" shall mean any corporation, firm, partnership or other entity, whether de jure or de facto, that directly or indirectly owns, is owned by, or is under common ownership with a party to this Services Agreement to the extent of at least 50 percent of the equity having the power to vote on or direct the affairs of the entity and any person, firm, partnership, corporation or other entity actually controlled by, controlling, or under common control with a party to this Services Agreement.

8.6     **Notices.**  All notices, demands, requests, consents, statements, satisfactions, waivers, designations, refusals, confirmations, denials and other communications that may be required or otherwise provided for or contemplated hereunder shall be in writing and shall be deemed to be properly given and received (i) upon delivery, if delivered in person or by facsimile transmission with receipt acknowledged, (ii) one business day after having been deposited for overnight delivery with Federal Express or another comparable overnight courier service, or (iii) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, addressed as follows:

304
XOE 00540

If to Recipient:
**XO Energy Worldwide, LLLP**
**6501 Red Hook Plaza, Suite 201**
**St. Thomas, VI 00802**

If to Provider:
**XO Energy, LLC**
**1619 New London Rd**
**Landenberg, PA 19350**

or such other person or persons at such address or addresses as may be designated by written notice to the other parties hereunder.

      8.7    **Transferability.** Neither Provider nor Recipient shall be free to transfer the rights or obligations under this Services Agreement to any other party, whether by sale, operation of law, pledge, assignment, or otherwise, without obtaining the prior written consent of the other party.

      8.8    **Survival.** All terms and provisions of this Services Agreement intended to be observed and performed after the expiration or termination of this Services Agreement shall survive such expiration or termination, and shall continue in full force and effect.

      8.9    **Amendments.** No change, modification, or amendment of this Services Agreement shall be valid or binding on the parties unless such change or modification shall be in writing signed by the party or parties against whom the same is sought to be enforced.

      8.10    **Further Assurances.** Each party hereby covenants and agrees that it shall execute and deliver such deeds and other documents as may be required to implement any of the provisions of this Services Agreement.

      8.11    **Counterparts.** This Services Agreement may be executed in multiple copies, each of which shall for all purposes constitute Services Agreement, binding on the parties, and each party hereby covenants and agrees to execute all duplicates or replacement counterparts of this Services Agreement as may be required.

      8.12    **Costs and Expenses.** Unless otherwise provided in this Services Agreement, each party shall bear all fees and expenses required to be paid in connection with this Services Agreement or its performance hereunder.

      8.13    **Title and Captions.** Section titles or captions contained in this Services Agreement are inserted only as a matter of convenience and for reference purposes and in no way define, limit, extend or describe the scope of this Services Agreement or the intent of any provisions thereof.

      8.14    **Governing Laws.** This Services Agreement shall be deemed made in, and governed by, the laws of the State of Delaware and in the event of a dispute, each Party hereby consents to the jurisdiction of the appropriate courts of the State of Delaware to resolve such dispute.

      8.15    **Integration.** This Agreement constitutes the full and complete agreement of the parties.

305
XOE 00541

8.16    **Number and Gender.** Whenever required by the context, the singular number shall include the plural, the plural number shall include the singular, and the gender of any pronoun shall include all senders.

8.17    **Computation of Time.** Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall on a Saturday, Sunday, or any public or legal holiday, whether local or national, the person having such privilege, or to discharge such duty.

IN WITNESS WHEREOF, the parties have caused this Services Agreement to be executed by their duly authorized representatives, effective as of the day and year first written above.


**XO ENERGY, LLC**


By: _____
Name: SHAWN SHEEHAN
Title: SOLE MEMBER


**XO ENERGY WORLDWIDE, LLLP**


By: _____
Name: SHAWN SHEEHAN
Title: SOLE MEMBER OF GENERAL PARTNER

306
XOE 00542

## EXHIBIT "A"

## <u>Technical Services</u>

Service Category                                                          Initials/Date

- ☐ Executive management & administration          _____/_____
- ☐ Product marketing and sales          _____/_____
- ☐ Information support services (information technology)          _____/_____
- ☐ Centralized purchasing (including supplier identification and qualification, materials management and inbound logistics)          _____/_____
- ☐ Engineering (product design, customization, process engineering, and technical support and similar services)          _____/_____
- ☐ Procurement and logistics          _____/_____
- ☐ Finance (50% of cost to be charged)          _____/_____
- ☐ Customer support          _____/_____
- ☐ Test engineering          _____/_____
- ☐ Quality control and product warranty          _____/_____
- ☐ Authority to negotiate sales contracts on Recipient's behalf          _____/_____

307



XOE 00543

## EXHIBIT "B"

The services fees are determined based on a cost allocation with or without a markup depending on the service.

For the current period, services that are subject to a markup will be marked up by 14.1%.

308
XOE 00544